David J. Meiselman (DM-6621)
James R. Denlea (JD-4610)
Jeffrey I. Carton (JC-8296)
MEISELMAN, DENLEA, PACKMAN,
   CARTON & EBERZ P.C.
1311 Mamaroneck Avenue
White Plains, New York 10605
(914) 517-5000
*Attorneys for Plaintiff*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————X
                                                        :
JACOBY & MEYERS, LLP, on behalf of itself and all       :
other similarly situated entities authorized to practice :   Civil Action No.
in the State of New York, and JACOBY & MEYERS           :    CV –11-3387 (LAK)
USA, LLC,                                                :
                                                        :
                                                        :
                                                        :
                                                        :
                     Plaintiffs,                        :   **AMENDED COMPLAINT**
                                                        :   **FOR DECLARATORY**
                                                        :   **AND INJUNCTIVE RELIEF**
          v.                                            :
                                                        :
THE PRESIDING JUSTICES OF THE FIRST,                    :
SECOND, THIRD AND FOURTH DEPARTMENTS,                   :
APPELLATE DIVISION OF THE SUPREME                       :
COURT OF THE STATE OF NEW YORK,                         :
                                                        :
                     Defendants.                        :
———————————————————————X

          Plaintiffs JACOBY & MEYERS, LLP and JACOBY & MEYERS USA, LLC

(collectively "Jacoby & Meyers"), on behalf of themselves and all others authorized to

practice law in the State of New York, by their attorneys, MEISELMAN, DENLEA,

PACKMAN, CARTON & EBERZ P.C., as and for their Amended Complaint against

defendants The Presiding Justices of the First, Second, Third and Fourth Departments

of the Appellate Division of the Supreme Court of the State of New York ("Defendants"),

allege, with personal knowledge as to their own actions and upon information and belief as to those of others, as follows:

## NATURE OF THE ACTION

1.   This class action seeks to redress an antiquated proscription which is restricting the public's right of access to affordable, quality representation, and correlatively violating the right of New York State attorneys – and the right of out-of-state attorneys subject to the extraterritorial reach of New York's Rules of Professional Conduct – to associate with and represent others to ensure meaningful access to the Courts.

2.   Indeed, the American Bar Association's "ABA Commission on Ethics 20/20" is currently soliciting comments on alternative business structures for the practice of law and has specifically inquired whether such changes would "enhance access to legal services for those otherwise unable to afford them."  This realization by the ABA echoes the central issue in this litigation.

3.   While the ABA's inquiry turns on a matter of policy, this complaint seeks an authoritative judgment by an Article III Court as to the Constitutional boundaries of legitimate constraints on the structure of law firms.  In addition to affording redress for the Constitutional violations currently being perpetrated against Jacoby & Meyers, the by-product of such a ruling on the Constitutional issues presented will provide a critical, binding pronouncement on pertinent questions of the highest current importance to the legal profession and the public.

4.   For nearly half a century, Jacoby & Meyers has been the pioneer and at the vanguard of ensuring the availability of quality legal services at a reasonable cost to

those most in need of it -- the lower and middle classes: working individuals who would have no access to the legal system absent firms like Jacoby & Meyers.  Unfortunately, however, Jacoby & Meyers' ability to raise the capital necessary to pay for improvements in technology and infrastructure, and to expand its offices and hire additional personnel, is severely impeded by an unreasonably restrictive Rule of Professional Conduct.

5.    Specifically, Rule 5.4 of New York's Rules of Professional Conduct bars, among other things, a lawyer from practicing "with or in the form of an entity authorized to practice law for profit, if . . . <u>a non-lawyer owns any interest therein</u> . . ." (emphasis added).  Stated otherwise, Rule 5.4 prevents Jacoby & Meyers and others licensed to practice law in New York from raising capital in exchange for owning an interest in law firms.  As a result, critical sources of funding are unavailable to lawyers in New York (and to many lawyers whose principal offices are out of state) which dramatically impedes access to legal services for those otherwise unable to afford them and correlatively impedes the attorneys' right to associate in order to represent such parties.

6.    It cannot credibly be disputed that advancements in technology, the proliferation of on-line business, and outsourcing to global markets are having a profound effect on the practice of law in the 21st century and on lawyers' ability to ensure that quality legal services remain available for all.  It is axiomatic that access to capital ensures access to the civil justice system, particularly for those disenfranchised or otherwise challenged by difficult socio-economic constraints.

7.    The present system perpetuates economic inequity at every level of practice. The small practice does not have access to the capital markets that the Wall Street

firms have and the Wall Street firms do not have access to the funding sources that firms in the U.K., Australia, and the District of Columbia have.[1]  This inequality has the obvious economic impact of artificially constraining firms in the practice of law.  Yet there are less obvious casualties of Rule 5.4 – namely, the individuals, groups or businesses that are deprived of cost-efficient, technologically advanced access to the legal system.  Simply put, the practice of law in the United States is now lagging considerably behind other English speaking countries (including the very one on which our legal system was modeled), in which similar investment prohibitions have been turned aside.

