David J. Meiselman
Todd S. Garber
Jeremiah Frei-Pearson
D. Greg Blankinship
MEISELMAN, PACKMAN, NEALON,
SCIALABBA & BAKER, P.C.
1311 Mamaroneck Avenue
White Plains, New York 10605
(914) 517-5000

R E C E I V E D
JUN 21 2013
U.S.D.C.
WP

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

|  |  |
|---|---|
| JACOBY & MEYERS, LLP and JACOBY & MEYERS, USA, LLC, on behalf of themselves and all other similarly situated entities authorized to practice law in the State of New York,<br><br>Plaintiffs,<br><br>v.<br><br>ERIC T. SCHNEIDERMAN AS ATTORNEY GENERAL FOR THE STATE OF NEW YORK, in his official capacity;  THE PRESIDING JUSTICES OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT (Luis A. Gonzalez, Peter Tom, Angela M. Mazzarelli, Richard T. Andrias, David Friedman, John W. Sweeny Jr., Rolando T. Acosta, David B. Saxe, Karla Moskowitz, Dianne T. Renwick, Leland G. DeGrasse, Helen E. Freedman, Rosalyn H. Richter, Sallie Manzanet-Daniels, Nelson S. Roman, Paul G. Feinman, Judith J. Gische, Darcel D. Clark), THE SECOND DEPARTMENT (Daniel D. Angiolillo, Peter B. Skelos, William F. Mastro, Randall T. Eng, Reinaldo E. Rivera, Mark C. Dillon, Cheryl E. Chambers, Thomas A. Dickerson, Anita R. Florio, Ruth C. Balkin, John M. Leventhal, L. Priscilla Hall, Sylvia O. Hinds-Radix, Jeffrey A. Cohen, Sheri. S. Roman, Plummer E. Lott, Leonard B. Austin, Sandra L. Sgroi, Robert J. Miller), THE THIRD DEPARTMENT (Karen K. Peters, | **ECF Case**<br><br>Civil Action No.<br>11-3387 (LAK)<br><br>**SECOND AMENDED**<br>**COMPLAINT FOR**<br>**DECLARATORY**<br>**AND INJUNCTIVE RELIEF** |

Thomas E. Mercure, Robert S. Rose, John A. Lahtinen,          :
Edward O. Spain, Leslie E. Stein, William E. McCarthy,        :
Elizabeth A. Garry, John C. Egan Jr.), and the                :
THE FOURTH DEPARTMENTS (Eugene M. Fahey,                      :
Nancy E. Smith, Henry J. Scudder, John V. Centra,             :
Erin M. Peradotto, Gerald J. Whalen, Rose H. Sconiers,        :
Edward D. Carni, Stephen K. Lindley, Joseph D. Valentino,:
 Salvatore R. Martoche), in their official capacities;        :
JORGE DOPICOIS, in his official capacity as the Chief         :
Counsel for the Departmental Disciplinary Committee for       :
the Appellate Division of the Supreme Court, First Judicial   :
Department; DIANE MAXWELL KEARSE, in her official             :
capacity as Chief Counsel for the Grievance Committee         :
for the Second, Eleventh and Thirteenth Judicial Districts;   :
GARY L. CASELLA, in his official capacity as Chief            :
Counsel for the Grievance Committee for the Ninth Judicial:
District; ROBERT A. GREEN, in his official capacity as        :
Chief Counsel for the Grievance Committee for the Tenth       :
Judicial District; PETER M. TORNCELLO, in his official        :
Capacity as Chief Attorney for the Committee on               :
Professional Standards for the Appellate Division of the      :
Supreme Court, Third Judicial Department; and                 :
GREGORY J. HUETHER, in his official capacity as               :
Chief Counsel for the Grievance Committee for the Fifth,      :
Seventh, and Eighth Judicial Districts,                       :
                                                              :
                        Defendants.                           :
                                                              :
_____X

     Plaintiffs JACOBY & MEYERS, LLP and JACOBY & MEYERS USA, LLC

(collectively "Jacoby & Meyers"), on behalf of themselves and all others authorized to practice

law in the State of New York, by their attorneys, MEISELMAN, PACKMAN, NEALON,

SCIALABBA & BAKER P.C., as and for their Second Amended Complaint against Defendants,

allege, with personal knowledge as to their own actions and upon information and belief as to

those of others, as follows:

## NATURE OF THE ACTION

1.      This class action is a constitutional challenge, pursuant to 42 U.S.C. § 1983, to state regulations that act as a blanket suppressions of First Amendment rights and that impose impermissible restrictions on interstate commerce.  Speech is an essential mechanism of democracy and speech restrictions based on the identity of the speaker are all too often simply a means to control content.  The challenged prohibition on corporate independent expenditures is a ban on speech.

2.      Plaintiffs seek to redress an antiquated proscription which is restricting the right of New York State attorneys – and the right of other attorneys subject to the extraterritorial reach of New York's Rules of Professional Conduct – to associate and speak freely.  New York's Rules of Professional Conduct prohibit non-attorneys from owning or investing in law firms, and the result is that lawyers are, in every case, prohibited from participating in economic associations whose primary purpose is free speech.  The effect of this prohibition is, among other things, to prevent lawyers from associating with non-lawyers in enterprises which could easily offer legal services to under-served populations, such as the economically challenged or people living in rural areas with minimal access to legal services.

3.      For nearly half a century, Jacoby & Meyers has been the pioneer and at the vanguard of ensuring the availability of quality legal services at a reasonable cost to economically challenged individuals who would otherwise have no access to the legal system.  Unfortunately, however, Jacoby & Meyers and other law firms' efforts in this regard are restricted owing to an inability to raise capital by the unnecessarily restrictive Rule of Professional Conduct and New York State laws.  Indeed, it is axiomatic that access to capital

ensures access to the civil justice system, particularly for those disenfranchised or otherwise challenged by difficult socio-economic constraints.

