UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————X
                                        :
JACOBY & MEYERS, LLP, *et. al.,*        :   **ECF Case**
                                        :   Civil Action No. 11-3387 (LAK)
                                        :
          Plaintiffs,                   :
                                        :
     v.                                 :
                                        :
THE PRESIDING JUSTICES OF THE FIRST,    :
SECOND, THIRD AND FOURTH DEPARTMENTS,   :
APPELLATE DIVISION OF THE SUPREME       :
COURT OF THE STATE OF NEW YORK, *et. al.* :
                                        :
                                        :
          Defendants.                   :
————————————————————————————X


## MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT....................................................................................................................4

I.      The Relevant Governing Standards ...................................................................4

II.     Plaintiffs' Statutory Challenges Are Not Meritless Because They
        Are Based On The Attorney General's Representations To This
        Court And The Second Circuit ............................................................................4

III.    This Court Should Exercise Its Jurisdiction To Determine
        Whether The Rules And Statutes The Attorney General
        Proclaims Unambiguously Prohibit Non-Lawyer Ownership
        Interests Are Unconstitutional ...........................................................................7

        A.      Plaintiffs Need Not Subject Themselves
                To Criminal Sanctions In Order To Challenge
                The Constitutionality Of New York's Prohibition
                On Non-Lawyer Investors.........................................................................9

        B.      Plaintiffs Need Not Bring A Declaratory Action
                In State Court..........................................................................................12

        C.      The Court Should Not Abstain From Hearing Plaintiffs'
                Constitutional Challenges .....................................................................13

IV.     The Blanket Prohibition On Non-Lawyer Investments
        In Law Firms Violates Plaintiffs' First Amendment Right
        Of Speech, Association, And Access To The Courts .......................................16

        A.      State Regulatory Schemes That Implicate Fundamental
                First Amendment Rights Must Withstand Strict Scrutiny ....................17

        B.      Because Less Restrictive Regulations Can Be Crafted
                To Ensure Attorney Independence, There Is No Compelling
                State Interest In A Complete Ban On Non-Lawyer Investments...........26

**TABLE OF CONTENTS**
**(Continued)**

|  |  | **Page** |

V.    Prohibitions on Non-Lawyer Investments
      In Law Firms Violates The Dormant Commerce Clause....................................................29

VI.   Prohibitions On Non-Lawyer Investments In Law Firms Violates
      The Due Process Clause Of The Fourteenth Amendment................................................33

VII.  Prohibitions On Non-Lawyer Investments In Law Firms
      Violates The Equal Protection Clause .............................................................................34

CONCLUSION...................................................................................................................35

00261061

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*Alexander v. Cahill,*
  598 F.3d 79 (2d Cir. 2010)..................................................................................................... 23, 25

*Alliant Energy Corp. v. Bie,*
  277 F.3d 916 (7th Cir. 2002)................................................................................................. 10, 11

*Ankenbrandt v. Richards,*
  504 U.S. 689, 112 S. Ct. 2206 (1992)......................................................................................... 13

*Antilles Cement Corp. v. Acevedo Vila,*
  408 F.3d 41 (1st Cir. 2005) ......................................................................................................... 31

*Babbitt v. United Farm Workers Nat. Union,*
  442 U.S. 289, 99 S. Ct. 2301 (1979) ...................................................................................... 9, 10

*Bates v. State Bar of Arizona,*
  433 U.S. 350, 97 S. Ct. 2691 (1977) .................................................................................... 23, 25

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544, 127 S. Ct. 1955 (2007) .......................................................................................... 4

*Brotherhood of Railroad Trainmen v. Virginia State Bar,*
  377 U.S. 1, 84 S. Ct. 1113 (1964) ....................................................................................... 21, 22

*Calcagno v. Aidman,*
  872 N.Y.S.2d 689 (Table), 2008 WL 3390943 (N.Y. Sup. Ct. Aug. 8, 2008).......................... 12

*Canadian Lumber Trade Alliance v. United States,*
  517 F.3d 1319 (Fed. Cir. 2008)................................................................................................... 10

*Citizens United v. Fed. Election Comm'n,*
  558 U.S. 310, 130 S. Ct. 876 (2010) .................................................................................. *passim*

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
  473 U.S. 432, 105 S. Ct. 3249 (1985) .................................................................................. 33, 34

*City of Philadelphia v. New Jersey,*
  437 U.S. 617, 98 S. Ct. 2531 (1978) .................................................................................... 30, 31

## TABLE OF AUTHORITIES
### (Continued)

**Cases**                                                                                    **Page**

*Colorado River Water Conservation Dist. v. United States,*
    424 U.S. 800, 96 S. Ct. 1236 (1976) ...................................................................... 13

*Copper v. Aaron,*
    358 U.S. 1, 78 S. Ct. 1401 (1958) ......................................................................... 3

*De Jonge v. State of Oregon,*
    299 U.S. 353, 57 S. Ct. 255 (1937) ...................................................................... 33

*Department of Revenue of Kentucky v. Davis,*
    553 U.S. 328, 128 S. Ct. 1801 (2008) .................................................................. 30

*Dow Jones & Co., Inc. v. Harrods Ltd.,*
    346 F.3d 357 (2d Cir. 2003) .................................................................................. 14

*Edenfield v. Fane,*
    507 U.S. 761, 113 S. Ct. 1792 (1993) .................................................................. 24

*Ellis v. Dyson,*
    421 U.S. 426, 95 S. Ct. 1691 (1975) .................................................................... 15

*England v. Louisiana State Bd. of Medical Seminars,*
    375 U.S. 411, 416, 84 S. Ct. 461, 465 (1964) ...................................................... 13

*Felmeister v. Office of Att'y Ethics,*
    856 F.2d 529 (3d Cir. 1988) .................................................................................. 12

*FTD Corp. v. Banker's Trust Co.,*
    954 F. Supp. 106 (S.D.N.Y. 1997) ....................................................................... 10

*Giboney v. Empire Storage & Ice Co.,*
    336 U.S. 490, 69 S. Ct. 684 (1949) ...................................................................... 24

*Gideon v. Wainwright,*
    372 U.S. 335, 83 S. Ct. 792 (1963) ...................................................................... 23

*Glickman v. Wileman Bros. & Elliott, Inc.,*
    521 U.S. 457, 117 S. Ct. 2130 (1997) .................................................................. 24

*Goldberg v. Kelly,*
    397 U.S. 254, 90 S. Ct. 1011 (1970) .................................................................... 23

## TABLE OF AUTHORITIES
### (Continued)

**Cases**                                                                          **Page**

*Graham v. Long Island R.R.,*
   230 F.3d 34 (2d Cir. 2000)..................................................................................... 34

*H.P. Hood & Sons, Inc. v. DuMond,*
   336 U.S. 525, 69 S. Ct. 657 (1949) ...................................................................... 31

*Harlen Assocs. v. Inc. Vill. of Mineola,*
   273 F.3d 494 (2d Cir. 2001).................................................................................. 34

*Harrison v. NAACP,*
   360 U.S. 177, 79 S. Ct. 1025, 1030 (1959) .......................................................... 13

*Horne v. Flores,*
   -- U.S. --, 129 S. Ct. 2579 (2009)......................................................................... 11

*Hughes v. Oklahoma,*
   441 U.S. 322, 99 S. Ct. 1727 (1979) .................................................................... 30

*IDK, Inc. v. Clark Cnty.,*
   836 F.2d 1185 (9th Cir. 1988)............................................................................... 24

*In re Lehman Bros. Sec. & Erisa Litig.,*
   799 F. Supp. 2d 258 (S.D.N.Y. 2011)................................................................... 4

*Inmates of The Rhode Island Training Sch. v. Martinez,*
   465 F. Supp. 2d 131 (D.R.I. 2006)........................................................................ 23

*Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments,*
   *Appellate Div. of Supreme Court of State of New York,*
   488 F. App'x 526 (2d Cir. 2012), .......................................................................... 2

*Jacoby & Meyers, LLP v. Presiding Justices,*
   847 F. Supp. 2d 590 (S.D.N.Y. 2012)................................................................... 6

*Kirschner v. Zoning Bd. of Appeals of Valley Stream,*
   924 F. Supp. 385 (E.D.N.Y. 1996)........................................................................ 34

*Lavoline v. Am. Bar Ass'n,*
   956 F.2d 1378 (7th Cir. 1992).................................................................... 12, 18, 22

**TABLE OF AUTHORITIES**
(Continued)

**Cases**                                                                    **Page**

*Louisiana State Bd. of Medical Examiners,*
   375 U.S at 415-416, 84 S. Ct. at 465................................................. 13, 15

*LSO, Ltd. v. Stroh,*
   205 F.3d 1146 (9th Cir. 2000)........................................................ 11

*Maine v. Moulton,*
   474 U.S. 159, 106 S. Ct. 477 (1985)................................................ 23

*Maine v. Taylor,*
   477 U.S. 131, 106 S. Ct. 2440 (1986).............................................. 30

*Marchi v. Bd. of Coop. Educ. Services of Albany,*
   173 F.3d 469 (2d Cir. 1999)........................................................... 11

*Matter of Oglesby v. McKinney,*
   7 N.Y. 3d 561 (2006) .................................................................... 12

*MedImmune, Inc. v. Genentech, Inc.,*
   549 U.S. 118, 127 S.Ct. 764 (2007) ................................................. 9

*Monsanto Co. v. Geertson Seed Farms,*
   -- U.S. --, 130 S. Ct. 2743 (2010)................................................... 11

*NAACP v. Alabama,*
   357 U.S. 449 (1958) ...................................................................... 24

*NAACP v. Button,*
   371 U.S. 415, 83 S. Ct. 328 (1963) ...........................................*passim*

*Nat'l Association of Optometrists & Opticians Lenscrafters, Inc. v. Brown,*
   567 F.3d 521 (9th Cir. 2009).......................................................... 30

*Nat'l Commodity & Barter Ass'n v. Archer,*
   31 F.3d 1521 (10th Cir. 1994)........................................................ 24

*NLRB v. Jones & Laughlin Steel Corp.,*
   301 U.S. 1, 57 S. Ct. 615 (1937) .................................................... 30