8.  Both Australia and the United Kingdom allow for non-lawyer ownership in law firms and similar State-only (e.g. North Carolina) legislative efforts are underway domestically.  Indeed, one need not look overseas to find jurisdictions whose regulation of the legal profession manifestly demonstrates – in actual regulatory practice, not just in policy proposals – that there are means to achieve the state's putative interests in regulating professional ethics in a manner less burdensome on the fundamental rights enumerated herein.

9.  For instance, the District of Columbia already permits non-lawyer ownership to the extent of a 25% interest in a firm.  Notably, the claimed evils most often advanced by critics of  outside, non-lawyer investment – the purported harm to clients' confidences and to lawyers' independent judgment – have not materialized in the wake of others' efforts to allow such outside investments.  However, Jacoby & Myers and

---

[1]  As discussed below, the formal right of District of Columbia attorneys to gain non-lawyer investment is neutralized by the illegitimate extraterritorial reach of Rule 5.4. Even the many powerful firms based in that critical market for legal services are loath to obtain non-lawyer investment in light of the restrictions imposed in other markets, such as New York State.

other class members are not permitted to organize in the District of Columbia (or any other jurisdiction) that allow non-lawyer investment – if they wish to practice (or simply be admitted) in New York State, by virtue of the extraterritorial reach of New York's Rule 5.4.

10.   Rule 5.4 substantially burdens the fundamental right of legal service providers to associate with others and to represent clients for purposes of accessing the courts and asserting legal entitlements.  There are no compelling or rational grounds for preventing lawyers from raising capital in the same manner as any other business; and there are alternative regulatory means to achieve any putative legitimate state purposes that Rule 5.4 otherwise seeks to advance.

11.   Jacoby & Meyers therefore seeks a declaratory judgment that Rule 5.4, insofar as it applies to law firms that either are presently organized in the form of limited liability companies or are prepared immediately to organize in the form of limited liability companies for purposes of consummating non-lawyer investment (1) violates the First Amendment to the United States Constitution, as incorporated in the Due Process Clause of the Fourteenth Amendment and thereby made applicable to the States; (2) violates the void for vagueness doctrine under the Due Process Clause of the Fourteenth Amendment and the First Amendment; (3)  excessively burdens the flow of interstate commerce in violation of the United States Constitution's Dormant Commerce Clause; (4) violates Substantive Due Process rights contained in the Fourteenth Amendment to the United States Constitution; and (5)  violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Jacoby &

Meyers also seeks an injunction against defendant's enforcement of Rule 5.4 against it and other similarly organized legal service providers.

12.   By this action, Jacoby & Meyers seeks to free itself and other class members of the shackles that currently encumber their ability to raise outside financing and to ensure that Jacoby & Meyers and other class members are able to enter into associations based on the Constitutionally protected relationship between legal representatives and represented parties, for purposes of securing access to the courts.

## THE PARTIES

13.   Plaintiff Jacoby & Meyers, LLP is a New York-based law firm with eleven offices located throughout the State – in Manhattan, the Bronx, Hempstead, Kingston, Middletown, New Windsor, Newburgh, Port Jervis, Queens, Spring Valley, Staten Island and Wappingers Falls.  The firm also operates offices in New Haven, Connecticut and in Edison and Newark, New Jersey.  Significantly, the location of the firm's offices reflects a commitment to the types of communities that most need cost-effective legal services. The firm employs nearly 100 professionals.  The firm represents New York and out-of-state clients in actions and transactions involving parties from New York and other States.  A substantial portion of the firm's revenues and expenses are generated through interstate commerce.  In the course of their practice, the firm's attorneys and non-lawyer employees frequently move across State lines.[2]

_____

[2]  As described below, however, Rule 5.4, as applied to law firms either presently organized in the form of limited liability companies or prepared immediately to organize in the form of limited liability companies for purposes of immediately seeking and obtaining non-lawyer investment, substantially reduces the interstate flow of capital, goods, services, and people by denying the firm access to the national capital market and thereby dampening the economic activity of it and other class members.

14.   Although the corporate form of entity through which Jacoby & Meyers presently exists is a limited liability partnership, Jacoby & Meyers has recently created Jacoby & Meyers USA, LLC, a New York limited liability company, for the express purpose of allowing non-lawyers to "own an interest" in the entity through which Jacoby & Meyers is authorized to practice law for profit.  Jacoby & Meyers, LLP is prepared immediately to transfer all of its assets to Jacoby & Meyers USA, LLC and immediately obtain non-lawyer investment – as soon as Rule 5.4's blanket suppression of non-lawyer ownership of an interest in law firms is declared unconstitutional and its enforcement permanently enjoined.

15.   Defendants, The Presiding Justices of the First, Second, Third and Fourth Departments, Appellate Division of the Supreme Court of the State of New York, are responsible for implementing and enforcing the Rules of Professional Conduct, which govern the conduct of attorneys licensed to practice law in the State of New York.  (N.Y. Judiciary Law § 90(2)).  The Appellate Division is authorized to censure, suspend, or disbar lawyers guilty of "professional misconduct, malpractice, fraud, deceit, crime or misdemeanor, or any conduct prejudicial to the administration of justice."  *Id.*

## JURISDICTION AND VENUE

16.   This Court has jurisdiction over this action under the Constitution of the United States of America and the Amendments thereto and pursuant to 28 U.S.C. §§ 1331 and 1343.