4.       Specifically, Rule 5.4 of New York's Rules of Professional Conduct bars, among other things, a lawyer from practicing "with or in the form of an entity authorized to practice law for profit, if . . . a non-lawyer owns any interest therein . . ." (emphasis added).  Thus, Rule 5.4 prevents Jacoby & Meyers and others licensed to practice law in New York from raising capital in exchange for owning an interest in law firms.

5.       Furthermore, Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. ("LLCL") §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 prohibit non-lawyer investment in law firms, however structured.

6.       As a result, critical sources of funding are unavailable to lawyers in New York (and to many lawyers whose principal offices are out of state),[1] which dramatically impedes access to legal services for those otherwise unable to afford them and correlatively impedes the attorneys' right to free speech through corporate expenditures, the attorneys' right to associate in order to represent and speak for such parties, and the public's first amendment right to hear information about legal services.

7.       These restrictions on non-lawyer ownership are based on the view that economic interests can conflict with a lawyer's professional judgment.  This view is not in keeping with the modern practice of law.  Indeed, the practice of law in the United States is now lagging considerably behind other countries with whom we share a common legal heritage (including

---

[1]  As discussed below, the formal right of District of Columbia law firms to allow non-lawyer investment is neutralized by the illegitimate extraterritorial reach of Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211.  Many firms based in that critical market for legal services are loath to allow non-lawyers to investment in light of the restrictions imposed in other markets, such as New York State.

4

England, upon which our legal system was modeled), in which similar investment prohibitions have been turned aside. Furthermore, non-lawyer investment can actually reduce the financial pressures on attorneys.

8.    Both Australia and the United Kingdom allow for non-lawyer ownership in law firms. There is also strong support in American jurisprudence for regulations that are less burdensome means of regulating professional ethics. The District of Columbia permits a degree of non-lawyer ownership. Notably, the claimed evils most often advanced by critics of outside, non-lawyer investment – the purported harm to clients' confidences and to lawyers' independent judgment – have not materialized in the wake of other jurisdictions' efforts to allow such outside investments. Moreover, on three separate occasions, in 1981, 2000, and 2011, commissions of the American Bar Association recommended revisions to Model Rule 5.4, the rule on which New York's Rule 5.4 is based, that would have permitted non-lawyer ownership in law firms.

9.    New York's prohibition on non-lawyer investment substantially burdens the fundamental right of legal service providers to free speech through corporate expenditure, the right to associate with others, and the right to speak for clients. There are no compelling or rational grounds for preventing lawyers from raising capital and participating in economic entities in the same manner as any other business, and there are alternative and less restrictive regulatory means to achieve any putative legitimate state purposes that New York's rules and statutes seek to advance.

10.    Plaintiffs therefore seeks a declaratory judgment that Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211, insofar as they are applied to non-lawyer investments in law firms: (1) violate the First Amendment to the United States Constitution, as

incorporated in the Due Process Clause of the Fourteenth Amendment and thereby made

applicable to the States; (2)  excessively burden the flow of interstate commerce in violation of

the United States Constitution's Dormant Commerce Clause; (3) violate Substantive Due Process

rights contained in the Fourteenth Amendment to the United States Constitution; and (4)  violate

the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Plaintiffs also seeks an injunction against Defendant's enforcement of Rule 5.4; Judiciary Law

Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability

Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211, against it and other similarly organized

legal service providers.

## THE PARTIES

11.     Plaintiff Jacoby & Meyers, LLP is a New York-based law firm with eleven

offices located throughout the State – in Manhattan, the Bronx, Hempstead, Kingston,

Middletown, New Windsor, Newburgh, Port Jervis, Queens, Spring Valley, Staten Island, and

Wappingers Falls.  The firm also operates offices in New Haven, Connecticut and in Edison and

Newark, New Jersey.  The location of the firm's offices reflects a commitment to communities

that most need cost-effective legal services.  The firm, which employs nearly 100 professionals,

represents New York and out-of-state clients in actions and transactions involving parties from

New York and other states.  A substantial portion of the firm's revenues and expenses are

generated through interstate commerce.  In the course of their practice, the firm's attorneys and

non-lawyer employees frequently move across state lines. Although the corporate form of entity

through which Jacoby & Meyers presently exists is a limited liability partnership, Jacoby &

Meyers has recently created Jacoby & Meyers USA, LLC, a New York limited liability

company, for the express purpose of allowing non-lawyers to "own an interest" in the entity

through which Jacoby & Meyers is authorized to practice law for profit. Jacoby & Meyers, LLP is prepared immediately to transfer all of its assets to Jacoby & Meyers USA, LLC and immediately obtain non-lawyer investment - as soon as Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211's blanket suppression of non-lawyer ownership of an interest in law firms is declared unconstitutional and their enforcement permanently enjoined.

12. Defendant Eric Schneiderman is the Attorney General of the State of New York and is responsible for enforcing New York Judiciary Law, New York Partnership Law and New York Limited Liability Company Law.

13. Defendants the Presiding Justices of the First, Second, Third and Fourth Departments, Appellate Division of the Supreme Court of the State of New York (Luis A. Gonzalez, Peter Tom, Angela M. Mazzarelli, Richard T. Andrias, David Friedman, John W. Sweeny Jr., Rolando T. Acosta, David B. Saxe , Karla Moskowitz, Dianne T. Renwick, Leland G. DeGrasse, Helen E. Freedman, Rosalyn H. Richter, Sallie Manzanet-Daniels, Nelson S. Roman, Paul G. Feinman, Judith J. Gische, Darcel D. Clark, Daniel D. Angiolillo, Peter B. Skelos, William F. Mastro, Randall T. Eng, Reinaldo E. Rivera, Mark C. Dillon, Cheryl E. Chambers, Thomas A. Dickerson, Anita R. Florio, Ruth C. Balkin, John M. Leventhal, L. Priscilla Hall, Sylvia O. Hinds-Radix, Jeffrey A. Cohen, Sheri. S. Roman, Plummer E. Lott, Leonard B. Austin, Sandra L. Sgroi, Robert J. Miller, Karen K. Peters, Thomas E. Mercure, Robert S. Rose, John A. Lahtinen, Edward O. Spain, Leslie E. Stein, William E. McCarthy, Elizabeth A. Garry, John C. Egan Jr., Eugene M. Fahey, Nancy E. Smith, Henry J. Scudder, John V. Centra, Erin M. Peradotto, Gerald J. Whalen, Rose H. Sconiers, Edward D. Carni, Stephen K. Lindley, Joseph D. Valentino, and Salvatore R. Martoche), are responsible for implementing and

enforcing the Rules of Professional Conduct, which govern the complained of conduct alleged herein.