## TABLE OF AUTHORITIES
### (Continued)

**Cases**                                                                              **Page**

*Ohralik v. Ohio State Bar Association,*
    436 U.S. 447, 98 S. Ct. 1912 (1978) ...................................................................... 24

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137, 90 S. Ct. 844 (1970) ................................................................... 30, 32

*Planned Parenthood of S.E. Pennsylvania v. Casey,*
    505 U.S. 833, 112 S. Ct. 2791 (1992) .................................................................... 33

*Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.,*
    748 F.2d 774 (2d Cir. 1984) ................................................................................... 4

*Schoenefeld v. New York,*
    No. 09-0504, 2010 WL 502758 (N.D.N.Y. Feb. 8, 2010) ........................................ 9

*Shumway v. United Parcel Service, Inc.,*
    118 F.3d 60 (2d Cir. 1997) .................................................................................... 34

*Sorrell v. IMS Health Inc.,*
    131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011) ............................................................ 24

*Steffel v. Thompson,*
    415 U.S. 452, 94 S. Ct. 1209 (1974) ...................................................................... 14

*Tennessee Secondary Schools Ass'n v. Brentwood Academy,*
    551 U.S. 291, 127 S. Ct. 2489 (2007) .................................................................... 24

*Texas v. United States,*
    523 U.S. 296, 118 S. Ct. 1257 (1998) ............................................................... 11, 20

*The New York Times Co. v. Gonzales,*
    159 F.3d 160 (2d Cir. 2006) .............................................................................. 14, 15

*Town of Clarkstown, New York,*
    511 U.S. at 389, 114 S. Ct. at 1682 ................................................................... 30, 31

*United Mine Workers of America, Dist. 12 v. Illinois State Bar Association,*
    389 U.S. 217, 88 S. Ct. 353 (1967) ........................................................................ 22

*United States v. Bell,*
    414 F.3d 474 (3d Cir. 2005) .................................................................................. 24

# TABLE OF AUTHORITIES
## (Continued)

**Cases**      **Page**

*United States v. Morrison,*
  529 U.S. 598, 120 S. Ct. 1740 (2000) .................................................................... 30

*United Transp. Union v. State Bar of Mich.,*
  401 U.S. 576, 91 S. Ct. 1076 (1971) ................................................................. 19, 22

*Vermont Right to Life Comm., Inc. v. Sorrell,*
  221 F.3d 376 (2d Cir. 2000) ................................................................................... 9

*W.&S. Life Insur. Co. v. State Bd. of Equalization of Cal.,*
  451 U.S. 648, 101 S.Ct. 2070, (1981) ................................................................... 29

*Washington State Grange v. Washington State Republican Party,*
  552 U.S. 442, 128 S. Ct. 1184 (2008) ................................................................... 18

*Wilton v. Seven Falls Co.,*
  515 U.S. 277, 115 S. Ct. 2137 (1995) ................................................................... 14

*Younger v. Harris,*
  401 U.S. 37, 91 S. Ct. 746 (1971) ........................................................................ 11

**Statutes**

New York Judiciary Law §§ 478, 479, 481, 482, 484, 485, 491 ................................... 5

New York Judiciary Law § 470 ................................................................................. 10

New York Judiciary Law § 495 ........................................................................ 3, 8, 13

New York Limited Liability Company Law § 201 ......................................... 3, 6, 8, 13

New York Limited Liability Company Law § 1203, 1207(a), 1208, 1210, 1211 ......... 6

New York Partnership Law § 121-1500(a)(1) ....................................................... 3, 6

## TABLE OF AUTHORITIES
### (Continued)

**Page**

**Rules**

Fed. R. Civ. P. 11 ................................................................................................................ 4

New York's Rules of Professional Conduct,  Rule 5.4 ........................................................ *passim*


**Other Authorities**

*Democratizing the Delivery of Legal Services,*
   73 Ohio St. L.J. 1 (2012) ................................................................................................ 20, 32

*Don't Just Check "Yes" or "No": The Need for Broader Consideration of Outside Investment Law,*
   210 U. Ill. L. Rev 311, 361 (2010) .................................................................................. 27

*"Professionalism" as Pathology:  The ABA's Latest Policy Debate on Nonlawyer Ownership of Law Practice Entities,*
   40 Fordham Urb. L.J. 75, 116 (2012) .............................................................................. 28

*Revising Model Rule 5.4: Adopting A Regualtory Scheme That Permits Non Lawyer Owbership And Management of Law Firms,*
   48 Washburn. L.J. 669 (2009) .......................................................................................... 28

Plaintiffs Jacoby & Meyers, LLP ("J&M LLP") and Jacoby & Meyers USA, LLC ("J&M LLC") (collectively, "Jacoby & Meyers"), respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Second Amended Complaint ("SAC").

<u>**PRELIMINARY STATEMENT**</u>

Plaintiffs claim that their First Amendment right to associate with non-lawyers for the purpose of expanding their legal practice is unduly restricted by New York's blanket prohibition on non-lawyer investment. The Second Amended Complaint ("SAC") pleads more than sufficient facts to render this claim plausible, and Defendants offer nothing in response but procedural objections already turned aside by the Second Circuit and the unsupported and counterfactual claim that the state's interest in ensuring attorney independence is furthered by the blanket prohibition. This Court should deny the motion to dismiss and allow this case to proceed to a determination as to whether New York's blanket prohibition violates the First Amendment.

The First Amendment guarantees all persons, including corporate entities, the right to associate, particularly when that association is formed for the purpose of providing legal speech on behalf of those who might not otherwise have access to legal services. But New York's prohibition on non-lawyer investment in law firms forecloses in every instance the ability of lawyers to associate with non-lawyers in the form of a joint economic enterprise created for the purpose of expanding and providing more effective legal representation. The SAC alleges that New York's non-lawyer rules restrict law firms' ability to expand their services to those who could not otherwise afford them (SAC ¶¶ 3, 6, 31-44), they prevent law firms from investing in technologies that would make legal services more affordable and more effective (*Id.*), and they prevent New York law firms from being able to compete with those from England and Australia, who allow (with no ill effects) non-lawyer investments. SAC ¶¶ 45-55. Plaintiffs also plausibly

allege that the blanket prohibition on non-lawyer investment does not further the state's interest in ensuring attorneys' independence and loyalty to their clients because any adverse consequences resulting from economic pressure caused by non-lawyer investors are more than equaled by the inherent pressures of any for-profit enterprise, particularly given the high interests rates attorneys must pay for bank loans because they are foreclosed from accepting non-lawyer investors.  SAC ¶¶ 45-63.  Plaintiffs also plausibly allege that the panoply of less restrictive regulations used in England and Australia and proposed by various American Bar Association committees are more than sufficient to ensure attorney independence.  *Id.*  These reasonable restrictions include creating independent licensing bodies, imposing restrictions on the amount of equity interest non-lawyers can hold, and requiring a legal practice with non-lawyer owners to appoint a legal director responsible for the management, oversight and compliance of lawyers' professional obligations.  In response, the Attorney General offers only the tired platitude that outside investors would force attorneys to abandon their loyalties to clients; the Attorney General offers not a shred of supporting fact or empirical proof for this claim.

Perhaps realizing they are wrong on the merits, Defendants go to great lengths to convince this Court that it need not reach them.  But the Second Circuit was clear that it expects this Court to "proceed to adjudicate the parties' dispute as to whether [the identified statutes], and Rule 5.4, are constitutional." *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments, Appellate Div. of Supreme Court of State of New York*, 488 F. App'x 526, 527 (2d Cir. 2012), as amended (Jan. 9, 2013) ("Summary Order").

The SAC more than plausibly alleges that Plaintiffs have standing to bring their ripe claims, and that this Court should not abstain from reaching the merits of this dispute.  The SAC alleges that Rule 5.4 of New York's Rules of Professional Conduct forbids non-lawyer

2

investments in law firms in whatever form they take.  SAC ¶ 4.  The SAC also alleges, and the

Attorney General agrees, that New York Partnership Law § 121-1500(a)(1) forbids a law firm

partnership from accepting non-lawyers as partners.  SAC ¶ 5; Dkt. 27 at 5.  The SAC also

alleges, and the Attorney General agrees, that New York's Limited Liability Company Law

("LLCL") forbids a law firm organized as a professional corporation from having non-lawyer

members.  *Id.*; Dkt. 27 at 7.  The Attorney General also represented that LLCL § 201 and

Judiciary Law § 495 "unambiguously prohibit non-lawyer investments in law firms."  Summary

Order at 527.  Notwithstanding the fact that the Attorney General previously identified a host of

other statutes it claimed prohibited non-lawyer investments, Defendants now claim that these

other laws do not prohibit non-lawyer investors.  Thus, Plaintiffs have challenged the application

of all of the rules and laws that preclude plaintiffs from accepting non-lawyer investors.[1]

Defendants go to great lengths to argue that Plaintiffs lack standing because neither is a

professional services limited liability company ("PLLC"), and a law firm may not practice as a

limited liability company.  But this argument does not address the fact that Jacoby & Meyers,

LLP is prepared to accept non-lawyer investments.  Moreover, Jacoby & Meyers USA, LLC *is* a

PLLC.  On August 27, 2013, Jacoby & Meyers USA II PLLC was formed, and on August 28,

2013, Jacoby & Meyers USA, LLC and Jacoby & Meyers USA II PLLC were merged into

Jacoby & Meyers USA II PLLC.  *See* Declaration of D. Gregory Blankinship, Exhibit 1.

Plaintiffs have expressed an unambiguous intent to accept non-lawyer investors, and they will do

so as a LLP or a PLLC or in whatever form is required; the only impediment preventing them

from doing so is New York's prohibition on non-lawyer investors and the Attorney General's

threat of prosecution.

---

[1]  Even if there are other as-yet-to-be identified rules or statutes that might prevent non-lawyer investments, a finding that Rule 5.4 is unconstitutional will bind New York officials from applying such rules in an unconstitutional manner.  *See Copper v. Aaron*, 358 U.S. 1, 15-23, 78 S. Ct. 1401, 1408-12 (1958).

Because it is beyond cavil that a litigant need not face the threat of criminal sanctions in order to challenge the constitutionality of a law, and because there is nothing ambiguous about New York's blanket prohibition on non-lawyer investors, Plaintiffs' claims are ripe and Defendants' motion to dismiss should be denied.