17.   Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because (1) at least one defendant resides in this District and all defendants reside in this State; (2) a

substantial part of the events giving rise to the claim occurred in this District; and (3) at least one defendant is found in this District.

## THE RELEVANT FACTS

### A.    New York's Rule of Professional Conduct 5.4

18.    On or about December 16, 2008, then-Chief Judge Judith S. Kaye, the Chief Judge of the New York Court of Appeals, and the Presiding Justices of the Appellate Division announced a new set of attorney conduct rules for New York.  These new Rules of Professional Conduct, effective April 1, 2009, were issued as Joint Rules of the Appellate Divisions, and constitute Part 1200 of the New York Court Rules. These rules expressly supersede the Disciplinary Rules which had previously governed the conduct of New York attorneys.  The new Rules of Professional Conduct are based upon the American Bar Association Model Rules that have been implemented in virtually every jurisdiction in the United States, with the critical exception of a jurisdiction which is the seat of many of the most powerful law firms in the country – namely, the District of Columbia.

19.    The Rules of Professional Conduct apply to all attorneys admitted to practice in New York State (either generally or for purposes of a particular proceeding), including out-of-state or foreign attorneys, regardless of where the attorneys' conduct occurs.  *See Rule 8.5: Disciplinary Authority and Choice of Law.*

20.    Rule 5.4 addresses the "Professional Independence of a Lawyer."  Rule 5.4 provides as follows:

(a)    A lawyer or law firm shall not share legal fees with a nonlawyer, except that:

(1)    an agreement by a lawyer with the lawyer's firm or another

8

lawyer associated in the firm may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;

(2)   a lawyer who undertakes to complete unfinished legal business of a deceased lawyer may pay to the estate of the deceased lawyer that portion of the total compensation that fairly represents the services rendered by the deceased lawyer; and

(3)   a lawyer or law firm may compensate a non-lawyer employee or include a nonlawyer employee in a retirement plan based in whole or in part on a profit-sharing arrangement.

(b)   A lawyer shall not form a partnership with a non-lawyer if any of the activities of the partnership consist of the practice of law.

(c)   Unless authorized by law, a lawyer shall not permit a person who recommends, employs or pays the lawyer to render legal service for another to direct or regulate the lawyer's professional judgment in rendering such legal services or to cause the lawyer to compromise the lawyer's duty to maintain the confidential information of the client under Rule 1.6.

(d)   A lawyer shall not practice with or in the form of an entity authorized to practice law for profit, if:

(1)   a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration;

(2)   a nonlawyer is a member, corporate director or officer thereof or occupies a position of similar responsibility in any form of association other than a corporation; or

(3)   a nonlawyer has the right to direct or control the professional judgment of a lawyer.

Rule 5.4 (emphasis added)

21.   As a result of this rule, Jacoby & Meyers cannot allow a non-lawyer to acquire or own an interest in the legal entity (i.e., the law firm) through which it provides legal services to its clients.

B.    **Jacoby & Meyers Pioneers Legal Services For All**

22.    Jacoby & Meyers was founded in September 1972 when Stephen Z. Meyers and Leonard D. Jacoby, law school classmates at UCLA, opened their first storefront office in Van Nuys, California.  In creating their law practice, Messrs. Jacoby and Meyers sought to ensure that people of modest or average means, who could often not afford to hire a lawyer, had a practical alternative to obtain competent, qualified counsel at reasonable rates.

23.    Since the firm began its operations nearly forty years ago, Jacoby & Meyers has become synonymous with legal services for the masses and has been at the vanguard in overturning obstacles that impede robust competition for lawyers, including attorney advertising.

24.    Ardent believers in attorneys' rights to freedom of speech and the public's right to be informed of worthwhile new concepts in the practice of law that could lower the cost of obtaining legal representation, Jacoby & Meyers helped spark an international debate that lasted for years, and ultimately culminated in a California Supreme Court decision in 1977, applying the founders' rights of free speech and the public's right to be informed.  A month later, the United States Supreme Court banned prohibitions on legal advertising in the seminal case of Bates v. State Bar of Arizona, 433 U.S. 350 (1977).

25.    Immediately after the issuance of the Bates decision, Jacoby & Meyers placed a full-page advertisement in the Los Angeles Times, and within weeks, the firm aired the first television commercial in the country advertising legal services.

26.   Jacoby & Meyers has continued to innovate through the years – all in an effort to help provide quality legal services to clientele at reasonable fees.  Jacoby & Meyers opened branch offices in retail shopping centers, maintained Saturday and evening office hours, and was the first law firm to accept credit cards for payment.

27.   The firm developed detailed written systems, to standardize the handling of cases, expediting the progress of the case and allowing for more efficiency and quality control.  For example, the firm developed detailed pre-printed forms for interview intakes, and created standard form pleadings and other legal documents which assured quality control.  This also allowed for paralegals to begin much of the initial drafting at much more reasonable prices, subject to attorneys' oversight, and finalization.