14.     Defendant Jorge Dopicois is the Chief Counsel for the Departmental Disciplinary Committee for the Appellate Division of the Supreme Court, First Judicial Department. In his official capacity, he is charged with initiating investigations into complaints concerning attorney misbehavior, and if formal disciplinary proceedings are warranted, commencing these proceedings in the Appellate Division

15.     Defendant Diane Maxwell Kearse is Chief Counsel for the Grievance Committee for the Second, Eleventh and Thirteenth Judicial Districts, which are part of the Appellate Division of the Supreme Court, Second Judicial Department. In her official capacity, she is charged with initiating investigations into complaints concerning attorney misbehavior, and if formal disciplinary proceedings are warranted, commencing these proceedings in the Appellate Division

16.     Defendant Gary L. Casella is Chief Counsel for the Grievance Committee for the Ninth Judicial District, which is part of the Appellate Division of the Supreme Court, Second Judicial Department. In his official capacity, he is charged with initiating investigations into complaints concerning attorney misbehavior, and if formal disciplinary proceedings are warranted, commencing these proceedings in the Appellate Division

17.     Defendant Robert A. Green is Chief Counsel for the Grievance Committee for the Tenth Judicial District, which is part of the Appellate Division of the Supreme Court, Second Judicial Department. In his official capacity, he is charged with initiating investigations into complaints concerning attorney misbehavior, and if formal disciplinary proceedings are warranted, commencing these proceedings in the Appellate Division

18.     Defendant Peter M. Torncello is Chief Attorney for the Committee on

Professional Standards for the Appellate Division of the Supreme Court, Third Judicial

Department.  In his official capacity, he is charged with initiating investigations into complaints

concerning attorney misbehavior, and if formal disciplinary proceedings are warranted,

commencing these proceedings in the Appellate Division

19.     Defendant Gregory J. Huether is acting Chief Counsel for the Grievance

Committee for the Fifth, Seventh, and Eighth Judicial Districts, which are part of the Appellate

Division of the Supreme Court, Fourth Judicial Department.  In his official capacity, he is

charged with initiating investigations into complaints concerning attorney misbehavior, and if

formal disciplinary proceedings are warranted, commencing these proceedings in the Appellate

Division

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action under the Constitution of the United

States of America and the Amendments thereto and pursuant to 28 U.S.C. §§ 1331 and 1343.

21.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because (1) at least

one defendant resides in this District and all defendants reside in this State; (2) a substantial part

of the events giving rise to the claim occurred in this District; and (3) at least one defendant is

found in this District.

## OPERATIVE FACTS

### A.     New York's Rule Of Professional Conduct 5.4

22.     On or about December 16, 2008, then-Chief Judge Judith S. Kaye, the Chief

Judge of the New York Court of Appeals, and the Presiding Justices of the Appellate Division,

announced a new set of attorney conduct rules for New York.  These new Rules of Professional

Conduct, effective April 1, 2009, were issued as Joint Rules of the Appellate Divisions, and

constitute Part 1200 of the New York Court Rules.  These rules expressly supersede the

Disciplinary Rules which had previously governed the conduct of New York attorneys.  The new

Rules of Professional Conduct are based upon the American Bar Association Model Rules that

have been implemented in virtually every jurisdiction in the United States, with the critical

exception of the District of Columbia.

23.    The Rules of Professional Conduct apply to all attorneys admitted to practice in

New York State (either generally or for purposes of a particular proceeding), including out-of-

state or foreign attorneys, regardless of where the attorneys' conduct occurs.  *See Rule 8.5:*

*Disciplinary Authority and Choice of Law.*

24.    Rule 5.4 addresses the "Professional Independence of a Lawyer."  Rule 5.4

provides as follows:

> (a)    A lawyer or law firm shall not share legal fees with a
> nonlawyer, except that:
>
> > (1)    an agreement by a lawyer with the lawyer's firm or another
> > lawyer associated in the firm may provide for the payment of
> > money, over a reasonable period of time after the lawyer's death,
> > to the lawyer's estate or to one or more specified persons;
> >
> > (2)    a lawyer who undertakes to complete unfinished legal business
> > of a deceased lawyer may pay to the estate of the deceased lawyer
> > that portion of the total compensation that fairly represents the
> > services rendered by the deceased lawyer; and
> >
> > (3)    a lawyer or law firm may compensate a non-lawyer employee
> > or include a nonlawyer employee in a retirement plan based in
> > whole or in part on a profit-sharing arrangement.
>
> (b)    A lawyer shall not form a partnership with a non-lawyer if
> any of the activities of the partnership consist of the practice of law.
>
> (c)    Unless authorized by law, a lawyer shall not permit a person who
> recommends, employs or pays the lawyer to render legal service for

another to direct or regulate the lawyer's professional judgment in rendering such legal services or to cause the lawyer to compromise the lawyer's duty to maintain the confidential information of the client under Rule 1.6.

(d)      A lawyer shall not practice with or in the form of an entity authorized to practice law for profit, if:

     (1)      a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration;

     (2)      a nonlawyer is a member, corporate director or officer thereof or occupies a position of similar responsibility in any form of association other than a corporation; or

     (3)      a nonlawyer has the right to direct or control the professional judgment of a lawyer.