## ARGUMENT

### I.   The Relevant Governing Standards.

The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir. 1984). When deciding a motion to dismiss, courts must accept as true the well pleaded allegations of the complaint. *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 272 (S.D.N.Y. 2011). "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 563 n. 8, 127 S. Ct. 1955, 1969 n. 8 (2007).  To meet the standard of adequacy, the complaint should contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 1974.  Here, these standards are easily satisfied.

### II.   Plaintiffs' Statutory Challenges Are Not Meritless Because They Are Based On The Attorney General's Representations To This Court And The Second Circuit.

When this action was first brought, Plaintiffs challenged only Rule 5.4 as an unconstitutional impediment to non-lawyer investment in New York law firms.  Dkt. 1.  In moving to dismiss that first complaint and the subsequently filed amended complaint, the Attorney General, New York's top law enforcement officer, represented to this Court in briefing signed pursuant to Fed. R. Civ. P. 11 and in oral argument that a host of other laws precluded

non-lawyer investment in law firms, however constituted.  The Second Circuit remanded this case "to permit the plaintiffs to amend their complaint to name additional state defendants and challenge the other provisions of New York law that prohibit non-lawyer investment in law firms."  Summary Order at 527.  To that end, Plaintiffs identified all of the laws the Attorney General identified as prohibiting non-lawyer investors.

The Attorney General identified three sets of laws it claimed prohibited non-lawyer investments in law firms.  First, in seeking dismissal of the first complaint, the Attorney General represented that "[a]rrangements such as that proposed by plaintiff could also easily run afoul of N.Y. Judiciary Law §§ 478, 484 and 485, barring non-lawyers from practicing law in the State or holding themselves out as able to do so," Dkt. 10 at 7, and that "[t]he Judiciary Law also sharply restricts the transactions and conduct of non-lawyers who are associated with lawyers practicing law in the State in other ways.  For example, a non-lawyer partner would be subject to criminal liability for involvement in obtaining or referring a client or legal matter to the firm, or if he were to exert any control over or be involved in the legal work done by the firm.  *See* N.Y. Jud. L. §§ 478, 479, 481, 482, 484, 485, 491." Dkt. 10 at 10.  The Attorney General repeated this claim in responding to the amended complaint, Dkt. 27 at 6, and again during oral argument before this Court.  To prevent the Attorney General from avoiding the constitutional issues at hand and to ensure that Plaintiffs' claims were ripe, Plaintiffs identified Judiciary Law §§ 478, 484, 485, 491, and 495 in the SAC.  In direct contradiction to its former representations to this Court, and without apology, the Attorney General now reverses course, stating that "Plaintiffs' claims seeking to strike down Judiciary Law §§ 478, 484 and 485 appear frivolous and, at a minimum, are wholly unsupported." Def. Mem. at 8.  If the Attorney General has now determined that these laws do not prohibit non-lawyer investment in law firms, Plaintiff will agree that this Court

need not determine whether they are unconstitutional as applied to firms taking on non-lawyer investors.

Second, the Attorney General cited Partnership Law § 121-1500(a)(1), asserting that "pursuant to the New York Partnership Law under which it is organized, J&M LLP is statutorily barred from adding a partner who is not a lawyer, or take on any limited partner, lawyer or not. N. Y. Part. L. § 121-1500(a)(I)." Dkt. 27 at 5. This Court agreed, stating "if J&M allowed a non-lawyer to own an equity interest in the firm, it could not operate as a limited liability partnership." *Jacoby & Meyers, LLP v. Presiding Justices*, 847 F. Supp. 2d 590, 598 (S.D.N.Y. 2012). Defendants' only argument as to why Plaintiffs' challenge to N.Y. Part. L. § 121-1500(a)(I) is improper is based on the incorrect assumption that Jacoby & Meyers, LLP has abandoned its challenge to the partnership law. Not so. While Jacoby & Meyers, LLP is prepared to transfer assets into Jacoby & Meyers USA, LLC (now Jacoby & Meyers USA II PLLC) for the purpose of accepting non-lawyer investments, Jacoby & Meyers, LLP is equally prepared to itself take on non-lawyer partners should the current prohibitions be struck down.

Third, with respect to New York's limited liability company laws, the Attorney General represented that "all persons with an ownership interest in the PSLLC must be professionals licensed in the relevant field. This is a bedrock requirement that is repeatedly stated in the lengthy governing statutes. LLCL §§1203, 1207(a), 1208,[2] 1210, 1211." Dkt. 27 at 7-8. Accordingly, Plaintiffs identified these statutes as unconstitutional impediments, along with § 201. The Attorney General makes two arguments in support of its claim that these statutes do not prohibit non-lawyer investment. First, the Attorney General asserts that these statutes do not

---

[2] The Attorney General misstates the record when he represents that the identification of § 1208 as an impediment to non-lawyer ownership was simply a mistake in the table of authorities. To the contrary, this representation is included not once but twice in Defendants' memorandum of law seeking dismissal of the amended complaint. Dkt. 27 at 7, 8.

apply because Plaintiff Jacoby & Meyers USA, LLC is not a PSLLC. But it is. *See* Exhibit 1.[3]

Second, the Attorney General now contends that these statutes do not act as impediments to non-lawyer ownership interests in law firms. Def. Mem. at 6. If the Attorney General has now determined that these laws do not prohibit non-lawyer investment in law firms, Plaintiff will agree that this Court need not determine whether they are unconstitutional as applied to firms that have non-lawyers with ownership interests.

Public statements by the Attorney General regarding the laws he intends to enforce and the manner in which he chooses to enforce them have consequences. Plaintiffs were required to challenge the application of these statutes after the Attorney General stated his position that these laws prohibit non-lawyer investments in law firms. If the Attorney General is now taking the position that the statutes he identified in briefing and argument before this Court do not in fact prohibit non-lawyer investment, Plaintiffs adopt Defendants' position. However, based on Defendants' July 15, 2011 representations, the laws challenged as applied by New York's top law enforcement officer are the laws that are violating Plaintiffs' constitutional rights. As such, Plaintiff has properly pled a challenge to these statutes as applied that is ripe for judicial review.

**III.    This Court Should Exercise Its Jurisdiction To Determine
          Whether The Rules And Statutes The Attorney General Proclaims
          Unambiguously Prohibit Non-Lawyer Ownership Interests Are Unconstitutional.**

Defendants make four arguments as to why this Court should not exercise its jurisdiction to determine whether the challenged statutes are constitutional. First, Defendant asserts that Plaintiffs lack standing because they are not PSLLCs. As discussed above, this argument is infirm, not the least reason being that Jacoby & Meyers USA, LLC (now Jacoby & Meyers USA II PLLC) is a PLLC. *See* Exhibit 1. This argument is further infirm as it fails to address Jacoby

---

[3] For the same reason, Defendants' argument (Point II) that Plaintiffs lack standing because neither is a PSLLC, Def. Mem. at 10-11, is based on an incorrect factual predicate. This is the only argument with respect to standing proffered by Defendants.

& Meyers, LLP's standing to challenge Rule 5.4 and New York partnership law's blanket prohibition on non-lawyer investments.  Second, Defendants contend that Plaintiffs' claims are not ripe because they have not yet been the subject of disciplinary or criminal enforcement actions, and because it is not clear that New York law would prohibit non-lawyers from having an ownership interest in law firms.  Def. Mem. at 11-14.  However, it is well settled that one need not risk criminal sanctions in order to challenge unconstitutional laws, and there is no ambiguity with respect to New York's non-lawyer rules.  Third, Defendants contend that Plaintiffs should first file a declaratory action in state court because the application of New York law to firms with non-lawyer investors is ambiguous.  Def. Mem. at 13.  But Defendants should not now be heard to claim that Judiciary Law § 495 or LLCL § 201 are ambiguous with respect to whether they prohibit non-lawyers from having an equity interest in law firms, as the Second Circuit explicitly noted that "appellees contend (and the district court agreed) that New York Judiciary Law § 495 and New York Limited Liability Company Law § 201 independently prohibit non-lawyer investment in law firms . . . Appellees  . . . argued in their brief and at oral argument that the alternative provisions of New York law unambiguously prohibit non-layer investment in law firms,  because appellees have taken that position in an effort to persuade this Court to endorse their position on standing, they (and the New York Attorney General . . .) would be judicially estopped from arguing in the district court that the relevant provisions of state law are sufficiently unclear to warrant *Pullman* abstention."  Summary Order at 527. Fourth, Defendants argue that this Court should abstain from deciding the case, but again, there are no ambiguities left to resolve.  As the Second Circuit plainly stated, "the district court can proceed to adjudicate the parties' dispute as to whether those statutes, and Rule 5.4, are constitutional."  *Id.*

8

A.      **Plaintiffs Need Not Subject Themselves
To Criminal Sanctions In Order To Challenge
The Constitutionality Of New York's Prohibition On Non-Lawyer Investors.**

Plaintiffs need not risk criminal sanction for their claims to be ripe.  The Attorney

General has unambiguously stated that it would bring an enforcement action against Plaintiffs

should they accept non-lawyer investors; these threats of enforcement are more than sufficient to

render Plaintiffs' claims ripe under Supreme Court jurisprudence.  Thus, in *Babbitt v. United

Farm Workers Nat. Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 2308-09 (1979), the Court held

that when a plaintiff "has alleged an intention to engage in a course of conduct arguably affected

with a constitutional interest, but proscribed by a statute, and there exists a credible threat of

prosecution thereunder, he should not be required to await and undergo a criminal prosecution as

the sole means of seeking relief."  *Id.*  Put differently, the Court held that a plaintiff has standing

to make a pre-enforcement challenge when fear of prosecution "under an allegedly

unconstitutional statute is not imaginary or wholly speculative."  *Id.*[4]  Simply stated, Plaintiffs

should not be forced to flout the law and face prosecution in order to exercise their constitutional

rights.  *See Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000) ("A

plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a

certainty that it will be prosecuted under the statute to show injury, but only that it has an actual

and well-founded fear that the law will be enforced against it.") (citation omitted).