28.   Similarly, the firm took an innovative approach to hiring.  The firm employed lawyers whose practices were devoted to a particular area of the law such as bankruptcy, personal injury, or criminal law, and then assigned these specialists to multiple offices.  This approach allowed the firm's clients to receive the services of lawyers with specialized knowledge who covered multiple offices throughout a particular geographic area, rather than the services of general practitioners, as was usually the case with traditional small firms.  Jacoby & Meyers set standard fees for basic services and provided clients with a written estimate of the fee, in advance.

29.   Jacoby & Meyers continues to practice law in an innovative fashion, and maintains a network of affiliated law offices across the country, including in Southern California, New York, Alabama, Florida, and Arizona.

30.   More significantly, throughout its forty year history, Jacoby & Meyers has always comported itself with the highest regard for its ethical and professional

responsibilities and has zealously represented the nearly one million clients it has been

privileged to serve.  Jacoby & Meyers holds its individual practitioners to the highest

ethical standards and over the past four decades has demonstrated the independence

of professional judgment that it will continue to exhibit *regardless* of the source of

outside capital it is permitted to pursue.

**C.**    **Jacoby & Meyers Requires Additional, Outside Capital**

31.   Jacoby & Meyers intends to expand its operations, hire additional attorneys

and staff, acquire new technology, and improve its physical offices and infrastructure to

increase its ability to serve its existing clients and to attract and retain new clients and

qualified attorneys.  Notably, Jacoby & Meyers' business plans principally concern

expansion within communities in which working-class, blue-collar and immigrant families

reside.  Indeed, as Chief Judge Jonathan Lippman remarked in his 2011 State of the

Judiciary Speech, it is often "the most vulnerable in our society" for whom the

courthouse doors must be kept open.

32.   As Justice Lippman explained:

> Every day in our courthouses we see the fallout from the economic
> downturn reflected in dockets surging with new foreclosure, eviction,
> family offense, consumer debt and criminal cases.  This flood of cases
> carries with it the futures of millions of New Yorkers -- -- many of limited
> means, including families, children and the most vulnerable members of
> our society – all seeking justice and often fighting for life's most basic
> needs, people who have nowhere else to turn to but the courts to protect
> their fundamental rights.  They come in record numbers at the very time
> that courts and judges are stretched thinnest, when New York's
> economy and business climate are at their weakest.  And it is our
> constitutional obligation -- -- ours alone -- -- to hear and resolve every
> single one of these matters with fairness, speed and wisdom.  It is
> precisely when the economy falters that commercial disputes ripen into
> lawsuits, and their speedy resolution can make the difference between a
> healthy business climate and a hostile one.  It is precisely when the
> economy stagnates that the courts become society's emergency room,

dealing with the most intractable of human disputes -- -- foreclosures and evictions, family violence and abuse, crime, delinquency, divorce, child custody and  support, and on and on.  These are the moments that matter most.

33.   In order to ensure the public's greatest possible access to legal representation and protection of their rights through the civil justice system in an affordable, cost-effective way, Jacoby & Meyers requires a substantial infusion of new capital.  Because of the proscriptions of Rule 5.4, however, law firms such as Jacoby & Meyers have been relegated to obtaining capital from (i) the personal contributions of the partners, (ii) retained earnings on fees generated and collected, and (iii) commercial bank loans, with onerous rates of interest.

34.   In these challenging economic times, these "normal" channels for capital infusion are either too expensive or unavailable to fund Jacoby & Meyers' and other class members' intended business plans.  Because of the proscriptions of Rule 5.4, Jacoby & Meyers has been unable to entertain the numerous offers it has received from prospective non-lawyer investors, both within and without the State, who are prepared to invest capital in exchange for owning an interest in the firm.

35.   Specifically, several high net-worth individuals including, but not limited to, Michael Ostrow, Anthony Costa, and Philip Guarnieri, as well as several institutional investors whose identities Jacoby & Meyers has been asked to keep confidential have expressed their commitment to invest significant sums of money in Jacoby & Meyers in exchange for owning an interest (specifically, a share of the anticipated profits) in the entity through which Jacoby & Meyers practices law.  Each of these investors understands that the law firm shall be managed by "managers" (and not its members), each of whom is an attorney duly licensed to practice law in New York, that the duties

and responsibilities of these managers shall be set forth in the law firm's articles of organization, and that the managers shall ensure that client confidences and the lawyers' independence of professional judgment are at all times preserved.

36.    In order to help facilitate these investments, Jacoby & Meyers has filed and registered with New York State the initial articles of organization of Jacoby & Meyers USA, LLC, a limited liability company to which Jacoby & Meyers is prepared immediately to transfer all of its assets to continue its practice of law.  But for the proscriptions of Rule 5.4, however, Jacoby & Meyers would have already consummated these investments and allowed non-lawyers to own an interest in the legal entity through which it practices law.