Rule 5.4 (emphasis added)

25.      As a result of this rule, Plaintiffs cannot allow a non-lawyer to acquire or own an interest in the legal entity (*i.e.*, the law firm) through which it provides legal services to its clients.

**B.      New York Judiciary Law, New York Partnership Law, And New York Limited Liability Company Law**

26.      On November 23, 2011, Plaintiffs filed their First Amended Complaint challenging the constitutionality of Rule 5.4.

27.      In moving to dismiss Plaintiffs' First Amended Complaint, Defendants argued that Plaintiffs lacked standing.  They argued that striking down Rule 5.4 would not redress Plaintiffs' alleged injury because Plaintiffs are effectively barred from obtaining an infusion of capital from a non-lawyer in exchange for an equity interest in the firms by New York partnership and corporations law.

28.     Defendants identified Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 as the New York statutes that barred Plaintiffs from obtaining an infusion of capital from a non-lawyer in exchange for an equity interest in the firms.  Defendant Eric Schneiderman, in his capacity as the New York Attorney General, also definitively and publicly stated that he would enforce these laws against any law firm that accepted non-lawyer investment.  *See Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments, Appellate Div. of Supreme Court of State of New York*, 488 F. App'x 526, 527 (2d Cir. 2012), as amended (Jan. 9, 2013).

29.     As a result of these statutes, Plaintiffs cannot allow a non-lawyer to acquire or own an interest in the legal entity (*i.e.*, the law firm) through which they provide legal services to their clients.

**C.     Rule 5.4 And New York Partnership
And Corporations Law Restrict Plaintiffs' Ability To Expand
Their Efforts To Provide Low Cost Legal Services To Needy Populations**

30.     Jacoby & Meyers was founded in September 1972 when Stephen Z. Meyers and Leonard D. Jacoby, law school classmates at UCLA, opened their first storefront office in Van Nuys, California.  In creating their law practice, Messrs. Jacoby and Meyers sought to ensure that people of modest or average means, who could often not afford to hire a lawyer, had a practical alternative to obtain competent, qualified counsel at reasonable rates.

31.     Since the firm began its operations nearly forty years ago, Jacoby & Meyers has become synonymous with legal services for underserved populations.  Jacoby & Meyers has been at the vanguard in overturning obstacles that impede robust competition for lawyers, including attorney advertising.

32.     Ardent believers in attorneys' rights to freedom of speech and the public's right to

be informed of worthwhile new concepts in the practice of law that could lower the cost of

obtaining legal representation, Jacoby & Meyers helped spark an international debate that lasted

for years, and ultimately culminated in a California Supreme Court decision in 1977, applying

the founders' rights of free speech and the public's right to be informed.  A month later, the

United States Supreme Court banned prohibitions on legal advertising in the seminal case of

*Bates v. State Bar of Arizona*, 433 U.S. 350 (1977).

33.     Jacoby & Meyers has continued to innovate through the years – all in an effort to

help provide quality legal services to clientele at reasonable fees.  Jacoby & Meyers continues to

practice law in an innovative fashion, and maintains a network of affiliated law offices across the

country, including in Southern California, New York, Alabama, Florida, and Arizona.

34.     More significantly, throughout its forty year history, Jacoby & Meyers has always

comported itself with the highest regard for its ethical and professional responsibilities and has

zealously represented the nearly one million clients it has been privileged to serve.  Jacoby &

Meyers holds its individual practitioners to the highest ethical standards, and over the past four

decades has demonstrated the independence of professional judgment that it will continue to

exhibit *regardless* of the source of outside capital it is permitted to pursue.

35.     Jacoby & Meyers wishes to expand its operations, hire additional attorneys and

staff, acquire new technology, and improve its physical offices and infrastructure to increase its

ability to serve its existing clients and to attract and retain new clients and qualified attorneys.

Notably, Jacoby & Meyers' business plans principally concern expansion within communities in

which working-class, blue-collar and immigrant families reside.  Indeed, as Chief Judge of the

New York Court of Appeals Jonathan Lippman remarked in his 2011 State of the Judiciary

Speech, it is often "the most vulnerable in our society" for whom the courthouse doors must be kept open.

36.   As Justice Lippman explained:

Every day in our courthouses we see the fallout from the economic downturn reflected in dockets surging with new foreclosure, eviction, family offense, consumer debt and criminal cases. This flood of cases carries with it the futures of millions of New Yorkers -- -- many of limited means, including families, children and the most vulnerable members of our society – all seeking justice and often fighting for life's most basic needs, people who have nowhere else to turn to but the courts to protect their fundamental rights. They come in record numbers at the very time that courts and judges are stretched thinnest, when New York's economy and business climate are at their weakest. And it is our constitutional obligation -- -- ours alone -- -- to hear and resolve every single one of these matters with fairness, speed and wisdom. It is precisely when the economy falters that commercial disputes ripen into lawsuits, and their speedy resolution can make the difference between a healthy business climate and a hostile one. It is precisely when the economy stagnates that the courts become society's emergency room, dealing with the most intractable of human disputes -- -- foreclosures and evictions, family violence and abuse, crime, delinquency, divorce, child custody and support, and on and on. These are the moments that matter most.

37.   In fact, on Tuesday May 28, 2013, Chief Judge Jonathan Lippman announced the makeup of a committee to study the feasibility of allowing non-attorneys to provide legal services to poor New Yorkers. The committee grew out of recommendations in a November 2012 report by Lippman's Taskforce to Expand Access to Civil Legal Services. The taskforce noted that non-lawyers have been used effectively in New York to aid clients in administrative proceedings, for unemployment and Workers' Compensation benefits, in housing and foreclosure actions and in some family law matters, such as preparation of applications for orders of protection.

38.     In fact, Federal law provides for the accreditation of non-lawyer advocates to give representation in administrative proceedings before the U.S. Citizenship and Immigration Services and the Executive Office of Immigration Review.