*Schoenefeld v. New York*, No. 09-0504, 2010 WL 502758, at *2-3 (N.D.N.Y. Feb. 8,

2010) is directly on point.  The plaintiff there, an attorney admitted to practice in both New York

---

[4] *See also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29, 127 S.Ct. 764, 772 (2007) ("Our analysis
must begin with the recognition that, where threatened action by *government* is concerned, we do not require a
plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat -- for example, the
constitutionality of a law threatened to be enforced.  The plaintiff's own action (or inaction) in failing to violate the
law eliminates the imminent threat of  prosecution, but nonetheless does not eliminate Article III jurisdiction.")
(emphasis in original).

and New Jersey who resided in New Jersey and maintained an office in New Jersey, challenged New York Judiciary Law § 470, which required her to maintain an office in New York in order to practice law in the state.  *Id.*  Defendants argued that "Plaintiff has failed to show any likelihood of her practicing law in New York or of § 470 being enforced against her, and, therefore, claim Plaintiff has failed to demonstrate that any real, substantial dispute admitting of specific relief exists."  *Id.*  Citing *Babbit*, the court rejected the defendants' ripeness argument, holding that the plaintiff, in alleging her refusal to take New York cases "because she does not have a New York office and does not wish to violate § 470," had sufficiently alleged a substantial controversy admitting of specific relief.  *Id.*  The same is true here.  Both Plaintiffs are ready to take on non-lawyer investments; only their desire to not violate the law prevents them from doing so.

Moreover, contrary to Defendants' assertions, this is not a case that turns on the imminence of prosecution, because the injury to Plaintiffs has already occurred.  The prohibitions on non-lawyer investments result in an immediate increase in the costs of financing law firms like Plaintiffs, thereby causing a present and ongoing injury and making Plaintiffs' challenge ripe.  *Alliant Energy Corp. v. Bie*, 277 F.3d 916, 920 (7th Cir. 2002) is instructive. There, the Seventh Circuit held that the plaintiff had standing to challenge a statute constraining equity investment in a company because it necessarily caused the plaintiff's costs of obtaining capital to increase, thereby causing injury sufficient to establish standing.  *Id.* at 920.  In so holding, the court reiterated that "complaints need not be elaborate, and in this respect injury (and thus standing) is no different from any other matter that may be alleged generally." *Alliant*, 277 F.3d at 919 (citation omitted).  *See also FTD Corp. v. Banker's Trust Co.*, 954 F. Supp. 106, 109 (S.D.N.Y. 1997); *cf., e.g., Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319,

10

1333 (Fed. Cir. 2008) (collecting cases holding that standing exists when the government acts so as to reduce a party's market share). Moreover, where, as here, "the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000).

      The ripeness cases relied upon by Defendants are inapposite. In *Texas v. United States*, 523 U.S. 296, 300, 118 S. Ct. 1257, 1259 (1998), the plaintiff's claims were not ripe because the constitutional violation alleged required the occurrence of several speculative events that were not "even likely" to occur. Similarly, in *Marchi v. Bd. of Coop. Educ. Services of Albany*, 173 F.3d 469, 474 (2d Cir. 1999), the Second Circuit held that claims were not ripe where the defendant never indicated that it intended to take any action against the plaintiff that would violate the constitutional right underlying the plaintiff's lawsuit. And, in *Younger v. Harris*, 401 U.S. 37, 42, 91 S. Ct. 746, 749 (1971), the Supreme Court held that claims were not ripe when the threat of prosecution was not "remotely possible." Here, as in *Alliant,* no further or future action is needed to cause injury to Plaintiffs. The statutes mere existence, without more, causes injury to Plaintiffs. To rule otherwise would place Plaintiffs in a Hobson's choice by which the cost of challenging the laws would be their license to practice law.

      As the Supreme Court has repeatedly explained, "Article III standing requires an injury that is (i) concrete, particularized, and actual or imminent, (ii) fairly traceable to the challenged action, and (iii) redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, -- U.S. --, 130 S. Ct. 2743, 2752 (2010) (citing *Horne v. Flores*, -- U.S. --, 129 S. Ct. 2579, 2591-2592 (2009)). Thus, the inquiry on this motion is whether Plaintiffs have pled sufficient facts making it plausible that a favorable ruling would redress the harm being inflicted upon them. Should this Court determine that the challenged laws, as applied, impermissibly prohibit

11

Plaintiffs from accepting non-lawyer investments, such a decision would remedy Plaintiffs' injury. Therefore, Plaintiffs' claims are ripe for adjudication.

**B.      Plaintiffs Need Not Bring A Declaratory Action In State Court.**

Defendants contend that Plaintiffs should have sought a declaratory judgment in state court because "this Court should not presume . . . that the State will act in an unconstitutional manner." Def. Mem. at 12.  To the contrary, the Court should presume exactly that, because the Attorney General has stated that the challenged laws prohibit non-lawyer investments in whatever form a law firm operates, and because the Second Circuit has commanded that the Attorney General not be heard to argue that the statutes are in any way ambiguous.  Defendants inexplicably rely upon *Matter of Oglesby v. McKinney*, 7 N.Y. 3d 561 (2006) and *Calcagno v. Aidman*, 872 N.Y.S.2d 689 (Table), 2008 WL 3390943 (N.Y. Sup. Ct. Aug. 8, 2008).  Neither of these cases is factually or legally similar to the instant one.  *Oglesby* simply held that a challenge to a judge's order granting a motion to strike a jury panel should be made by a declaratory judgment, not an Article 78 proceeding.  Plaintiffs have not filed an Article 78 proceeding, but instead seek a declaratory judgment.  *Calcagno* involved a declaratory judgment action in state court to determine whether an attorney disciplinary rule had been violated.  Plaintiffs are not seeking a declaration as to whether they have violated the statutes at issue, as was the case in *Calcagno*; they are challenging the very constitutionality of the statutes as they are being applied.  There simply are no preliminary issues for a state court to determine before constitutionality is determined.[5]

---

[5]  Likewise, neither *Lawline v. Am. Bar. Ass'n,* 956 F.2d 1378 (7th Cir. 1992) nor *Felmeister v. Office of Att'y Ethics,* 856 F.2d 529 (3d Cir. 1988) support Defendants' claim that Plaintiffs claims are not ripe until "state court proceedings regarding the transaction had concluded."  Def. Mem. at 11.  *Lawline* does not involve or address the propriety of state law claims.  And in *Felmeister*, the plaintiff's claims were dismissed because the allegations in the complaint made it impossible to determine whether the plaintiff's proposed advertisements would violate a New York disciplinary rule.  Here, Defendants themselves contend that what Plaintiffs want to do – enter into engagements with non-lawyer investors – is prohibited.

**C.      The Court Should Not Abstain From Hearing Plaintiffs' Constitutional Challenges.**

The Second Circuit's mandate in this case provides that "abstention is unnecessary, and the district court can proceed to adjudicate the parties' dispute as to whether those statutes, and Rule 5.4, are constitutional." Summary Order at 527.[6] The direction from the Second Circuit could not have been clearer. Moreover, notwithstanding the unique posture of this case, abstention is unwarranted even under traditional application of the doctrine. Indeed, "abstention from the exercise of federal jurisdiction is the exception, not the rule." *Ankenbrandt v. Richards*, 504 U.S. 689, 704, 112 S. Ct. 2206 (1992), quoting, *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S. Ct. 1236, 1244 (1976). "Abstention should rarely be invoked, because the federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" *Ankenbrandt*, 504 U.S. at 705, 112 S. Ct. at 2215, quoting *Colorado River*, 424 U.S. at 813, 465 S. Ct. at 1246.[7]

It is well settled that abstention is only applicable where the issue of state law is uncertain; if the "state statute in question is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction." *Id.* Here, as mandated by the Second Circuit, there is no "uncertain" issue of a state law that could moot the federal constitutional questions, and therefore abstention is unwarranted. *See Louisiana State Bd. of Medical Examiners*, 375 U.S at 415-416, 84 S. Ct. at 465 ("[R]ecognition of the role of state

---

[6] Defendants appropriately relegate to a footnote the claim that the Second Circuit only meant that the Attorney General is estopped from arguing that Rule 5.4, Judiciary Law § 495, and LLCL § 201 are ambiguous with respect to the transfer of the LLP's assets to the LLC. Def. Mem. at 15. Not so. The Attorney General argued before this Court and the Second Circuit that Judiciary Law § 495 and LLCL § 201 unambiguously prohibit non-lawyer ownership interests in law firms, and the Second Circuit explicitly rejected the availability of abstention.

[7] The abstention doctrine does not, in any way, divest the federal court of its jurisdiction over a constitutional claim. *See England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411, 416, 84 S. Ct. 461, 465 (1964) (abstention does not "'involve the abdication of federal jurisdiction, but only the postponement of its exercise.'"), quoting *Harrison v. NAACP*, 360 U.S. 177, 79 S. Ct. 1025, 1030 (1959).

courts as the final expositors of state law implies no disregard for the *primacy of the federal judiciary in deciding questions of federal law*.") (emphasis added).

Defendants' contention that this Court should exercise its "broad discretion" under the Declaratory Judgment Act to refuse to exercise jurisdiction over this action (Def. Mem. at 16) should likewise be swiftly rejected, not the least reason being that Plaintiffs did not bring this action pursuant to the Declaratory Judgment Act (the "Act"). Section 1983 provides an independent cause of action providing for declaratory relief. Moreover, the Act, which creates a federal cause of action for a declaratory judgment, does not diminish this Court's jurisdiction over Plaintiffs' constitutional challenge. Indeed, determining the constitutionality of a state statute is a proper subject for adjudication under the Act. *See Steffel v. Thompson*, 415 U.S. 452, 467, 94 S. Ct. 1209, 1219 (1974) (the Declaratory Judgment Act was designed to test constitutionality of state criminal statutes).[8]

Moreover, even if this Court were to apply the factors identified by the Second Circuit as relevant to a court's determination of whether to entertain a declaratory judgment action under the Act, such an exercise of jurisdiction would be warranted. The applicable factors are:

> (i) "whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved"; (ii) "whether a judgment would finalize the controversy and offer relief from uncertainty"; (iii) "whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to *res judicata*' "; (iv) "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court"; and (v) "whether there is a better or more effective remedy."