**D.    No Legitimate Rationale Exists To Prevent Non-Lawyers From Owning An Interest In A Law Firm**

37.    Under existing regulatory constraints, law firms have strained to self-finance their operations through partners' capital contributions, cash flow, and bank loans. New York's Rule 5.4 expressly bars lawyers and law firms from raising capital for their law firms from outside non-lawyer investors through sales of ownership interests in their firms or from engaging in fee sharing agreements with non-lawyers.   While there are similar legal ethics rules in other states, one national center of legal service provision – the District of Columbia – stands in the vanguard of domestic and international jurisdictions that have rejected the arbitrary and insubstantial grounds for maintaining such obsolete rules.  But New York's Rule 5.4 reaches across state lines and bars even the powerful law firms headquartered in the District of Columbia from taking non-lawyer investment, if those firms are admitted to practice in New York State, as many such firms are.

38.   The ostensible "ethical" constraints prohibiting non-lawyer ownership of law firms and fee-sharing with non-lawyers are substantial impediments to law firms' ability to raise capital not only to fulfill the Constitutional right of low-income clients to representation, but also to compete in the increasingly interstate and global marketplace for legal services.  Indeed, in recent years, Australian and British legislators have recognized that rules barring non-lawyer ownership and management of law firms are antiquated and negatively impact the practice of law.  In response, Australia enacted the Legal Profession Act in 2004 which allows non-lawyers to own shares in Australian law firms.  In May 2007, the Australian law firm Slater & Gordon completed an initial public offering of stock in its firm, becoming the first publicly-traded law firm in the world.  In the United Kingdom, the forebearer of the American legal system, Parliament has enacted the Legal Services Act of 2007, which will enable non-lawyers to obtain ownership stakes in British law firms.

39.   The inexpensive infusions of capital now available to Australian and British law firms resulting from the elimination or liberalization of obsolete, unjustified restrictions on non-lawyer investments in law firms give Australian and British law firms distinct competitive advantages in practicing law in an ever-increasing global legal marketplace.

40.   More significantly, the parade of horrors predicted by critics of non-lawyer investment in law firms has not materialized.  The fear that lawyers' professional judgment and independence will be eroded and that non-lawyers cannot understand the ethical considerations of lawyers, or that such outside investors will be motivated only by anticipated profits and the return on their investment, has proven to be unfounded.

In fact, as described by modern-day academics and legal scholars, "a law firm's goal of making a profit and its duty to provide competent, ethical representation to its clients are not in opposition to each other; a law firm can only maximize its profits by providing competent, quality, ethical representation." Bish, Matthew, "Revising Model Rule 5.4: Adopting A Regulatory Scheme That Permits Non Lawyer Ownership And Management of Law Firms," Washburn Law Journal, 48 WBNLJ 669, 694 (2009).

41.   Indeed, providing ethical, competent representation and making a profit are not mutually exclusive propositions.  Law firms have been doing that for centuries.  That is, the putative pressures to achieve profitability at the "expense" of professional ethics are even stronger when lawyers directly take profits than when profits are taken by outside investors insulated by appropriate regulations from placing pressure on the legal practice.  It is arbitrary and irrational to bar the lesser purportedly "perverse" incentive while maintaining the stronger.  And the recent experiences of Australia and the United Kingdom in fact provide a panoply of regulatory safeguards that can be implemented to ensure that outside investors do not interfere with attorneys' professional obligations.

42.   Whether regulating law firms with outside investors through independent licensing bodies, imposing restrictions on the amount or type of interest non-lawyers can own, or requiring a legal practice with non-lawyer owners to appoint a legal director responsible for the management, oversight and compliance of lawyers' professional obligations, there are innumerable ways in which to ensure that a lawyer's professional "independence of judgment" remains resolute.

43.   The time has come to permit non-lawyers to own an interest in law firms in New York and in the United States, following the vanguard jurisdictions in the United

States and overseas.  This is not just a matter of good policy.  It is a Constitutional mandate.

## CLASS ACTION ALLEGATIONS

44.   Jacoby & Meyers brings this action on its own behalf and on behalf of all others similarly situated pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.  The action is brought on behalf of a class (the "Class") defined as all entities and persons licensed to practice law in the State of New York and either presently organized in the form of a limited liability company or prepared to immediately organize in the form of a limited liability company for purposes of obtaining investment from non-lawyers.

45.   This action is brought as a class action for the following reasons:

a.   Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

b.   The claims asserted by Jacoby & Meyers are typical of the claims of the members of the Class.

c.   Jacoby & Meyers will fairly and adequately protect the interests of the Class, and Jacoby & Meyers has retained attorneys experienced in class action litigation and complex litigation.

## STANDING AND RIPENESS

46.   As set forth above, Jacoby & Meyers' standing to pursue this action is amply established by its inability, pursuant to Rule 5.4, to allow non-lawyers to own an interest

in the limited liability company it has created and through which it is otherwise prepared immediately to practice law and to obtain investment from identified non-lawyers already committed to doing so.

47.   The blanket suppression of non-lawyer ownership of an interest in a law firm organized as a limited liability company increases the cost of raising capital, and constitutes an actual, cognizable injury, proximately caused by Rule 5.4 and redressable by the relief sought below.  Such a disability readily gives rise to Article III standing.  An injury is being suffered by existing law firms such as Jacoby & Meyers and therefore requires no determination as to whether hypothetical actors not yet engaged in the practice of law would have standing on the grounds that Rule 5.4 forecloses a profitable business opportunity to such hypothetical actors.