39.     In addition, the taskforce noted that non-lawyers have been used to successfully handle some forms of legal assistance in Great Britain and that the state of Washington is now developing rules for certification of a new Limited Licensed Legal Technician for non-lawyers.

40.     In order to ensure the public's greatest possible access to legal representation and protection of their rights through the civil justice system in an affordable, cost-effective way, Jacoby & Meyers requires a substantial infusion of new capital.  Because of the proscriptions of Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211, however, law firms such as Plaintiffs have been relegated to obtaining capital from (i) the personal contributions of the partners, (ii) retained earnings on fees generated and collected, and (iii) commercial bank loans, which invariably come with onerous interest rates and intrusive covenants and conditions.

41.     In these challenging economic times, these "normal" channels for capital infusion are either too expensive or unavailable to fund Jacoby & Meyers' and other class members' intended business plans.  Because of the proscriptions of Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211, Jacoby & Meyers has been unable to entertain the numerous offers it has received from prospective non-lawyer investors, both within and without New York, who are prepared to invest capital in exchange for owning an interest in the firm.

42.     Specifically, several high net-worth individuals including, but not limited to, Michael Ostrow, Anthony Costa, and Philip Guarnieri, as well as several institutional investors whose identities Jacoby & Meyers has been asked to keep confidential, have expressed their commitment to invest significant sums of money in Jacoby & Meyers in exchange for owning an interest in the entity through which Jacoby & Meyers practices law. Each of these investors understands that the law firm and each office will be solely managed and directed by attorneys duly licensed to practice law in New York, that the duties and responsibilities of Plaintiffs' attorneys shall be set forth in the law firm's articles of organization, that Plaintiffs' attorneys shall ensure that client confidences and lawyers' independence of professional judgment are at all times preserved and that Plaintiffs' attorneys must adhere to the rules of professional conduct and elevate clients' interests over those of shareholders' interests.

43.     In order to help facilitate these investments, Jacoby & Meyers has filed and registered with New York State the initial articles of organization of Jacoby & Meyers USA, LLC, a limited liability company to which Jacoby & Meyers is prepared immediately to transfer all of its assets to continue its practice of law. But for the proscriptions of Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211, however, Jacoby & Meyers would have already consummated these investments and allowed non-lawyers to own an interest in the legal entity through which it practices law.

44.     Indeed, under existing regulatory constraints, law firms have strained to self-finance their operations through partners' capital contributions, cash flow, and bank loans. Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 bar lawyers and law

firms from raising capital for their law firms from outside non-lawyer investors through sales of ownership interests in their firms or from engaging in fee sharing agreements with non-lawyers. While there are similar legal ethics rules in other states, one national center of legal service provision – the District of Columbia – stands in the vanguard of domestic and international jurisdictions that have rejected the arbitrary and insubstantial grounds for maintaining such obsolete rules.[2]  But Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N. Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 reach across state lines and bars even the powerful law firms headquartered in the District of Columbia from allowing non-lawyer ownership, if attorneys with those firms are admitted to practice in New York State.  Not surprisingly, many such firms include attorneys so admitted.

### D. No Legitimate Rationale Exists To Prevent Non-Lawyers From Owning An Interest In A Law Firm

45.     The restrictions on non-lawyer ownership in law firms have a deleterious effect on the legal profession and the populations it serves.  Indeed, owing to the lack of affordable legal services (which is to some degree caused by unnecessarily restrictive rules on non-attorney investment), many consumers are forced to seek alternative, cheaper means to address their legal needs.  Often, they do so at great legal peril.

46.     For example, LegalZoom.com is an online service that provides cheap legal options for individuals who cannot currently afford traditional legal services.  While its website cautions that the information provided is not legal advice and LegalZoom is not a law firm, the website also touts that "Our documents are trial-tested and have been accepted by courts and

---

[2]  However, the freedom provided in the District of Columbia is less sweeping than that provided in Australia and the United Kingdom.

government agencies in all 50 states.  With over 1 million satisfied customers, your satisfaction

is 100% guaranteed."

      47.    Disturbingly, clients must venture to the seventh page of LegalZoom's nine pages

of disclaimer, to discover that it does not warrant that its forms are "accurate, reliable, complete,

or timely."  If the use of those forms result in losses, clients must console themselves with the

$100 that LegalZoom provides as its limitation of liability.  Though LegalZoom was founded by

lawyers, much of its capitalization comes from private equity investments, and on July 25, 2011,

the company announced that it had raised $66 million in its latest round of venture capital.

      48.    While the impact of denying non-lawyer financing upon client advocacy is

palpable, the effect upon firms can also be cataclysmic.  In an article published in The Wall

Street Journal, the Brookings Institution made the direct link between the inability to obtain

private investment and the demise of the firm of Dewey & LeBoeuf:

> While law firms can and do get bank loans, ABA regulations
> prohibit banks, private-equity firms or other corporations from
> owning or having an ownership stake in a law firm.  This limits a
> law firm's financing options and raises its capital costs.  Dewey's
> collapse has been attributed to the firm being highly leveraged and
> unable to attract investment from businesses outside the legal
> profession.

Clifford Winston and Robert W. Crandall, The Law Firm Business Model Is Dying, The Wall

Street Journal, May 29, 2012, at A13.

      49.    The ostensible "ethical" constraints prohibiting non-lawyer ownership of law

firms and fee-sharing with non-lawyers are substantial impediments to law firms' ability to raise

capital, not only to fulfill the Constitutional right of low-income clients to representation but also

to compete in the increasingly interstate and global marketplace for legal services.

50.     Indeed, in recent years, Australian and British legislators have recognized that rules barring non-lawyer ownership and management of law firms are antiquated and negatively impact the practice of law.  In response, Australia enacted the Legal Profession Act in 2004, which allows non-lawyers to own shares in Australian law firms.  In May 2007, the Australian law firm Slater & Gordon completed an initial public offering of stock in its firm, becoming the first publicly-traded law firm in the world.