---

[8] Tellingly, virtually none of the cases cited by Defendants address a federal court's jurisdiction to issue a declaratory judgment on a constitutional challenge. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 115 S. Ct. 2137 (1995) (underwriters sought declaratory judgment that their commercial liability insurance policies provided no coverage); *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 358 (2d Cir. 2003) (newspaper publisher sought declaration that story was not libelous as a matter of law); *The New York Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006) (newspaper seeking declaratory judgment that its reporters' telephone records were privileged from potential grand jury subpoena).

*Gonzales*, 459 F.3d at 167 (citations omitted) (finding that the district court did not abuse its discretion in entertaining the action). All of these factors weigh heavily in favor of this Court hearing this case. Factors (i) and (ii) favor a decision on the merits. A declaration that a blanket prohibition on non-lawyer investments in law firms is unconstitutional would settle the legal issue involved and finalize the controversy for all of the reasons discussed above. Factor (iii) is inapplicable on its face. Factor (iv) likewise weighs in favor of the Court's exercise of jurisdiction. The Court's resolution of Plaintiffs' constitutional claims would not intrude upon the domain of a state court because the matter at issue focuses on a question of federal constitutional law. Indeed, there is no interpretation of New York's blanket prohibition on non-lawyer investments in law firms that would avoid the need for an adjudication of its constitutionality. This determination is not one of state law, but of the United States Constitution, and as such is squarely within the dominion of this Court. *See Louisiana State Bd.f Medical Examiners*, 375 U.S at 415-416, 84 S. Ct. at 466 (recognizing the "primacy of the federal judiciary in deciding questions of federal law.").

*Ellis v. Dyson*, 421 U.S. 426, 95 S. Ct. 1691 (1975) is particularly instructive. There, the plaintiff brought a claim under both Section 1983 and the Act alleging that a state anti-loitering law was unconstitutional. The Supreme Court ruled that the opportunity for adjudication of constitutional rights in a federal forum was "paramount" and superseded any considerations of comity and federalism, especially where there was no pending state judicial case enforcing the statute. *Ellis*, 421 U.S. at 432, 95 S. Ct. 1691 (where no state enforcement proceeding is pending, "the opportunity for adjudication of constitutional rights in a federal forum, as authorized by the Declaratory Judgment Act, becomes paramount").

Finally, turning to factor (v), there is no better or more effective remedy. Indeed, Defendants do not argue that there exists another remedy, but rather that Plaintiffs should seek the same remedy in state court. Def. Mem. at 18. However, given this Court's ability to decide these constitutional issues, it can hardly be said that seeking a declaratory judgment in state court would be a "better" or "more effective" remedy.

This Court should exercise its jurisdiction over Plaintiffs' constitutional claims.

**IV.   The Blanket Prohibition On Non-Lawyer Investments In Law Firms Violates Plaintiffs' First Amendment Right Of Speech, Association, And Access To The Courts.**

That corporate entities enjoy the same First Amendment protections as natural people is now beyond cavil. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342, 130 S. Ct. 876, 899 (2010) ("The Court has recognized that First Amendment protection extends to corporations."). The First Amendment thus protects the rights of corporations to associate with each other and with natural persons. This is particularly true with respect to law firms, whose *reason d'être* is to speak and advocate for their clients. This Court must strictly scrutinize the application of any law that abridges these rights, and it must invalidate the application of those laws unless the state demonstrates that it has a compelling interest in enforcing them.

The SAC pleads facts that render plausible Plaintiffs' claim that New York's laws prohibiting non-lawyer investment in law firms are invalid under the First Amendment. Plaintiffs allege that New York's rules prohibiting non-lawyer investments inhibits law firms' ability to associate with others for the purpose of expanding their ability to speak and advocate for others, particularly those who have difficulty affording lawyers. SAC ¶¶ 2-3, 6. The SAC also plausibly alleges that New York's blanket prohibition against non-lawyer ownership interests does not further any legitimate state interest. The SAC alleges that there is no basis for

16

asserting that the financial pressures from non-lawyer investors would be greater than the financial pressures involved in any legal enterprise however structured (SAC ¶¶ 9, 54-55); in fact, because bank loans come at a cost much greater than firms would incur by allowing non-lawyer investors, New York's prohibition on non-lawyer investments makes financial pressures worse, not better. SAC ¶¶ 40-41. The Attorney General argues that the non-lawyer rules further the state's compelling interest in ensuring that attorneys act in the best interest of their client, but Defendants offer not a shred or fact or empirical data to support this claim. The SAC, on the other hand, plausibly pleads that allowing non-lawyer investments does not result in the erosion of attorney independence, as demonstrated by the experiences of the District of Columbia, England, and Australia, who allow non-lawyer investments in law firms and who have not experienced the parade of horrible the Attorney General imagines. SAC ¶¶ 50-54. This is particularly so given the ability of the judiciary and the state to fashion less restrictive alternatives to an all-out ban on non-lawyer investments. SAC ¶¶ 56-62. Defendants' prohibitions on non-lawyer investments cannot survive the strict scrutiny to which this Court must subject them, and therefore the motion to dismiss should be denied.

## A.    State Regulatory Schemes That Implicate Fundamental First Amendment Rights Must Withstand Strict Scrutiny.

The Attorney General goes to great lengths to avoid strict scrutiny of the laws he intends to enforce, arguing that a lesser review is appropriate because Plaintiffs are not making an applied challenge and because the First Amendment issue here only involves corporate activities. Def. Mem. at 19-22. But Plaintiffs are challenging New York's laws only as they are applied to the associational and speech activities in which they would engage but for the Attorney General's enforcement of the prohibition against non-lawyer investment.

The Attorney General argues that there can be no applied challenge because Plaintiffs have not yet subjected themselves to criminal sanctions. Def. Mem. at 19-20. But, as discussed above, a plaintiff need not submit to criminal sanctions in order to challenge an unconstitutional law. Indeed, *Citizens United* forecloses Defendants' argument. In *Citizens United*, the plaintiff wanted to engage in certain activity ("to make Hillary available through video-on-demand within 30 days of the 2008 primary elections"), but did not for fear of "civil and criminal penalties," and instead "sought declaratory and injunctive relief" as against the Federal Election Commission, arguing its law were "unconstitutional as applied to Hillary and to the three ads for the movie." *Citizens United*, 558 U.S. at 321, 130 S. Ct. at 888.

Cases cited by Defendants do not require a different conclusion. In *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 454, 128 S. Ct. 1184, 1193 (2008), the Supreme Court concluded that a facial challenge to an election law failed because the plaintiff's arguments "depend, not on any facial requirement of [the election law at issue], but on the possibility that voters will be confused as to the meaning of the party-preference designation. But respondents' assertion that voters will misinterpret the party-preference designation is sheer speculation." Here, however, there is no question that New York's rules prohibit non-lawyer ownership of law firms, in whatever form that association takes. Similarly, the Seventh Circuit declined to find a statute invalid on its face in *Lawline*, 956 F.2d at 1386, because it was not clear that the rule would prohibit constitutionally protected speech; here, of course, the Attorney General has made clear his intent to enforce New York's prohibition on non-lawyer investments in law firms.

Even if this Court chooses to view Plaintiffs' claims as a facial challenge, it should still find New York's non-lawyer investment laws unconstitutional because they plainly prohibit non-

18

lawyer investment, which the SAC alleges violates Plaintiffs' freedom of association and speech.

If a statute on its face abridges a fundamental constitutional right, then it should be stricken

down, even if it has not yet been applied:

> This injunction, like a criminal statute, prohibits conduct under fear of
> punishment. Therefore, we look at the injunction as we look at a statute, and if
> upon its face it abridges rights guaranteed by the First Amendment, it should be
> struck down. Our statement in *NAACP v. Button* concerning the statute there in
> question is equally applicable to the injunction now before us: '(W)e cannot
> assume that, in its subsequent enforcement, ambiguities will be resolved in favor
> of adequate protection of First Amendment rights.'

*United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 581, 91 S. Ct. 1076, 1080 (1971).

Moreover, Defendants are incorrect in asserting that the challenged conduct does not

deserve strict scrutiny because it only involves law firm profitability.  To the contrary, the SAC

alleges that New York's non-lawyer rules inhibit Plaintiffs' ability to expand their practice and

provide low cost services to those who cannot otherwise afford to hire an attorney.  It is well

settled that activity "undertaken to obtain meaningful access to the courts is a fundamental right

within the protection of the First Amendment."  *United Transportation Union*, 401 U.S. at 585,

91 S. Ct. at 1082 (1971).  Moreover, because corporate entities are afforded the same protections

as natural persons, restrictions on law firms' ability to associate with non-lawyers to form

economic associations for the purpose of providing access to the courts must be strictly

scrutinized.  In *Citizens United*, the Supreme Court applied strict scrutiny to strike down a

federal law prohibiting corporations from spending general funds as independent expenditures

for electioneering communications.  *See Citizens United*, 558 U.S. at 340, 130 S. Ct. at 898.  The

Supreme Court held that speech is an essential mechanism of democracy, that speech restrictions

based on the identity of the speaker are all too often simply a means to control content, and a

prohibition on corporate independent expenditures is a ban on speech.  *Id.*  Under *Citizens*

*United*, then, law firms and their investors have the right to engage in expenditures related to the

delivery of legal services, and restrictions on such expenditures must be viewed with strict scrutiny. *Id.*[9]

*NAACP v. Button*, 371 U.S. 415, 83 S. Ct. 328 (1963) further buttresses the conclusion that lawyers have a constitutional right to associate with others for the delivery of legal services, and that governmental restrictions on associations with non-lawyers must be narrowly tailored because they infringe on that right. In *Button*, the Court held that state laws which infringe on the "right of the NAACP and its members and lawyers to associate for the purpose of assisting persons who seek legal redress" are unconstitutional. In so holding, the Supreme Court recognized that restrictions on lawyers' ability to form associations to provide legal services have a direct impact on clients' rights. *Id.* 372 U.S. at 428, 83 S. Ct. at 335. There, the Supreme Court held that states could not ban the delivery of legal services through an arrangement involving the NAACP (a corporate entity) and lawyers. *See Button*, 371 U.S. at 445-46, 83 S. Ct. at 344. In 1956, Virginia changed its anti-solicitation statute to prohibit solicitation of legal business by an agent for an individual or organization which retains a lawyer in connection with an action to which it is not a party and in which it has no pecuniary right or liability. *See Button*, 371 U.S. at 424-26, 83 S. Ct. at 334. The Virginia Supreme Court held that the NAACP violated that statute as well as the ABA Canons of Professional Ethics by fomenting and soliciting legal business in which they were not parties and had no pecuniary right or liability. *Id.*