48.   Similarly, no further delay to await new events is required as the court would be in no better position to adjudicate the issues in the future than it is now.  Likewise, given the credible threat of a disciplinary proceeding being prosecuted against Jacoby & Meyers if it were to transfer all of its assets to, and allow a non-lawyer to own an interest in, the limited liability company it has created to practice law, Jacoby & Meyers should not be required to await and undergo a prosecution with its resultant licensure implications as the sole means of seeking relief.

49.   Stated otherwise, Jacoby & Meyers should not be forced to choose between "the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believes to be constitutionally protected activity."

50.   Accordingly, its claims are ripe for adjudication and it has standing to prosecute this action.

51.   Likewise, there is no New York State law, other than Rule 5.4, that prohibits non-lawyer investors from investing in a limited liability company that provides legal services.  There is also no issue of New York State law that puts into question the validity of Rule 5.4 as a matter of New York State law.[3]  Hence, there is no basis for the court to abstain from deciding the merits of Jacoby & Meyers' Federal Constitutional claims, since there are no unsettled issues of State law that, once settled, would obviate the Court's exercise of its duty under the Supremacy Clause to enforce the United States Constitution by declaring infirm, and enjoining the enforcement of, an unconstitutional State law causing both present and imminent proximate harm to the plaintiffs.

### FIRST CLAIM
### (Violation of First Amendment)

52.   Jacoby & Meyers repeats and realleges the allegations contained in Paragraphs 1-51 above as if fully set forth herein.

53.   Rule 5.4 creates an artificial, unnecessary and unreasonable blanket suppression of non-lawyers' ownership of an interest in a law firm organized in the form of a limited liability company.  That blanket suppression serves neither a compelling nor a substantial state interest, and is not the least burdensome means of achieving any putative state interest.  The First Amendment to the Constitution of the United States, as incorporated in the Fourteenth Amendment and thereby made applicable to the States, protects the fundamental right of access to the courts, the right of a party to

---

[3] The Attorney General of the State of New York has conceded this point, in earlier proceedings conducted in this case.  See *Transcript of Oral Argument on Defendant's Motion to Dismiss, 11 Civil 3387 (November 3, 2011), at page 12.*

obtain representation by attorneys, the correlative right of attorneys to serve as representatives, and the right of collective associations, including non-profit or for-profit corporations, to secure each of the former rights. The First Amendment therefore protects associations of people to help meet the costs of legal representation to ensure access to the legal system.

54.   In violation of the First Amendment, Rule 5.4 prohibits those in the legal profession presently organized in the form of a limited liability company or prepared immediately to organize in the form of a limited liability company, and those wishing to invest in the practice of law, from freely associating in the service of ensuring parties' legal representation and access to the courts. There is no compelling State interest for such encroachments on First Amendment rights. Even if there were a compelling State interest, there are alternative means for achieving such putative interests that encroach less on First Amendment freedoms. Such alternative means are not imaginary. They are manifestly demonstrated – although by no means exhausted – by the actual regulatory schemes enacted in jurisdictions that already permit non-lawyer investment in law firms.

55.   Jacoby & Meyers is suffering irreparable harm caused by the violations of the First Amendment.

## SECOND CLAIM
### (Void For Vagueness)

56.   Jacoby & Meyers repeats and realleges the allegations contained in Paragraphs 1-55 above as if fully set forth herein.

57.   Under the Due Process Clause of the Fourteenth Amendment and the First Amendment, in order for a statute, rule or regulation that touches on First Amendment

interests to be valid, it must be specifically drawn so as to provide a legitimate, clear meaning, in a manner that prevents arbitrary enforcement.  Rule 5.4 violates the void for vagueness standard and impacts a fundamental First Amendment right.

58.   Rule 5.4 provides for a blanket suppression of non-lawyer ownership of an interest in law firms organized in the form of a limited liability company.  Specifically, Rule 5.4 prohibits the ownership of "any interest" by a non-lawyer in an entity authorized to practice law for profit.  While Rule 5.4 clearly bars non-lawyer ownership of interests in law firms organized in the form of a limited liability company, Rule 5.4 is severely ambiguous on the question of precisely *which* types of "ownership interests" in such limited liability companies might run afoul of Rule 5.4's proscription.

59.   The vagueness associated with Rule 5.4 has a chilling effect on lawyers' (and potential litigants') exercise of their First Amendment freedoms of speech and association for fear of being disciplined or prosecuted for ethics violations.  Accordingly, the Court should declare Rule 5.4 unconstitutionally void for vagueness, and should enjoin its enforcement against law firms either presently organized as limited liability companies or prepared to immediately organize as limited liability companies for purposes of immediately seeking and obtaining non-lawyer investment.

60.   Jacoby & Meyers is suffering irreparable harm caused by these violations of the Due Process Clause and the First Amendment.