51.     In the United Kingdom, the forbearer of the American legal system, Parliament has enacted the Legal Services Act of 2007, which enables non-lawyers to obtain ownership stakes in British law firms.  Within three weeks of the law going into effect, sixty-five (65) firms applied to convert to the alternative business structures permitted under the act.  There are now nearly 200 firms with alternative business structure licenses.

52.     The British and Australian legislators recognized that permitting non-lawyer investment in law firms would give firms greater access to capital through private or public offerings, allow firms to offer stock option incentives to lawyer as well as non-lawyer employees, allow law firms to offer more comprehensive services to clients, and increase access to legal services for needy populations.  Furthermore, the legislators recognized that permitting non-lawyer investment could result in other benefits to clients and firms, such as better and less expensive legal services, as well as innovative models, enhanced public information about legal services, and superior technology.

53.     The inexpensive infusions of capital now available to Australian and British law firms resulting from the elimination or liberalization of obsolete, unjustified restrictions on non-lawyer investments in law firms give Australian and British law firms distinct competitive advantages in practicing law in an ever-increasing global legal marketplace.

54.     The parade of horrors predicted by critics of non-lawyer investment in law firms has not materialized in other countries or in the District of Columbia.  The fear that lawyers' professional judgment and independence will be eroded, and that non-lawyers cannot understand the ethical considerations of lawyers, or that such outside investors will be motivated only by anticipated profits and the return on their investment, has proven to be unfounded.  In fact, as described by modern-day academics and legal scholars, "a law firm's goal of making a profit and its duty to provide competent, ethical representation to its clients are not in opposition to each other; a law firm can only maximize its profits by providing competent, quality, ethical representation."  Bash, Matthew, "Revising Model Rule 5.4: Adopting A Regulatory Scheme That Permits Non Lawyer Ownership And Management of Law Firms," *Washburn Law Journal*, 48 WBNLJ 669, 694 (2009); *see, e.g.*, Schneyer, Ted, "'Professionalism' as Pathology: The ABA's Latest Policy Debate on Nonlawyer Ownership of Law Practice Entities," *Fordham Urban Law Journal*, 40 FORDHAM URB. L.J. 75, 116 (2012) ("What lawyers do in practice to earn money is usually meant to serve client interests; the law firm that opens a new branch office or adds a new practice group will hope to benefit clients and *thereby* profit.").

55.     Indeed, providing ethical, competent representation and making a profit are not mutually exclusive propositions, and law firms have been doing that for centuries.  To the contrary, the putative pressures to achieve profitability at the "expense" of professional ethics are even stronger when lawyers directly take profits than when profits are taken by outside investors insulated by appropriate regulations from placing pressure on the legal practice.  It is arbitrary and irrational to bar the lesser purportedly "perverse" incentive while maintaining the stronger. And the recent experiences of Australia and the United Kingdom in fact provide a panoply of

regulatory safeguards that can be implemented to ensure that outside investors do not interfere with attorneys' professional obligations.

56.    In fact, there are innumerable ways in which to ensure that a lawyer's professional "independence of judgment" remains resolute, including: regulating law firms with outside investors through independent licensing bodies; imposing restrictions on the amount or type of interest non-lawyers can own; or requiring a legal practice with non-lawyer owners to appoint a legal director responsible for the management, oversight and compliance of lawyers' professional obligations.

57.    It is therefore not surprising that, on multiple occasions, ABA commissions have recommended changes to Model Rule 5.4 that would have permitted non-lawyer ownership in law firms.

58.    In 1977, the ABA formed the Commission on the Evaluation of Professional Standards (Kutak Commission) to examine whether the ABA should revise or replace the Model Code.  In 1981, the Kutak Commission recommended adopting a rule of professional conduct that would have permitted non-lawyer ownership and managerial control of law firms.

59.    In July of 2000, the Commission on Multidisciplinary Practice recommended that the ABA amend the Model Rules to permit lawyers and non-lawyer professionals to form partnerships that provide both legal and non-legal professional services.

60.    Most recently, in 2009, the ABA formed a Commission on Ethics 20/20 to "perform a thorough review of the ABA Model Rules of Professional Conduct and the U.S. System of lawyer regulation in the context of advances in technology and global legal practice developments."  Among the issues the Commission investigated was whether the ABA should adopt a model rule permitting law firm ownership by non-lawyers.

61.     On December 2, 2011, the ABA 20/20 Commission published for comment a Discussion Paper on Alternative Law Practice Structures recommending amendments to Model Rule 5.4 similar to the District of Columbia Model.  In its research, the ABA 20/20 Commission's Working Group analyzed how the District of Columbia Model has functioned since it was introduced and found no evidence of ethical violations, complaints, or any other adverse consequences.

62.     Those in favor of permitting alternative ownership law firm structures included the ABA Commission on Law and Aging, Consumers for a Responsive Legal System, and the National Federation of Paralegal Associations.  Consumers for a Responsive Legal System argued that "consumers nationwide would welcome the lower prices and new combinations of services that true innovation in the delivery of legal services would bring."

63.     The time has come to permit non-lawyers to own an interest in law firms in New York and in the United States, following the vanguard jurisdictions in the United States and overseas.  This is not just a matter of good policy.  It is a Constitutional mandate.

## CLASS ACTION ALLEGATIONS

64.     Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.  The action is brought on behalf of a class (the "Class") defined as all entities and persons licensed to practice law in the State of New York.

65.     This action is brought as a class action for the following reasons:

        a.      The class is so numerous that joinder of all members is impracticable;

b.      Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole;

c.      The claims asserted by Plaintiffs are typical of the claims of the members of the Class; and

d.      Plaintiffs will fairly and adequately protect the interests of  the Class, and Jacoby & Meyers has retained attorneys experienced in class action litigation and complex litigation.

## STANDING AND RIPENESS

66.      As set forth above, Plaintiffs' standing to pursue this action is amply established by their inability to allow non-lawyers to own an interest in their law firms.