The U.S. Supreme Court reversed, holding that the First Amendment, as applied to the states under the Fourteenth Amendment, protects the arrangement under which NAACP

---

[9] In concurrence, Justice Scalia noted that the freedom of speech includes "the freedom to speak in association with other individuals, including association in the corporate form." *Id.* 558 U.S. at 386, 130 S. Ct. at 925. *See also* Renee Newman Knake, *Democratizing the Delivery of Legal Services*, 73 Ohio St. L.J. 1, 11 (2012) ("In the wake of Citizens United, however, a lift on the state bans against corporate law firm ownership may very well be inevitable.").

attorneys, working as staff to the NAACP corporate entity, may advise and represent prospective

litigants, notwithstanding Virginia's power to regulate the legal profession and its prohibition on

the improper solicitation of legal business. *Id.* 371 U.S. at 429, 83 S. Ct. at 336.  Importantly,

*Button* established that the First Amendment protects the delivery of legal services through an

arrangement between a corporation and staff lawyers working for that corporation based upon

the important free speech, association, and petition interests involved.  As the Supreme Court

noted, "association for litigation may be the most effective form of political association." *Id.* 371

U.S. at 431, 83 S. Ct. at 337.  Thus, the Court permitted the NAACP's legal delivery system

whereby a corporation was able to solicit clients to institute litigation and to prosecute the

litigation through its own staff lawyers.

      The Supreme Court subsequently expanded its *Button* ruling beyond the civil rights arena

in *Brotherhood of Railroad Trainmen v. Virginia State Bar*, 377 U.S. 1, 84 S. Ct. 1113 (1964).

There, the Court voided, on First Amendment grounds, an injunction barring the Brotherhood

from advising injured workers and the families of deceased workers to obtain legal advice from

recommended lawyers before settling any claims with the railroads.  The arrangement violated

Virginia's legal ethics rules, but the Supreme Court held that those rules were trumped by the

First Amendment protections.

      Specifically, the Court held that:

> A State could not, by invoking the power to regulate the professional conduct of
> attorneys, infringe in any way the right of individuals and the public to be fairly
> represented in lawsuits authorized by Congress to effectuate a basic public
> interest.  Laymen cannot be expected to know how to protect their rights when
> dealing with practiced and carefully counseled adversaries . . . and for them to
> associate together to help one another preserve and enforce rights granted them
> under federal laws cannot be condemned as a threat to legal ethics.  The State can
> no more keep these workers from using their cooperative plan to advise one
> another than it could use more direct means to bar them from resorting to the

courts to vindicate their legal rights. The right to petition the courts cannot be so handicapped.

377 U.S. at 7, 84 S. Ct. at 1117 (internal citation omitted).

Similarly, in *United Mine Workers of America, Dist. 12 v. Illinois State Bar Association*, 389 U.S. 217, 88 S. Ct. 353 (1967), the Supreme Court clarified that *Button* was not limited only to political litigation. The Court voided yet another injunction obtained by a state bar organization which prohibited a union from hiring an attorney to advise members in processing workers' compensation claims. The Court found that "the freedom of speech, assembly, and petition guaranteed by the First and Fourteenth Amendments give ... the right to hire attorneys ... to assist ... in the assertion of ... legal rights." *Id.* 377 U.S. at 221-222, 88 S. Ct. 355-56.

*Button* and its progeny make clear that association for the purpose of providing access to the courts is a fundamental right which cannot be trumped by state regulation of the practice of law. As the Supreme Court has explained:

> The common thread running through our decisions in *NAACP v. Button*, *Trainmen* and *United Mine Workers* is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment. However, that right would be a hollow promise if courts could deny associations of workers or others the means of enabling their members to meet the costs of legal representations.

*United Transportation Union v. State Bar of Michigan*, 401 U.S. 576, 585-586, 91 S. Ct. 1076, 1082 (1971).

Defendants misapprehend the First Amendment protections impinged upon by the statutes at issue, relying upon, for instance, *Lawline*, which pre-dates *Citizens United* by nearly 30 years. Def. Mem. at 25. That court limited the reach of *Button* and its progeny on the grounds that those cases did not involve for-profit corporations. But *Lawline* can no longer be squared with the clear pronouncement by the Supreme Court in *Citizens United* that the First

Amendment protects for-profit corporations just as much as non-profits or individuals.

Similarly, Defendants argument that "the Constitution . . . [does] not guarantee [Plaintiffs] the

right to a particular State law corporate form, or to the State's limited liability protections" (Def.

Mem. at 6-7) was explicitly rejected by *Citizens United*, which held that "state law grants [to]

corporations [of] special advantages – such as limited liability, perpetual life, and favorable

treatment of the accumulation and distribution of assets . . . do[] not suffice to allow laws

prohibiting speech.  It is rudimentary that the State cannot exact as the price of those special

advantages the forfeiture of First Amendment rights." *Id.* 558 U.S. at 351, 130 S. Ct. at 905.

     Indeed, all legal representation involves some form of defense or vindication of the rights

of clients, a role that has been recognized as a fundamental right.  *See Maine v. Moulton*, 474

U.S. 159, 169, 106 S. Ct. 477, 483 (1985) ("The right to be heard would be, in many cases, of

little avail if it did not comprehend the right to be heard by counsel."); *Goldberg v. Kelly*, 397

U.S. 254, 270, 90 S. Ct. 1011, 1022 (1970) (same); *Gideon v. Wainwright*, 372 U.S. 335, 342-44,

83 S. Ct. 792, 795-97 (1963) (same; discussing the fundamental right to legal representation).

     As the Supreme Court stated, "[t]he Court often has recognized that collective activity

undertaken to obtain meaningful access to the courts is protected under the First Amendment."

*Bates v. State Bar of Arizona*, 433 U.S. 350, 404, n. 32, 97 S. Ct. 2691, 2719 (1977) (collecting

cases).  Where a question exists about the protection warranted, the First Amendment demands

that courts "must give the benefit of any doubt to protecting rather than stifling speech." *Citizens

United*, 558 U.S. at 327, 130 S. Ct. at 891 (citations omitted).[10]  *Cf. Inmates of The Rhode Island*

---

[10] Even if the Court were to apply a more lenient level of scrutiny, such as that which has traditional been applied to commercial speech, the law at issue still would not survive, as evidenced by the Supreme Court decision in *Bates* and the recent Second Circuit decision in *Alexander v. Cahill*, 598 F.3d 79 (2d Cir. 2010).  Here, the affiliations between lawyers and non-lawyers that Plaintiffs seek to create can plainly be construed to fit into the same class of protected expression as the commercial speech in *Bates* and *Alexander*, and as such the same test for determining the adequacy of the advertising rules should be applied.  Under this test, prophylactic prohibitions would at a minimum give way to less restrictive measures.

*Training Sch. v. Martinez*, 465 F. Supp. 2d 131, 140 (D.R.I. 2006) (state laws that prohibited

nonprofit entities from obtaining legal fees are unconstitutional and may infringe on First

Amendment right of association).  "Government actions that 'may have the effect of curtailing

the freedom to associate [have been] subject to the closest scrutiny,' since at least 1958."  *Nat'l*

*Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521, 1533 (10th Cir. 1994) (quoting *NAACP v.*

*Alabama*, 357 U.S. 449, 460-61 (1958)).

Defendants cite a number of cases for the proposition that Plaintiffs only seek to increase

their profitability, and therefore a low level of scrutiny is appropriate.  Def. Mem. at 20-22.

However, these cases simply stand for the proposition that commercial speech is due less

deference than political speech.[11]  Defendants' reliance on *Ohralik v. Ohio State Bar*

*Association*, 436 U.S. 447, 98 S. Ct. 1912 (1978) and cases relying on that decision (Def. Mem.

at 22) is misplaced.  As the Supreme Court more recently pointed out in *Tennessee Secondary*

*Schools Ass'n v. Brentwood Academy*, 551 U.S. 291, 298, 127 S. Ct. 2489, 2494 (2007),

"*Ohralik*'s 'narrow' holding [proscribing direct, in-person ambulance chasing] is limited to

conduct that is 'inherently conducive to overreaching and other forms of misconduct.'"  *Id.*

(quoting *Edenfield v. Fane*, 507 U.S. 761, 774, 113 S. Ct. 1792 (1993).  Rather, the Court

emphasized that "we have not been chary of invalidating state restrictions on solicitation and

---

[11] *See Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469-70, 117 S. Ct. 2130, 2138 (1997) (addressing law requiring fruit growers to pay for advertising and holding that "none of our First Amendment jurisprudence provides any support for the suggestion that the promotional regulations should be scrutinized under a different standard from that applicable to the other anticompetitive features of the marketing orders.").  Defendants include a quotation from *Glickman* regarding restrictions on a "firm's advertising budget," Def. Mem. at 21, but that refers to an advertising firm, not a law firm.  Other cases cited by Defendant are likewise inapposite.  *See IDK, Inc. v. Clark Cnty.*, 836 F.2d 1185, 1187-88 (9th Cir. 1988) (escort service challenged statutes requiring licenses and prohibiting advertising suggesting sexual services were available); *United States v. Bell*, 414 F.3d 474, 475 (3d Cir. 2005) (challenge to injunction barring defendant from promoting and selling unlawful tax advice); *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011) (challenge to law restricting the sale, disclosure, and use of pharmacy records that reveal the prescribing practices of individual doctors); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 492, 69 S. Ct. 684, 685 (1949) (challenge to restriction on labor picketing activity).

commercial advertising in the absence of the acute risks associated with in-person legal solicitation." *Id.*

Rule 5.4 contains a blanket prohibition on non-lawyers having an ownership interest in a law firm. The Supreme Court has repeatedly held that such blanket restrictions of First Amendment rights are unconstitutional. For example, in *Bates v. The State Bar of Arizona*, 433 U.S. 350, 97 S. Ct. 2691 (1977), the Supreme Court invalidated Arizona's disciplinary rule prohibiting all attorney advertising. The Court acknowledged that some regulation of attorney advertising would be permissible, but that a blanket ban on such advertising violated the First Amendment. In explaining its decision, the Court noted that:

> In holding that advertising by attorneys may not be subject to blanket suppression, and that the advertisement at issue is protected, we, of course, do not hold that advertising by attorneys may not be regulated in any way . . . We do not foreclose the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required of even an advertisement of the kind ruled upon today so as to ensure the consumer is not misled. In sum, we recognize that many of the problems in defining the boundary between deceptive and nondeceptive advertising remain to be resolved, and we expect that the bar will have a special role to play in assuring that advertising by attorneys flows freely and cleanly.