### THIRD CLAIM
### (Violation of the Dormant Commerce Clause)

61.   Jacoby & Meyers repeats and realleges the allegations contained in Paragraphs 1- 60 above as if fully set forth herein.

62. Article I, Section 8, of the United States Constitution grants Congress the power to "regulate Commerce among the several States." The "dormant" or "negative" aspect of the Commerce Clause prohibits States from enacting and enforcing laws that (a) unduly burden the free flow of interstate commerce, (b) reach across state lines to regulate out-of-state entities and activities, or (c) discriminate against out-of-state actors in favor of in-state actors. In addition, the United States Supreme Court has devised special rules of standing, which permit in-state actors to assert claims grounded in Dormant Commerce Clause violations against out-of-state actors, if the latter violations cause indirect harm to the in-state actors (that is, even if the in-state plaintiff is not the proximate victim of state discrimination against out-of-state actors).

63. Rule 5.4 of the New York Rules of Professional Conduct, as currently enacted, prohibits Jacoby & Meyers from obtaining the necessary capital infusion from non-lawyer investors required to fund and expand its operations, as set forth above.

64. The deprivation of this investment opportunity excessively burdens interstate commerce relative to any putative local benefit it might otherwise advance.

65. The flow of capital across State lines constitutes interstate commerce. Many non-lawyer investors wishing to invest in law firms organized in the form of limited liability companies are inevitably located in States that differ from the States in which law firms (either presently organized as limited liability companies or prepared to immediately organize as limited liability companies for the purpose of obtaining non-lawyer investment) are located. Moreover, both single-state and multi-state law firms organized in the limited liability company form and obtaining low-cost infusions of capital

from non-lawyers would expand their operations, causing increased interstate flows of goods and services purchased by such law firms and sold by such law firms.

66.   For similar reasons – that is, by increasing the cost of capital and thereby restricting the expansion of legal services – Rule 5.4 substantially dampens the flow of lawyers and law-firm employees across State lines. Since Rule 5.4 manifestly and substantially burdens the flow of capital, goods, services, lawyers, and employees across state lines, it substantially burdens the flow of interstate commerce.  Such burdens are clearly excessive in relation to any putative New York State interest served by Rule 5.4.

67.   Moreover, there are alternative means for achieving any such putative state interest that impose lesser burdens on the interstate flow of commerce. Unless the proscriptions of Rule 5.4 against non-lawyer ownership of an interest in a law firm organized in the form of a limited liability company are declared invalid and enforcement of the provisions enjoined, the provisions will continue to interfere substantially with the free flow of interstate commerce in violation of the Commerce Clause.

68.   New York State law proscribes not only *in-state* law firms organized in the form of limited liability companies to receive capital from non-lawyer investors.  It also proscribes *out-of-state* law firms organized in the form of limited liability companies to receive capital from non-lawyer investors, if those firms are admitted to practice in New York State.  This proscription applies, even if the firm is not actually practicing in New York State.  Rule 5.4 therefore reaches across state lines to regulate out-of-state actors. This constitutes extraterritorial regulation that violates the Dormant Commerce Clause.

69.  It also constitutes discrimination against out-of-state investors and against out-of-state law firms either presently organized as limited liability companies or prepared immediately to organize as limited liability companies for purposes of obtaining non-lawyer investment, since those firms must reorganize their financial structure if they wish to be admitted or to practice in New York State.  In-state law firms presently organized as limited liability companies (or prepared to immediately organize in such form) are indirectly harmed by such violations and thereby have standing to challenge such out-of-state regulation and such discrimination, under the special standing rules applicable to the Dormant Commerce Clause.

70.  Jacoby & Meyers is suffering irreparable harm caused by these violations of the Dormant Commerce Clause.

## FOURTH CLAIM
### (Violation of the U.S. Constitution Due Process Clause)

71.  Jacoby & Meyers repeats and realleges the allegations contained in Paragraphs 1-70 above as if fully set forth herein.

72.  The proscriptions of Rule 5.4 of the New York Rules of Professional Conduct are arbitrary and capricious.  The restrictions preventing a non-lawyer from owning an interest in a law firm presently organized in the form of a limited liability company or prepared to immediately organize in the form of a limited liability company serve no legitimate state interest, and/or to the extent such a legitimate state interest exists, Rule 5.4 is not a rational means to serve that interest.

73.   Alternatively, to the extent that Rule 5.4 abridges a fundamental right under Substantive Due Process, it neither serves a compelling state interest, nor is it fashioned with the least restrictive means possible.

74.   Consequently, Rule 5.4 violates Jacoby & Meyers' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

75.   Jacoby & Meyers is suffering irreparable harm caused by these violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### FIFTH CLAIM
**(Violation of Equal Protection)**

76.   Jacoby & Meyers repeats and realleges the allegations contained in Paragraphs 1-75 above as if fully set forth herein.