67.      The blanket suppression of non-lawyer ownership of an interest in a law firm increases the cost of raising capital, and constitutes an actual, cognizable injury, proximately caused by Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 and redressable by the relief sought below.  Such a disability readily gives rise to Article III standing. An injury is being suffered by existing law firms such as Plaintiffs.

68.      Similarly, no further delay to await new events is required, as the Court would be in no better position to adjudicate the issues in the future than it is now.  Likewise, given the credible threat of a disciplinary proceeding being prosecuted against Plaintiffs if they were to allow a non-lawyer to own an interest in the law firms, Plaintiffs are not required to await and undergo prosecution with the resultant licensure implications as the sole means of seeking relief.

69.     Stated otherwise, Plaintiffs should not be forced to choose between "the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believes to be constitutionally protected activity." *St. Martin's Press, Inc. v. Carey*, 605 F.2d 41, 47 (2d Cir. 1979) (quoting *Steffel v. Thompson*, 415 U.S. 452, 462 (1974)).

70.     Accordingly, Plaintiffs' claims are ripe for adjudication and they have standing to prosecute this action.

71.     Likewise, there is no basis for the Court to abstain from deciding the merits of Plaintiffs' Federal Constitutional claims.  There are no unsettled issues of state law that, once settled, would obviate the Court's exercise of its duty under the Supremacy Clause to enforce the United States Constitution by declaring infirm, and enjoining the enforcement of, unconstitutional State laws causing both present and imminent proximate harm to the Plaintiffs.

72.     Plaintiffs stand ready to accept non-lawyer investors, and there are specific non-lawyer investors who stand ready to make such investments and enter into a corporate association with Plaintiffs.  They would do so but for New York's prohibition on non-lawyer investment and the Attorney General's public statement that he would enforce current New York statutes prohibiting such associations and the prohibitions of Rule 5.4.

## FIRST CLAIM

### (Violation of First Amendment)

73.     Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

74.     Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 create an artificial, unnecessary and unreasonable blanket suppression of non-lawyers'

ownership of an interest in a law firm and the public's first amendment interest in information about legal services. That blanket suppression serves neither a compelling nor a substantial state interest, and is not the least burdensome means of achieving any putative state interest.

75.     The First Amendment to the Constitution of the United States, as incorporated in the Fourteenth Amendment and thereby made applicable to New York and other states, protects the fundamental right to free speech, right to associate, right of access to the courts, the right of a party to obtain representation by attorneys, the correlative right of attorneys to serve as representatives and to speak on behalf of their clients, and the right of collective associations, including non-profit or for-profit corporations, to secure each of the former rights. The First Amendment therefore protects associations of people to help meet the costs of legal representation to ensure access to the legal system.

76.     Speech is an essential mechanism of democracy, and speech restrictions based on the identity of the speaker are all too often simply a means to control content. Rule 5.4 and New York partnership and corporations law prohibit corporations and individuals from making an investment in law firms such as Plaintiffs that strive to represent and speak for underserved populations in a legal capacity. The challenged prohibition on corporate independent expenditures is thus an impermissible ban on speech. The challenged prohibitions also infringe on the right of individuals and corporations from forming associations for the purpose of providing legal representation and impose restrictions that silence speech about legal services.

77.     The essential essence of legal representation is to speak for others, either in individual legal settings or in courts of law. Thus, restrictions on the ability of firms to provide legal representation, and on non-lawyers to economically associate with lawyers for that purpose, are impermissible restrictions on First Amendment rights.

78.     Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211, which prohibit those in the legal profession, and those wishing to invest in the practice of law, from free speech and from freely associating in the service of ensuring parties' legal representation and access to the courts, thus violate the First Amendment.

79.     There is no compelling state interest for such encroachments on First Amendment rights.  Even if there were a compelling State interest, there are alternative and less restrictive means for achieving such putative interests that encroach less on First Amendment freedoms, as demonstrated by the rules in place for more than two decades in the District of Columbia, the recently amended laws of Great Britain and Australia, and the multiple proposed amendments to the Model Rules put forth by commissions of the American Bar Association.

80.     Such alternative means are far from imaginary.  They are manifestly demonstrated -- although by no means exhausted -- by the actual regulatory schemes enacted in jurisdictions that already permit non-lawyer investment in law firms, and by various proposals of commissions of the ABA that have exhaustively studied the topic.

81.     Plaintiffs are suffering irreparable harm caused by the violations of the First Amendment.

## SECOND CLAIM

### (Violation of the Dormant Commerce Clause)

82.     Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

83.     Article I, Section 8 of the United States Constitution grants Congress the power to "regulate Commerce among the several States."  The "dormant" or "negative" aspect of the Commerce Clause prohibits States from enacting and enforcing laws that (a) unduly burden the

free flow of interstate commerce, (b) reach across state lines to regulate out-of-state entities and activities, or (c) discriminate against out-of-state actors in favor of in-state actors. In addition, the United States Supreme Court has devised special rules of standing, which permit in-state actors to assert claims grounded in Dormant Commerce Clause violations against out-of-state actors, if the latter violations cause indirect harm to the in-state actors (that is, even if the in-state plaintiff is not the proximate victim of state discrimination against out-of-state actors).

84.     According to the ABA, in 2011, there were 1,225,452 active lawyers in the United States and 161,031 in New York alone. The practice of law necessarily accounts for billions of dollars annually in interstate commerce. According to the United States Census Bureau, the annual 2009 payroll for legal services firms nationwide was $89.5 billion, and in New York was $12.02 billion.

85.     Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211, as currently enacted, prohibit Plaintiffs from obtaining the necessary capital infusion from non-lawyer investors required to fund and expand their operations in New York and elsewhere. These rules prohibit Plaintiffs from accepting non-lawyer investment, not just in New York; because they apply extraterritorially, a firm with New York lawyers cannot accept non-lawyer investment in its offices or operations in other states or in the District of Columbia.

86.     The deprivation of this investment opportunity excessively burdens interstate commerce relative to any putative local benefit it might otherwise advance.