433 U.S. at 383-84, 97 S. Ct. at 2709. Thus, the Court acknowledged the need for some regulation and the bar's role in crafting that regulation, but ultimately held that the "present application" of the rule, which barred *all* advertising, violated the First Amendment. *Id. See also Alexander v. Cahill*, 598 F.3d 79 (2d Cir. 2010).

Here, the laws at issue impose a blanket prohibition on Plaintiffs' right to associate for the purpose of providing access to the courts for their clients. *NAACP v. Button* and its progeny, *Bates v. State Bar*, and *Citizens United v. FEC* make plain that laws prohibiting non-lawyers from owning or investing in law firms impair First Amendment interests.

**B.      Because Less Restrictive Regulations Can Be Crafted
To Ensure Attorney Independence, There Is No Compelling
State Interest In A Complete Ban On Non-Lawyer Investments.**

New York's prohibition on non-lawyer investment substantially burdens the fundamental

right of legal service providers to free speech through corporate expenditure, the right to

associate with others, and the right to speak for clients.  There are alternative and less restrictive

regulatory means to ensure attorney independence.

Defendants argue, without resort to any fact or empirical proof, that non-lawyer

investment rules further the state's interest in regulating the legal profession.  Def. Mem. at 23.

But the mere assertion of such an interest without more is insufficient to justify abridging First

Amendment rights:

> The decisions of this Court have consistently held that only a compelling state
> interest in the regulation of a subject within the State's constitutional power to
> regulate can justify limiting First Amendment freedoms.  Thus it is no answer to
> the constitutional claims asserted by petitioner to say, as the Virginia Supreme
> Court of Appeals has said, that the purpose of these regulations was merely to
> insure high professional standards and not to curtail free expression.  For a State
> may not, under the guise of prohibiting professional misconduct, ignore
> constitutional rights.

*Button*, 371 U.S. at 438-39, 83 S. Ct. at 341.

The restrictions on non-lawyer ownership at issue are based on the view that economic

interests can conflict with a lawyer's professional judgment.[12]  This view is not in keeping with

the modern practice of law.  Indeed, the practice of law in the United States is now lagging

considerably behind other countries with whom we share a common legal heritage (including

---

[12] Defendants also argue without support that allowing non-lawyers to invest in a law firm will result in violations
of a number of rules of professional responsibility, such as maintaining client confidentiality or not speaking to
represented parties.  Def. Mem. at 24.  This is a straw man argument, as in-house counsel faces these situations on a
daily basis.  Furthermore, as noted below, the state could easily craft rules prohibiting non-lawyers from actually
practicing law while allowing them to own a financial interest in a firm.

England, upon which our legal system was modeled), in which similar investment prohibitions have been turned aside.[13]

Of course, accepting the notion that non-lawyer investment is appropriate is not the same as abandoning the principle that attorneys must exercise independent judgment as loyal advocate for their clients. Heather Miller, in an article oddly cited by Defendants (Def. Mem. at 24), explains how the ethical interests at issue can be achieved through laws that are more narrowly tailored without the unconstitutional blanket prohibition Defendants defend. *See* Heather A. Miller, *Don't Just Check "Yes" or "No": The Need for Broader Consideration of Outside Investment in the Law*, 2010 U. Ill. L. Rev. 311, 361 (2010) ("The analysis also provides numerous examples of how a firm can address the ethical and professional concerns of outside investment while benefitting from the capital raised."). England and Australia provide examples of less restrictive but effective regulations that ensure attorney independence.

There is also strong support in American jurisprudence for regulations that are less burdensome means of regulating professional ethics. SAC ¶¶ 54-63. The District of Columbia permits a degree of non-lawyer ownership. SAC ¶ 8. Moreover, on three separate occasions, in 1981, 2000, and 2011, commissions of the American Bar Association recommended revisions to Model Rule 5.4, the rule on which New York's Rule 5.4 is based, that would have permitted non-lawyer investments in law firms. SAC ¶¶ 54-63.

Not surprisingly, the parade of horrors predicted by critics of non-lawyer investment in law firms has not materialized. The fear that lawyers' professional judgment and independence will be eroded and that non-lawyers cannot understand the ethical considerations of lawyers, or

---

[13] The inexpensive infusions of capital now available to Australian and British law firms resulting from the elimination or liberalization of restrictions on non-lawyer investments in law firms give Australian and British law firms distinct competitive advantages in practicing law in an ever-increasing global legal marketplace. Thus, New York firms are disadvantaged in both domestic and global competition. SAC ¶¶ 50-54.

that such outside investors will be motivated only by anticipated profits and the return on their investment, has proven to be unfounded. SAC ¶ 54. In fact, as described by modern-day academics and legal scholars, "a law firm's goal of making a profit and its duty to provide competent, ethical representation to its clients are not in opposition to each other; a law firm can only maximize its profits by providing competent, quality, ethical representation." Matthew Bish, Revising Model Rule 5.4: Adopting A Regulatory Scheme That Permits Non Lawyer Ownership And Management of Law Firms, 48 Washburn L.J. 669, 694 (2009). *See also* Schneyer, Ted, "Professionalism" as Pathology: The ABA's Latest Policy Debate on Nonlawyer Ownership of Law Practice Entities, 40 Fordham Urb. L.J. 75, 116 (2012) ("What lawyers do in practice to earn money is usually meant to serve client interests; the law firm that opens a new branch office or adds a new practice group will hope to benefit clients and thereby profit.").

Whether regulating law firms with outside investors through independent licensing bodies (as in England), imposing restrictions on the amount of equity interest non-lawyers can hold (District of Columbia), or requiring a legal practice with non-lawyer owners to appoint a legal director responsible for the management, oversight and compliance of lawyers' professional obligations (Australia), there are innumerable ways in which to ensure that a lawyer's professional independence of judgment remains resolute without imposing a blanket ban on protected association and speech.[14]

Indeed, each of the jurisdictions that currently permit non-lawyer ownership of law firms has enacted safeguards to ensure that the lawyer's duty to the client is paramount and that attorney-client confidentiality must be preserved. For instance, in the United Kingdom,

---

[14] As a further example, the District of Columbia's version of Rule 5.4 provides that "[a]ll persons having such managerial authority or holding a financial interest undertake to abide by these Rules of Professional Conduct," *see Rule 5.4(b)(2)* and "[t]he lawyers who have a financial interest or managerial authority in the partnership or organization undertake to be responsible for the nonlawyer participants to the same extent as if nonlawyer participants were lawyers under Rule 5.1," *see* Rule 5.4(b)(3).

legislators have enacted provisions in the Legal Services Act of 2007 specifically designed to protect the ethical obligations of lawyers practicing in the newly-allowed alternative business structures by imposing restrictions on non-lawyer management and ownership. Blankinship Decl. Ex. 2. at §§ 1-79; 197-98; Schedules 11, 13. The New South Wales' Legal Profession Act, as amended in 2004, requires each incorporated legal practice to appoint a legal director who is responsible for management of the legal services of the corporation. Blankinship Decl. Ex. 3 at Part 2.6). The legal director must institute appropriate oversight systems to ensure that the corporation complies with the professional obligations of the lawyers. *Id.* at §140(3)(a). The legal director must ensure that officers or employees of the corporation do not adversely affect the professional obligations of the legal professionals, and if the legal director is aware that actions by the corporation will lead to a breach of the legal professionals' obligations, he or she must take steps to avoid the breach or take appropriate remedial action. *Id.* at §140(3)-(4).

Because the SAC more than plausibly alleges a violation of the First Amendment, Defendant's motion to dismiss should be denied.

## V.    Prohibitions on Non-Lawyer Investments In Law Firms Violates The Dormant Commerce Clause.

Article 1, Section 8, of the U.S. Constitution grants to Congress the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, §8, cl. 3. The Commerce Clause also contains "an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce." *See, e.g., W.&S. Life Insur. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 652, 101 S. Ct. 2070, 2074 (1981) ("In a long line of cases stretching back to the early days of the Republic . . . this Court has recognized that the Commerce Clause contains an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce.") (citations omitted);

*Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 338, 128 S. Ct. 1801, 1808 (2008)

(same). "This inference, commonly referred to as the dormant Commerce Clause, promotes a

free flow of commerce between the states by preventing them from adopting economic

protectionist policies." *Nat'l Association of Optometrists & Opticians Lenscrafters, Inc. v.*

*Brown*, 567 F.3d 521, 523 (9th Cir. 2009) (citations omitted).  The dormant Commerce Clause is

implicated if state laws regulate an economic activity that has a substantial effect on interstate

commerce.  *See United States v. Morrison*, 529 U.S. 598, 613, 120 S. Ct. 1740, 1751 (2000);

*Town of Clarkstown, New York*, 511 U.S. at 389, 114 S. Ct. at 1682 ("It is well settled that

actions are within the domain of the Commerce Clause if they burden interstate commerce or

impede its free flow.") (*citing NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S. Ct. 615

(1937)).  The challenged laws regulate an activity -- the practice of law -- that has a very

substantial effect on interstate commerce.