77.   The proscriptions of Rule 5.4 of the New York Rules of Professional Conduct bar non-lawyers from owning *any* interests in law firms organized in the form of limited liability companies (however ambiguous and vague the precise definition of "interests" may be).  Other professions in New York have no such barriers to capital investment.  For instance, investment bankers face no restrictions on capital ownership in their firms.  Yet they, like the lawyers they work with on a daily basis on the same transactions, deal with the most sensitive of corporate secrets and proprietary information, must preserve client confidentiality, and must guard assiduously against conflicts of interest that might disadvantage their clients.

78.   Because they face no barriers to outside investors, investment banking firms have been able to amass enormous capital through public offerings of their stock

which they can then use to fund and expand their businesses. As a result, investment banks such as Goldman Sachs & Co. and Morgan Stanley, Inc., formerly privately-held partnerships, have become publicly-traded financial juggernauts. Indeed, Goldman Sachs has a current market capitalization of approximately $84 billion and nearly 40,000 employees worldwide, and Morgan Stanley has a current market capitalization of approximately $40 billion, with 62,000 employees around the world.

79.   The restrictions barring non-lawyer ownership interests in law firms either presently organized in the form of limited liability companies or prepared immediately to organize in the form of limited liability companies for purposes of immediately seeking and obtaining non-lawyer investment, as compared to similarly situated professions, including but not limited to investment banking, are arbitrary and capricious, and deny Jacoby & Meyers the equal protection of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. This is true, whether or not law firms are deemed an especially "protected group" under the Fourteenth Amendment.

80.   Jacoby & Meyers is suffering irreparable harm caused by these violations of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

## PRAYER FOR RELIEF

**WHEREFORE**, Jacoby & Meyers prays for judgment and relief as follows:

1.   An Order declaring that Rule 5.4 of the New York Rules of Professional Conduct violates the First Amendment, as incorporated in the Fourteenth Amendment to the United States Constitution and thereby made applicable to the States, in Rule

5.4's blanket suppression of non-lawyer ownership of an interest in law firms either presently organized in the form of limited liability companies or prepared to immediately organize in the form of a limited liability companies for purposes of immediately seeking and obtaining non-lawyer investment, thereby burdening the fundamental right of access to the courts, the right of a party to obtain representation by attorneys, the correlative right of attorneys to serve as representatives, and the right of collective associations, including non-profit or for-profit corporations, to secure each of the former rights;

2.   An Order declaring that Rule 5.4 is unconstitutionally void for vagueness as applied to law firms either presently organized as limited liability companies or prepared to immediately organize as limited liability companies for purposes of immediately seeking and obtaining non-lawyer investment, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

3.   An Order declaring that Rule 5.4 of the New York Rules of Professional Conduct, insofar as it applies to law firms presently organized in the form of limited liability companies or prepared to immediately organize in the form of limited liability companies for purposes of immediately seeking and obtaining non-lawyer investment, violates the Dormant Commerce Clause of the United States Constitution by substantially reducing the interstate flow of capital, goods, services, lawyers, and law firm employees, thereby excessively burdening the flow of interstate and international commerce relative to any putative local interest; by reaching across state lines to regulate out-of-state law firms that are either presently organized in the form of limited liability companies or prepared to immediately organize in the form of limited liability

companies for purposes of immediately seeking and obtaining non-lawyer investment; and by discriminating against such out-of-state firms and out-of-state investors in ways that indirectly harm in-state law firms that are either presently organized in the form of limited liability companies or prepared to immediately organize in the form of limited liability companies for purposes of immediately seeking and obtaining non-lawyer investment.

4.     An Order declaring that Rule 5.4 of the New York Rules of Professional Conduct violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution by arbitrarily, capriciously, and unreasonably  encroaching on the rights of law firms either presently organized in the form of limited liability companies or prepared to immediately organize in the form of limited liability companies for purposes of immediately seeking and obtaining non-lawyer investment, to finance their practice of law;

5.     An Order declaring that Rule 5.4 of the New York Rules of Professional Conduct violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by discriminating against law firms either presently organized in the form of limited liability companies or prepared to immediately organize in the form of limited liability companies for purposes of immediately seeking and obtaining non-lawyer investment, in their abilities to finance their businesses as compared to other, similarly situated professionals;

6.     An Order enjoining Defendants from enforcing Rule 5.4 with respect to non-lawyer ownership interests in law firms either presently organized in the form of limited liability companies or prepared to immediately organize in the form of limited liability

companies for purposes of immediately seeking and obtaining non-lawyer investment, and enjoining Defendants from undertaking any disciplinary or other actions against Jacoby & Meyers and other class members for any putative violations of Rule 5.4;

7.    An Order awarding Jacoby & Meyers costs and attorneys' fees pursuant to 42 U.S.C. §1988(b); and

8.    An Order granting such other and further legal and equitable relief as this Court deems just and proper.

Dated:  November 23, 2011

Respectfully submitted,

**MEISELMAN, DENLEA, PACKMAN, CARTON & EBERZ P.C.**

By:_____
David J. Meiselman (DM-6621)
James R. Denlea (JD-4610)
Jeffrey I. Carton, Esq. (JC-8296)
1311 Mamaroneck Avenue
White Plains, New York 10605
Tel: (914) 517-5000
Fax: (914) 517-5055
*Attorneys for Plaintiffs*

00245006.doc

29