87.     The flow of capital across state lines constitutes interstate commerce. Many non-lawyer investors wishing to invest in law firms are inevitably located in states that differ from the states in which law firms (either presently organized as limited liability companies or prepared to

immediately organize as limited liability companies for the purpose of obtaining non-lawyer investment) are located.

88.     Moreover, both single-state and multi-state law firms obtaining low-cost infusions of capital from non-lawyers would expand their operations, causing increased interstate flows of goods and services purchased by such law firms and sold by such law firms.

89.     For similar reasons – that is, by increasing the cost of capital and thereby restricting the expansion of legal services – Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 substantially dampen the flow of lawyers and law-firm employees across state lines.

90.     Since Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 manifestly and substantially burden the flow of capital, goods, services, lawyers, and employees across state lines, they substantially burden the flow of interstate commerce. Such burden is clearly excessive in relation to any putative New York State interest served by Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211.

91.     Moreover, there are alternative means for achieving any such putative state interest that impose lesser burdens on the interstate flow of commerce.

92.     Unless the proscriptions of Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 against non-lawyer ownership of an interest in a law firm organized in the form of a limited liability company or other forms are declared invalid and enforcement of

the provisions enjoined, the provisions will continue to interfere substantially with the free flow of interstate commerce in violation of the Commerce Clause.

93.     New York law does not only prohibit *in-state* law firms organized in the form of limited liability companies or other forms from receiving capital from non-lawyer investors. It also proscribes *out-of-state* law firms organized in the form of limited liability companies or other forms from receiving capital from non-lawyer investors, if lawyers in those firms practice in New York State. This proscription applies, even if the firm's lawyers are not actually practicing in New York State. Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 therefore reach across state lines to regulate out-of-state actors. This constitutes extraterritorial regulation that violates the Dormant Commerce Clause.

94.     It also constitutes discrimination against out-of-state investors and against out-of-state law firms, since those firms must reorganize their financial structure if they wish to be admitted or to practice in New York State. In-state law firms are directly and indirectly harmed by such violations and thereby have standing to challenge such out-of-state regulation and such discrimination, under the special standing rules applicable to the Dormant Commerce Clause.

95.     Plaintiffs are suffering irreparable harm caused by these violations of the Dormant Commerce Clause.

## THIRD CLAIM
### (Violation of the U.S. Constitution Due Process Clause)

96.     Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

97.     The proscriptions of Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 are arbitrary and capricious.

98.     The restrictions preventing non-lawyers from owning an interest in a law firm serve no legitimate state interest, and/or to the extent such a legitimate state interest exists, Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 are not rational means to serve that interest.

99.     Moreover, Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 abridge fundamental right under Substantive Due Process without serving compelling state interests, and without being fashioned in the least restrictive means possible.

100.    Consequently, Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 violate Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

101.    Plaintiffs are suffering irreparable harm caused by these violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## FOURTH CLAIM
### (Violation of Equal Protection)

102.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

103.    The proscriptions of Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a),

1208, 1210, 1211 bar non-lawyers from owning *any* interests in law firms and as such bar law firms from corporate independent expenditures such as selling interests in their law firms.

104.    Other professions in New York have no such barriers to capital investment.  For instance, investment bankers face no restrictions on capital ownership in their firms.  Yet they, like the lawyers they work with on a daily basis on the same transactions, deal with the most sensitive of corporate secrets and proprietary information, must preserve client confidentiality, and must guard assiduously against conflicts of interest that might disadvantage their clients.

105.    Because they face no barriers to outside investors, investment banking firms have been able to amass enormous capital through public offerings of their stock which they can then use to fund and expand their businesses.  As a result, investment banks such as Goldman Sachs & Co. and Morgan Stanley, Inc., formerly privately-held partnerships, have become publicly-traded financial juggernauts.  Indeed, Goldman Sachs has a current market capitalization of approximately $84 billion and nearly 40,000 employees worldwide, and Morgan Stanley has a current market capitalization of approximately $40 billion, with 62,000 employees around the world.

106.    The restrictions barring non-lawyer ownership interest in law firms denies Plaintiffs the equal protection of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

107.    Furthermore, the restrictions barring non-lawyer ownership interests in law firms as compared to similarly situated professions, including but not limited to investment banking, are arbitrary and capricious, and deny Plaintiffs the equal protection of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

This is true whether or not law firms are deemed an especially "protected group" under the Fourteenth Amendment.

108.    Plaintiffs are suffering irreparable harm caused by these violations of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

A.    An Order declaring that Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 violate the First Amendment, as incorporated in the Fourteenth Amendment to the United States Constitution and thereby made applicable to the States;

B.    An Order declaring that Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 violate the Dormant Commerce Clause of the United States Constitution;

C.    An Order declaring that Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

D.    An Order declaring that Rule 5.4; Judiciary Law Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

E.      An Order enjoining Defendants from enforcing Rule 5.4; Judiciary Law Sections

§§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability Co. L. §§

201, 1201, 1203, 1207(a), 1208, 1210, 1211 with respect to non-lawyer ownership interests in

law firms and enjoining Defendants from undertaking any disciplinary or other actions against

Plaintiffs and other class members for any putative violations of Rule 5.4; Judiciary Law

Sections §§ 478, 484, 485, 491, 495; N.Y. Part. L. § 121-1500(a)(I); and N.Y. Limited Liability

Co. L. §§ 201, 1201, 1203, 1207(a), 1208, 1210, 1211;

F.      An Order awarding Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C.

§1988(b); and

G.      An Order granting such other and further legal and equitable relief as this Court

deems just and proper.

White Plains, New York
Dated:  June 21, 2013

Respectfully submitted,

**MEISELMAN, PACKMAN, NEALON,
SCIALABBA & BAKER P.C.**

By:_____

David J. Meiselman
Todd S. Garber
Jeremiah Frei-Pearson
D. Greg Blankinship
1311 Mamaroneck Avenue
White Plains, New York 10605
Tel: (914) 517-5000
Fax: (914) 517-5055

*Attorneys for Plaintiffs*