　　　　As the Supreme Court explained in *Town of Clarkstown*, 511 U.S. at 390, 114 S. Ct. at

1682, jurisprudence on the dormant Commerce Clause "yields two lines of analysis; first,

whether the ordinance discriminates against interstate commerce (*Philadelphia v. New Jersey*,

437 U.S. 617, 98 S. Ct. 2531 (1978)), and second, whether the ordinance imposes a burden on

interstate commerce that is 'clearly excessive in relation to the putative local benefits,' *Pike v.*

*Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 847 (1970)."  In *Hughes v. Oklahoma*, 441

U.S. 322, 336, 99 S. Ct. 1727, 1736 (1979), the Supreme Court established that once a state law

is shown to discriminate against interstate commerce "either on its face or in practical effect," the

burden falls on the State to demonstrate both that the statute "serves a legitimate local purpose,"

and that this purpose could not be served as well by available nondiscriminatory means.  This

inquiry has been labeled the "strict scrutiny" test.  *See also Maine v. Taylor*, 477 U.S. 131, 106

30

S. Ct. 2440 (1986).  Indeed, "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected."  *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S. Ct. 2531, 2535 (1978) (*citing H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 537-38, 69 S. Ct. 657, 665 (1949)).  Defendants abjectly fail to sustain their strict burden because they have not and cannot demonstrate that the laws at issue as applied to prohibiting non-lawyer investments in law firms  serves a legitimate local purpose that could not be similarly and more effectively advanced by available nondiscriminatory means.

Defendants' argument that the laws of New York would not apply to law firms located outside the state of New York is simply wrong.  Defendants rely on Ethics Opinion 889.  This opinion holds that a lawyer who principally practices in a jurisdiction that allows partnership with a non-lawyer, and who is also admitted in New York, may ordinarily conduct New York litigation even if in a partnership that includes a non-lawyer who would benefit from the resulting fees.  All this opinion allows is for a Washington D.C. lawyer who is in a partnership with a non-lawyer to conduct one-off litigations in New York.  Defendants ignore Ethics Opinion 911 (Blankinship Decl. Ex. 4).  This opinion states that a New York lawyer may not practice law principally in New York as an employee of an out-of-state entity that has non-lawyer owners or managers.  Simply put, the broad extraterritorial exercise of New York's law prohibiting non-lawyer investments in law firms necessarily impacts interstate commerce in a disparate and substantial way.  This extraterritorial application absolutely prevents New York admitted attorneys from opening a New York office for a United Kingdom or District of Columbia law firm in which non-lawyers are permitted to own equity in the firm.  The challenged statutes thus violate not only the dormant interstate Commerce Clause, but the dormant international Commerce Clause as well.  *See Antilles Cement Corp. v. Acevedo Vila*,

408 F.3d 41, 46 (1st Cir. 2005) ("Although the language of dormant Commerce Clause jurisprudence most often concerns interstate commerce, essentially the same doctrine applies to international commerce.").[15]

Rather than meeting the Supreme Court's high hurdle of requiring that the laws Defendants seek to enforce "serves a legitimate local purpose," and that this purpose could not be served as well by available non-discriminatory means, Defendants merely posit that the laws serve generally to "ensure that the profession's 'complete independence and uncompromised loyalty to those it serves…the very foundation of the profession' is not compromised by the conflicts of interests that would arise whenever a law firm becomes financially beholden to its nonlawyer investors." Def. Mem. at 27.[16]   But, as discussed above, there are numerous less restrictive means of ensuring attorney independence.[17]

---

[15] Defendants argue that the laws are not discriminatory because similar laws have been implemented in virtually every jurisdiction in the United States. While most states do, in fact, maintain substantially similar laws, this rationalization cannot be a defense to a Commerce Clause violation – indeed, all those states' laws are similarly infirm under the Commerce Clause. Moreover, as the SAC points out, the District of Columbia allows non-lawyer ownership under certain circumstances, and Australia and the United Kingdom do more broadly.

[16] Interestingly, the roots of the ABA's prohibition on non-lawyer investment in law firms are not planted in lofty concerns for preservation of ethical principles, as Defendants suggest, but rather, in the elimination of competition for legal services – the sort of constraint on competition that the dormant Commerce Clause precisely guards against. The ABA has proscribed non-lawyer investments in law firms since the 1920s, though the rule finds its origin in a New York State criminal statute enacted in 1909 at the request of individual lawyers concerned about competition from corporations contracting with lawyers in bulk to provide legal advice to subscribers. Renee Newman Knake, Democratizing the Delivery of Legal Services, 73 Ohio St. L.J. 1, 15 (2012).

[17] Defendants erroneously argue that the appropriate Commerce Clause analysis arises under the *Pike* test. *Pike*, 397 U.S. at 142, 90 S. Ct. at 847. The *Pike* test applies where a statute regulates even-handedly to effectuate a legitimate local public interest and its effects on interstate commerce are only incidental. If *Pike* applies, the statute will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Id.* *Pike* plainly does not apply here because, as noted above, in the multi-billion dollar market for legal services, the implicated laws' effects on interstate commerce are far from incidental, but rather, are substantial, direct, and disparate. But even if the *Pike* test were found to apply (which it should not), the Supreme Court in *Pike* held: "If a legitimate local purpose [to the challenged statute] is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.* Even under *Pike,* Defendants have not explained why the State of New York's interests could not be promoted with a lesser impact on interstate activities than the complete ban currently in existence.

**VI.    Prohibitions On Non-Lawyer Investments
In Law Firms Violates The Due Process Clause Of The Fourteenth Amendment.**

The Due Process Clause of the Fourteenth Amendment provides that no state shall

"deprive any person of life, liberty, or property, without due process of law." The Due Process

Clause has a substantive component. "It is settled that the due process clause of the Fourteenth

Amendment applies to matters of substantive law as well as to matters of procedure." *Planned*

*Parenthood of S.E. Pennsylvania v. Casey*, 505 U.S. 833, 846-47, 112 S. Ct. 2791, 2804 (1992).

The prohibition on non-lawyer investments in law firms fails the rational basis test. The

interests Defendants have identified are not rationally advanced because they are arbitrary and

disconnected from the purported aim they seek to achieve. The Supreme Court has not shied

away from declaring state law irrational when the interests at issue lack credibility. *See City of*

*Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 105 S. Ct. 3249 (1985). In *Cleburne*, the

Court noted that an ostensible state interest in regulating homes for the mentally disabled could

not be credited when more narrowly-tailored regulations would serve the state's articulated

interests in protecting the well being of the mentally disabled. *See Cleburne*, 473 U.S. at 475,

105 S. Ct. at 3273. Here, the laws at issue can plainly be more narrowly tailored to serve the

ostensible state interest. *See supra*.

Defendants' entire defense to Plaintiffs' due process and equal protection claims rests on

the incredible statement that the laws that Plaintiffs are challenging "do not interfere with

fundamental rights." Def. Mem. at 29. However, the right to free speech, as guaranteed by the

First Amendment, has been repeatedly and steadfastly held to be a fundamental right. *De Jonge*

*v. State of Oregon*, 299 U.S. 353, 364, 57 S. Ct. 255, 260 (1937) ("Freedom of speech and of the

press are fundamental rights."). The absurdity of Defendants' argument comes through in their

33

assertion that freedom of speech is not "deeply rooted in this Nation's history and tradition."

Def. Mem. at 30.  As such, Defendants' argument falls woefully short of its mark.

## VII.  Prohibitions On Non-Lawyer Investments In Law Firms Violates The Equal Protection Clause.

The Fourteenth Amendment to the United States Constitution provides that no state shall

"deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend.

XIV, § 1.  "The Equal Protection Clause requires that the government treat all similarly situated

people alike." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir. 2001) (*citing

City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985)).  To

be "similarly situated, the individuals with whom [plaintiff] attempts to compare himself must be

similarly situated in all material respects" and have "engaged in comparable conduct." *Shumway

v. United Parcel Service, Inc.,* 118 F.3d 60, 64 (2d Cir. 1997).  As a general rule, whether

another is similarly situated is a factual issue that should be submitted to the jury. *See, e. g.,

Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000) ("Whether two employees are

similarly situated ordinarily presents a question of fact for the jury.").[18]

Defendants give short shrift to Plaintiffs' equal protection claim, contending only that the

claim fails because lawyers and investment bankers are not similarly situated because the latter

are not subject to regulation by the state judiciary.  Def. Mem. at 28-29.  Defendants miss the

mark.  Under equal protection analysis, groups need to be "similarly situated," not identical. *See

Cleburne,* 473 U.S. at 447, 105 S. Ct. at 3258 (comparing regulation of mentally disabled to

other, similarly situated groups).  Moreover, simply being subject to regulation by the state

judiciary is not a distinction that impacts the equal protection analysis.  Rather, it is whether the

line drawn to distinguish attorneys from other businesses or professions with whom they are

---

[18] *See also Kirschner v. Zoning Bd. of Appeals of Valley Stream,* 924 F. Supp. 385, 394 (E.D.N.Y. 1996) (holding that issue of whether two shops are similarly situated is "classic" issue of fact precluding summary judgment).

similarly situated truly justifies disparate treatment between these groups.  Defendants do not

even attempt to justify this disparate treatment in their motion.  Investment bankers are indeed

similarly situated to lawyers but are treated differently.  Investment bankers often work side by

side with lawyers on transactions on behalf of their clients, and, like lawyers, deal with the most

sensitive of corporate secrets and proprietary information, must preserve client confidentiality

(even to the point of potential criminal prosecution), and must guard assiduously against

conflicts of interest that might disadvantage their clients.  Despite these similarities, they are

treated completely differently under the law with respect to allowable methods of capitalizing

their firms; indeed, virtually all of the major investment banking firms are now publicly owned.

Because the prohibition on non-lawyer investments in law firms is arbitrary and unrelated

to the furtherance of any legitimate state interest, Defendants' motion to dismiss Plaintiffs' equal

protection claim should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

motion to dismiss in its entirety, together with such other and further relief as it deems just and

proper.

White Plains, New York
Dated:  September 6, 2013

**MEISELMAN, PACKMAN, NEALON,
SCIALABBA & BAKER P.C.**

By:  /s/ *D. Greg Blankinship*
    David J. Meiselman
    Todd S. Garber
    Jeremiah Frei-Pearson
    D. Greg Blankinship
    1311 Mamaroneck Avenue
    White Plains, New York 10605
    Tel: (914) 517-5000
    Fax: (914) 517-5055

    *Attorneys for Plaintiffs*

35