UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JACOBY & MEYERS, LLP, and JACOBY & MEYERS
USA II, PLLC,

               Plaintiffs,

          -against-                           11 Civ. 3387 (LAK)

THE PRESIDING JUSTICES OF THE FIRST, SECOND,
THIRD AND FOURTH DEPARTMENTS, APPELLATE
DIVISION OF THE SUPREME COURT OF THE STATE
OF NEW YORK, *et al.*,

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

               Todd S. Garber
               D. Greg Blankinship
               Jeremiah Frei-Pearson
               FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER

               David J. Meiselman
               MEISELMAN, PACKMAN, NEALON, SCIALABBA & BAKER
               *Attorneys for Plaintiffs*

               Daniel A. Schulze
                   Special Litigation Counsel
               Michael J. Siudzinski
                   Assistant Attorney General
               ERIC T. SCHNEIDERMAN
               ATTORNEY GENERAL OF THE STATE OF NEW YORK
               *Attorneys for Defendants*

2

LEWIS A. KAPLAN, *District Judge.*

This putative class action challenges—on First and Fourteenth Amendment and dormant Commerce Clause grounds—the constitutionality of several New York laws and regulations that, like those of all or most other states, prohibit non-lawyer equity ownership in law firms. The matter, which the Court previously dismissed for lack of standing, is on remand from the Court of Appeals and is before the Court on a motion to dismiss the third amended complaint ("TAC"). The Court concludes that (1) it is constrained by the mandate rule to hold that the plaintiffs have standing and that their dispute is justiciable, but (2) the plaintiffs' constitutional challenges are entirely without merit.

I

*New York Rule of Professional Conduct 5.4*

Rule 5.4 of the New York Rules of Professional Conduct[1] ("New York Rule 5.4") and comparable provisions in effect across all or most of the country provide in substance that "[l]awyers in the United States are not now permitted to obtain equity investments in their practices from non-lawyers, which precludes them from, among other things, selling stock in their practices to the public."[2] It has its most recent origins in Rule 5.4 of the American Bar Association's Model Rules of Professional Conduct, which was adopted in 1983 and which, among other things, prohibits

---

[1]

N.Y. COMP. CODES R. & REGS. tit. 22, § 1200.0 (Rule 5.4).

[2]

*Jacoby & Meyers, LLP v. Presiding Justices of First, Second, Third and Fourth Dep'ts, Appellate Div. of Supreme Court of N.Y.*, 847 F. Supp. 2d 590 (S.D.N.Y. 2012), *remanded*, 488 F. App'x 526 (2d Cir. Nov. 21, 2012).

a lawyer from "practic[ing] with or in the form of a professional corporation or association authorized to practice law for a profit if . . . a nonlawyer owns any interest therein."[3]  In the intervening years, nearly every state, including New York, has adopted Model Rule 5.4(d) or a variant thereof.[4]

*Prior Proceedings*

 *The Complaint and the Amended Complaint*

   This action originally was filed on May 18, 2011 by Jacoby & Meyers Law Offices, LLP.[5]  At a November 2011 hearing on defendants' motion to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim, however, it became clear that there in fact was no such entity.[6]  In part to cure that problem, and in part to respond to the Court's concerns about justiciability, the plaintiff moved orally for leave to amend its complaint—a request the Court granted on the record.[7]

   On November 23, 2011, Jacoby & Meyers, LLP ("J&M") and Jacoby & Meyers USA, LLC ("J&M LLC")—a limited liability company formed by J&M, allegedly to receive non-

---

[3]    MODEL RULES OF PROF'L CONDUCT R. 5.4(d).

[4]    *See, e.g.*, N.Y. COMP. CODES R. & REGS. tit. 22, § 1200.0 (Rule 5.4); *see also* AM. BAR ASS'N & BUREAU OF NAT'L AFFAIRS, LAWYERS' MANUAL ON PROFESSIONAL CONDUCT 91:402 (2015) ("Most jurisdictions that base their ethics rules on the ABA Model Rules do not deviate appreciably from Rule 5.4(b) and Rule 5.4(d)."); Renee Newman Knake, *Democratizing the Delivery of Legal Services*, 73 OHIO ST. L.J. 1, 14 & n.64 (2012).

[5]    Compl. [DI 1].

[6]    Hr'g Tr. (Nov. 3, 2011) [DI 21], at 2:17-3:13.

[7]    *Id.* at 25:15-25; 27:24-25.

4

lawyer equity investment and to conduct J&M's practice following a proposed transfer to it of J&M's assets—filed an amended complaint ("AC") which did not vary from the original in any respect that remains material.[8]   The AC, like the original complaint, named as defendants the presiding justices of the four appellate divisions of the New York Supreme Court, and sought principally a declaration that New York Rule 5.4 violated the First and Fourteenth Amendments and the dormant Commerce Clause.[9]

*This Court's Prior Decision*

Defendants moved to dismiss the AC, arguing, among other things, that the plaintiffs lacked standing, that their claims were unripe, and, alternatively, that the Court should abstain.   At the heart of defendants' motion was an assertion that provisions of New York law independent of New York Rule 5.4 would preclude plaintiffs from accepting non-lawyer equity investors even if the Rule were deemed unconstitutional.   In consequence, defendants argued, plaintiffs lacked standing because "their injury can neither be traced to the Rule, nor remedied by striking it down."[10]

---

[8]      AC [DI 23] ¶ 14.

[9]      *Id.* ¶ 11.

[10]      Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pls.' Am. Compl. [DI 27], at 10.

Article III standing, which is an essential prerequisite to federal subject matter jurisdiction, has an "irreducible constitutional minimum" of three elements.   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).   The plaintiff must allege an "injury in fact" that is (1) "concrete," "particularized," and "actual or imminent;" (2) "fairly . . . trace[able] to the challenged action of the defendant;" and (3) "redress[able] by a favorable decision."   *Id.* at 560-61 (ellipsis and first alteration in original) (internal quotation marks omitted).

At oral argument, the Court advised plaintiffs of its preliminary view that their failure to challenge any of the other provisions of New York law said by defendants to prohibit plaintiffs from accepting non-lawyer equity investment could result in dismissal for lack of standing.[11] Nevertheless, plaintiffs expressly confirmed that they were challenging only New York Rule 5.4, though they did dispute whether the other New York laws relied upon by the defendants applied, arguing that those laws "by necessity . . . would fall" if this Court issued a decision declaring New York Rule 5.4 unconstitutional.[12]

The Court began its analysis by examining state statutes (other than New York Rule 5.4) claimed by the defendants to foreclose non-lawyer equity investment in law firms.  It held that Section 495 of the New York Judiciary Law and Section 121-1500 of the New York Partnership Law foreclosed J&M LLC and J&M, respectively, from accepting equity investment from non-lawyers.[13]  Accordingly, the Court concluded that plaintiffs had not sufficiently alleged that New York Rule 5.4 caused their alleged injuries or that a decision invalidating the Rule would redress any such injury.[14]  It therefore dismissed the AC for lack of subject matter jurisdiction.[15]

---

[11]

Hr'g Tr. (Feb. 7, 2012) [DI 36], at 2:2-3:20.

[12]

*Id.* at 5:4-6:2.

[13]

*Jacoby & Meyers*, 847 F. Supp. 2d at 597-98.

In view of these holdings, it was unnecessary for the Court to consider the effect of other state law provisions relied upon by the defendants for their theory that plaintiffs lacked standing to challenge the constitutionality of New York Rule 5.4.

[14]

*Id.* at 598.

[15]

*Id.* at 598-99.

*The Appeal*

On appeal, plaintiffs asserted that this Court's standing determination was erroneous, arguing in a conclusory fashion, that "[w]here, as here, the plaintiff itself is the subject of the government action (or inaction) at issue, 'there is ordinarily little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it.'"[16]  Plaintiffs' appellate briefs for the most part did not even address the question whether their failure to challenge the constitutionality of state laws distinct from—but with the same practical effect as—New York Rule 5.4, deprived them of standing to challenge the Rule for the reasons provided by this Court in its opinion granting defendants' motion to dismiss the AC.  The lone exception was a terse statement in plaintiffs' reply brief that assumed—as plaintiffs had argued unsuccessfully before this Court—that a ruling striking down New York Rule 5.4 necessarily would invalidate the other relevant state laws and thus would redress their alleged injury.[17]

---

[16]   The Court indicated also that, had it found the relevant state law provisions unclear, it would have abstained under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), to permit state court resolution of those issues.  *See Jacoby & Meyers*, 847 F. Supp. 2d at 599.

[17]   Brief and Special Appendix for Plaintiffs-Appellants at 13, *Jacoby & Meyers, LLP v. Presiding Justices of First, Second, Third and Fourth Dep'ts, Appellate Div. of Supreme Court of N.Y.*, 488 F. App'x 526 (2d Cir. Nov. 21, 2012) (No. 12-1377-cv), ECF No. 31 (filed May 31, 2012) (second alteration in original) (quoting *Lujan*, 504 U.S. at 561-62).

See Reply Brief for Plaintiffs-Appellants at 2, *Jacoby & Meyers*, 488 F. App'x at 526, ECF No. 43 (filed July 19, 2012); *see also* DI 21, at 22:8-11; DI 36, at 5:4-6.

Plaintiffs' assertion is not necessarily correct.  The state interests underlying rules of professional conduct for lawyers are not necessarily the same as those underlying each of the statutes that the defendants claim independently forecloses non-lawyer equity investment in law firms.  It therefore is theoretically possible that a constitutional challenge might prevail as to New York Rule 5.4 but fail as to a state statute that had precisely the same effect as the Rule.

At oral argument before the Court of Appeals, plaintiffs confirmed that they "had declined to challenge the other provisions of New York state law out of concern that the district court . . . would [have] abstain[ed] from deciding the case pursuant to" *Pullman*.[18]   But after defendants argued that "alternative provisions of New York law *unambiguously* prohibit non-lawyer investment in law firms," plaintiffs voiced no objection to a remand "so that [they] could amend [their] complaint to challenge the other provisions of New York law as well."[19]   Ultimately, the Court of Appeals vacated this Court's judgment without explicitly discussing standing, remanded the case with instructions to grant plaintiffs leave to amend their complaint, and said:

> "Because the district court and appellees agree that Judiciary Law § 495 and LLC Law § 201, as authoritatively interpreted by the state courts, unambiguously prohibit non-lawyer investment in law firms, *Pullman* abstention is unnecessary, and the district court can proceed to adjudicate the parties' dispute as to whether those statutes, and Rule 5.4, are constitutional."[20]

*Proceedings on Remand – the Second and Third Amended Complaints*

On June 21, 2013, seven months after the Second Circuit's remand, J&M and J&M LLC filed a second amended complaint ("SAC") challenging, in addition to New York Rule 5.4 and consistent with the Second Circuit's suggestion, more than a dozen state laws that allegedly prohibited non-lawyer equity investment in law firms.[21]   Defendants again moved to dismiss.  During

---

18

*Jacoby & Meyers, LLP v. Presiding Justices of First, Second, Third and Fourth Dep'ts, Appellate Div. of Supreme Court of N.Y.*, 488 F. App'x 526, 527 (2d Cir. Nov. 21, 2012) (amended summary order filed January 9, 2013).

19

*Id.* (emphasis added).

20

*Id.* at 527-28.

21

SAC [DI 47].

briefing on that motion, however, it became clear that J&M—nearly three weeks after defendants filed their motion but 10 days before J&M filed its opposition—had organized a new entity, Jacoby & Meyers USA II PLLC ("J&M PLLC"), presumably on the theory that it (unlike J&M LLC) would not run afoul of Section 201 of the LLC Law or Section 495 of the Judiciary Law, both of which prohibit limited liability companies from practicing law *regardless of who their investors are*.[22] J&M LLC soon merged with and into J&M PLLC.[23]  Thus, one of the two plaintiffs in the case ceased to exist.  Moreover, plaintiffs' opposition to defendants' motion to dismiss relied heavily on claims that appeared to be asserted by J&M PLLC, which was not a party to the action.  Accordingly, the Court (1) dismissed the action as moot insofar as it was brought on behalf of J&M LLC, (2) denied defendants' motion to dismiss the SAC as to J&M without prejudice to renewal, and (3) permitted the filing of a motion for leave to amend the complaint to add J&M PLLC as a plaintiff.[24]

Plaintiffs filed the TAC on March 13, 2015.  Aside from adding J&M PLLC as a plaintiff, it adds nothing to the SAC, which itself added little beyond the additions noted above to the AC.[25]  The facts alleged, in substance, have remained the same throughout this litigation.

J&M contends, with debatable justification, that it "has become synonymous with legal services for underserved populations" and that it "has been at the vanguard of overturning

---

[22]

See Order (Mar. 2, 2015) [DI 123], at 3.

[23]

Decl. of D. Greg Blankinship [DI 118], Ex. 1.

[24]

DI 123, at 4.

[25]

As they did in the SAC, plaintiffs challenge here the constitutionality of New York Rule 5.4; Sections 478, 484, 485, 491, and 495 of the New York Judiciary Law; Section 121-1500(a)(i) of the New York Partnership Law; and Sections 201, 1201, 1203, 1207(a), 1209, 1210, and 1211 of the New York Limited Liability Company Law.  TAC [DI 125] ¶¶ 5, 10.

obstacles that impede robust competition for lawyers."[26]  It goes on at some length, as it did in the AC and in the SAC, about what it characterizes as its "pioneer[ing]" efforts to provide "quality legal services at a reasonable cost to economically challenged individuals who would otherwise have no access to the legal system."[27]  To accomplish its purported goals—and, no doubt, to increase its profitability—J&M wants to "expand [its] operations, hire additional attorneys and staff, acquire new technology, and improve [its] physical offices and infrastructure."[28]  To do this, J&M says it "requires a substantial infusion of new capital"—capital it admits is, in some circumstances, available to it in the form of partner contributions, retention of earnings on fees, and commercial bank loans, but which it says is now "too expensive."[29]  In light of the alleged unavailability of these traditional means of financing, J&M contends, New York's prohibition on non-lawyer equity investment in law firms has jeopardized J&M's commitment to providing low-cost legal services to the poor.[30]

But fear not.  J&M says it has received "numerous offers . . . from prospective non-lawyer investors . . . who are prepared to invest capital in exchange for owning an interest in the firm."[31]  Indeed, there allegedly are "several high net-worth individuals" and institutional investors

---

[26] *Id.* ¶ 30.

[27] *Id.* ¶ 3; *see also* SAC ¶ 3; AC ¶ 4.

[28] TAC ¶ 34.

[29] *Id.* ¶¶ 39-40; *see also id.* ¶ 43.

[30] *See id.* ¶ 3.

[31] *Id.* ¶ 40.

who "have expressed their commitment to invest significant sums of money" in J&M in exchange for equity in the firm.[32]  It is only the ban on non-lawyer equity ownership of law firms, the TAC asserts, that has prevented J&M from entertaining these offers.[33]  But for the ban—a ban that J&M contends "unnecessarily restrict[s]" its ability to raise capital by eliminating "critical sources of funding" for lawyers who practice, or are admitted to practice, in New York—J&M says it already would have "consummated these investments and allowed non-lawyers to own an interest" in J&M, J&M PLLC, or "whatever form is required."[34]

*The Pending Motion to Dismiss*

Defendants have moved to dismiss the TAC.  They argue, once again, that this case is not justiciable—that plaintiffs lack standing because their alleged prospective injury neither would be caused by the challenged statutes nor redressed by a favorable decision, and that their claims are unripe because "no disciplinary, criminal or other proceeding regarding the Rule and statutes at issue against either plaintiff is imminent."[35]  Defendants argue in the alternative that the Court should abstain from deciding this case to give the New York state courts an opportunity to hear, in the first instance, plaintiffs' challenge to the constitutionality of New York Rule 5.4 and the other New York

---

[32]

*Id.* ¶ 41.

[33]

*See id.* ¶ 40.

[34]

*Id.* ¶¶ 3, 6, 42, 44; Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss [DI 129], at 3.

[35]

Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pls.' Third Am. Compl. [DI 128], at 7-15.

laws at issue here.[36]  Finally, defendants contend that plaintiffs' First and Fourteenth Amendment and dormant Commerce Clause claims lack merit.[37]

## II

A.    *Preliminary Issues: Justiciability & Abstention*

The judicial power of the United States extends only to "cases" and controversies."[38] This "case-or-controversy limitation on federal judicial authority underpins," among other doctrines, the principles of standing and ripeness,[39] which seek to "preserve the 'the proper—and properly limited—role of the courts in a democratic society.'"[40]   No doubt aware of these and other limitations of Article III jurisdiction—and of the Court's corresponding duty to avoid reaching constitutional questions if it can decide a case on other, more limited grounds[41]—the parties argue at length about whether (1) J&M has standing to bring this suit, (2) J&M's claims are ripe for adjudication, and (3) the Court, on grounds of comity, should abstain from deciding this case now.

---

[36]

    *Id.* at 15-19.

[37]

    *Id.* at 19-31.

[38]

    U.S. CONST. art. III, § 2.

[39]

    *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000) (citation omitted); *see also Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 807-08 (2003).

[40]

    *Wight v. Bank of Am.*, 219 F.3d 79, 86 (2d Cir. 2000) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

[41]

    *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149-50 (2d Cir. 2001) ("It is axiomatic that the federal courts should, where possible, avoid reaching constitutional questions.").

To be sure, this pre-enforcement facial constitutional challenge presents some interesting—and arguably difficult—questions of justiciability, for the law governing standing and ripeness in such cases is complicated and unsettled.[42] In the ordinary case, of course, the Court would consider those "threshold issue[s]" before reaching the merits of J&M's constitutional challenge.[43] But this is not an ordinary case.

On the prior appeal, J&M confirmed that it deliberately had challenged only the constitutionality of New York Rule 5.4 in the AC, claiming that it did so in an attempt to avoid any possibility of abstention in favor of state court proceedings. But it then changed its position before the Court of Appeals, agreeing to a remand to permit it to amend the complaint it had declined to expand below. The Second Circuit saw "no reason not to remand the case . . . in order to permit the plaintiffs to amend their complaint to name additional state defendants and challenge the other provisions of New York law that prohibit non-lawyer investment in law firms."[44] In so doing, the Court of Appeals gave this Court very clear instructions. It said that "abstention is unnecessary."[45]

---

[42]

See, e.g., *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1143 (2013); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *Hedges v. Obama*, 724 F.3d 170, 195-98, 199-200 (2d Cir. 2013) (discussing Supreme Court and Second Circuit precedent on standing in the context of a pre-enforcement facial challenge to the constitutionality of a statute and noting that courts will "presume that the government will enforce the law" even, in some cases, where the government argues that the relevant statute does not proscribe the plaintiff's conduct or that it never has enforced the statute), *cert. denied*, 134 S. Ct. 1936 (2014); *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) ("[W]e assess pre-enforcement First Amendment claims . . . under somewhat relaxed standing and ripeness rules."); *Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000).

[43]

*Horne v. Flores*, 557 U.S. 433, 445 (2009).

[44]

*Jacoby & Meyers*, 488 F. App'x at 527.

[45]

*Id.*

And it directed this Court "to adjudicate the parties' dispute as to whether [Judiciary Law § 495 and LLC Law § 201], and Rule 5.4, are constitutional."[46]

The issue concerning Section 201 of the LLC Law now is out of the case by virtue of the merger of J&M LLC with and into J&M PLLC, as there no longer is a limited liability company plaintiff. But implicit in—and necessary to—the Second Circuit's directive was a conclusion that J&M's anticipated TAC would contain allegations that, if proved, would establish J&M's standing to bring constitutional claims against New York Rule 5.4, Section 495 of the Judiciary Law, and the additional state statutes identified by defendants, as well as the ripeness of those claims.[47]  Under the "so-called 'mandate rule,'" then, this Court must do what the Second Circuit has asked.[48]  It must reach the legal sufficiency of J&M's constitutional challenge.[49]

---

[46]

    *Id.*

[47]

    The Court thus frames the matter because this is a motion to dismiss, which assumes the truth of the factual allegations in the TAC and draws all reasonable inferences therefrom in plaintiffs' favor.  Assuming that this case were to proceed beyond the Rule 12(b)(6) stage, it would remain plaintiffs' obligation to prove the facts alleged, which at this stage are assumed to be true and which, if proved, might establish standing.  *See, e.g.*, *Comer v. Cisneros*, 37 F.3d 775, 790-92 (2d Cir. 1994); *Chevron Corp. v. Donziger,* 974 F. Supp. 2d 362, 551 (S.D.N.Y. 2014) ("[A] plaintiff ultimately bears the burden of proving, not merely alleging, facts sufficient to satisfy the standing requirements as of the date an action is begun . . . .").

[48]

    *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) ("The law of the case doctrine . . . requires a trial court to follow an appellate court's previous ruling on an issue in the same case.  This is the so-called 'mandate rule.'" (citation omitted)); *see also United States v. Cirami*, 563 F.2d 26, 32-33 (2d Cir. 1977) (noting that "the trial court must adhere to" decisions on "matters" that are "expressly *or implicitly* part of the decision of the court of appeals" (emphasis added)).

[49]

    For the sake of completeness, the Court notes that the mandate of the Court of Appeals applies only to the parties that were before it: J&M and J&M LLC, the latter of which no longer exists.  As noted above, however, J&M PLLC subsequently was added as a plaintiff.  As its constitutional claims parallel those of J&M, the Court henceforth uses "J&M" to refer

B.      *Constitutional Claims*

J&M argues that the New York laws it challenges here violate the First and Fourteenth Amendments and the dormant Commerce Clause by prohibiting it, and other firms like it, from practicing law if they accept non-lawyer equity investment.  Two points bear mention at this stage.

*First*, this is a facial, not an as-applied, challenge.[50]  Facial challenges are "disfavored for several reasons," not least of which being that they inevitably require decisions to be made "on the basis of factually barebones records."[51]  That perhaps is at least part of the reason that many of the cases J&M cites in support of its First Amendment claims address *as-applied* challenges.[52]

*Second*, state statutes regulating the conduct of lawyers are entitled to a strong presumption of constitutionality, for there is an "important state obligation to regulate persons who are authorized to practice law."[53]  Indeed, the Supreme Court repeatedly has reflected on the

---

collectively to both entities unless otherwise stated.  Moreover, the Court considers the Second Circuit to have required a decision on the legal sufficiency of J&M's constitutional claims without further assessment, at the pleading stage, of standing and/or ripeness.

[50]

To the extent J&M attempts to characterize its lawsuit as an as-applied challenge, it simply does not appreciate the distinction between as-applied and facial challenges.  This is a quintessential facial challenge.

[51]

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008); *see also United States v. Stevens*, 559 U.S. 460, 473 (2010) (describing facial challenges in the First Amendment context); *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999) (noting that facial overbreadth challenges are "an exception to the traditional rule").

[52]

*See, e.g.*, *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576 (1971); *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217 (1967); *Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1 (1964).

[53]

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432-33 (1982).

"extremely important interest in maintaining and assuring the professional conduct of the attorneys" that are licensed by a particular state, and it has looked favorably upon the "extensive control" that states "traditionally have exercised . . . over the professional conduct of attorneys."[54]  A state's interest in regulating lawyers, the Supreme Court has said, is "especially great" because "lawyers are essential to the primary governmental function of administering justice, and have historically been officers of the courts."[55]  For that reason, and because the judiciary and the public depend upon the "professionally ethical conduct of attorneys," courts themselves have "a significant interest in assuring and maintaining high standards of conduct of attorneys engaged in practice."[56]

From that starting point, we proceed to plaintiffs' constitutional arguments.

### 1.    First Amendment

Employing at times soaring rhetoric about, among other things, the "right of access to courts" and the "essential essence of legal representation," J&M claims, broadly speaking, that New York Rule 5.4 and the various other provisions of New York law here at issue unconstitutionally restrict the core First Amendment protections of free speech and association.[57]  Specifically, J&M says that New York law (1) is "an impermissible ban" on "free speech through corporate expenditure,"

---

[54]

Id. at 434; see also Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 460, 467 (1978) (noting that the State "bears a special responsibility for maintaining standards among members of the licensed professions" and has a "strong interest in regulating members of the Bar").

[55]

Goldfarb v. Va. State Bar, 421 U.S. 773, 792 (1975) (internal quotation marks omitted).

[56]

Middlesex Cnty. Ethics Comm, 457 U.S. at 434.

[57]

See TAC ¶¶ 72-80.

(2) "infringe[s] on the right of individuals and corporations from forming associations for the purpose of providing legal representation," and (3) restricts lawyers' "right to speak for clients."[58]  Ultimately, J&M's First Amendment claim, in effect, is largely this: lawyers and, by extension, law firms have a constitutional right to associate with others, including non-lawyers, for the purpose of providing clients with legal services.  By prohibiting such associations, New York law unconstitutionally bans corporate speech and restricts the receipt of that speech by the public at large.

J&M's argument at best is unpersuasive.  At worst, it makes a mockery of the First Amendment.  It lacks logical coherence.  At times, it misstates the law, misconstrues Supreme Court precedent, and misunderstands critical distinctions in First Amendment jurisprudence.  In the end, the theory on which it depends—and on which it bases the proposed transaction—falls outside even the most expansive reading of the First Amendment.

It is true, of course, that "First Amendment protection extends to corporations,"[59] that "speech that otherwise would be within the protection of the First Amendment" does not "lose[] that

---

[58]   *Id.* ¶ 75.

To the extent plaintiffs seek to vindicate the rights of their clients, current and perhaps future, their claims face quintessential third party standing issues.  *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 499-502 (1975).  Nonetheless, "[v]endors are routinely accorded standing to assert the constitutional rights of customers and prospective customers," 13A Charles Alan Wright et al., Federal Practice and Procedure § 3531.9.3 (3d ed. 2008), and the Supreme Court has said that those with a "commercial interest" in speech may "challenge the facial validity of a statute on the grounds of its substantial infringement of the First Amendment interests of others." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 504 n.11 (1981) (plurality opinion) (internal quotation marks omitted); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) ("If there is a right to advertise, there is a reciprocal right to receive the advertising, and it may be asserted by [third parties].").  Thus, the Court concludes that J&M and J&M PLLC may assert all of their First Amendment claims.

[59]   *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010).

protection simply because its source is a corporation,"[60] and that "restriction[s] on the amount of money a person or group can spend" on certain kinds of speech violate the First Amendment by "reduc[ing] the quantity of expression."[61]  It is true also that "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"[62] and that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment."[63]  Whatever the reach of those principles, however, J&M's argument that lawyers have a constitutional right to associate with non-lawyers in the practice of law is not within it.

For one thing, this case has nothing to do with speech, despite J&M's best efforts to convince the Court otherwise.  The transaction that J&M proposes to undertake—that is, its plan to accept non-lawyer equity investment—is not speech at all.[64]  It is neither an advertisement, paid or

---

[60]

*First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784 (1978).

[61]

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2820 (2011) (first alteration in original) (internal quotation marks omitted).

[62]

*Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983).

[63]

*United Transp. Union*, 401 U.S. at 585.

[64]

Moreover, even if the proposed activity were construed as speech, laws regulating it would not warrant the level of scrutiny J&M urges the Court to apply.  The First Amendment does not "offer all speech the same degree of protection."  *Garcetti v. Ceballos*, 547 U.S. 410, 444 (2006) (Breyer, J., dissenting).  "Political speech, of course, is at the core of what the First Amendment is designed to protect."  *Morse v. Frederick*, 551 U.S. 393, 403 (2007) (internal quotation marks omitted).  The Supreme Court has said that political speech "must prevail against laws that would suppress it, whether by design or inadvertence," and that "the Government may not suppress political speech on the basis of the speaker's corporate identity."  *Citizens United*, 558 U.S. at 340, 365.  For this reason, laws that burden political speech "are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  *Id.* at 340 (internal quotation marks omitted).

unpaid, nor a solicitation of money or business, in-person or otherwise.[65]   Indeed, whereas

"commercial speech serves to inform the public of the availability, nature, and prices of products and

---

Like political speech, "commercial speech," or "speech that does no more than propose a commercial transaction, is protected by the First Amendment." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001).  But commercial speech is "a sort of second-class expression," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring), that "receives a limited form of First Amendment protection." *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 535 (1987) (internal quotation marks omitted); *see also Ohralik*, 436 U.S. at 455-56 (noting the "common sense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech" and explaining that commercial speech is afforded "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values" (internal quotation marks omitted)).

The proposed transaction here is unambiguously commercial—and apolitical–in nature. Were it speech within the meaning of the Constitution, then, the Court would apply something less than strict scrutiny to any law alleged to regulate it.  *See, e.g.*, *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667-68 (2011) ("Under a commercial speech inquiry, . . . the State must show at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." (citation omitted)).  Indeed, the subject at issue here—that is, the professional relationship between lawyers and non-lawyers—is "only marginally affected with First Amendment concerns.  It falls within the State's proper sphere of economic and professional regulation." *Ohralik*, 436 U.S. at 459.  And the "State's interest in protecting the lay public" from the conflicts of interest and other adverse consequences for clients that could arise were non-lawyers permitted to invest in law firms "demonstrate[s] the need for prophylactic regulation" restricting, or even barring, such investment.  *Id.* at 468.

Thus, were the Court to read the New York laws challenged here to restrict speech, which it does not, it would uphold them as permissible means by which to advance the state's "especially great" interest in regulating the lawyers operating within its borders.  *Goldfarb*, 421 U.S. at 792.

65

The Supreme Court has held that commercial advertisements constitute speech within the meaning of the First Amendment.  *See, e.g.*, *Citizens United*, 558 U.S. at 325 (describing the communication in question as "in essence, . . . a feature-length negative advertisement that urges viewers to vote against [Hillary] Clinton for President"); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 384 (1977) (cloaking a "truthful advertisement concerning the availability and terms of routine legal services" with constitutional protection); *Buckley v. Valeo*, 424 U.S. 1 (1976); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964).  So too has it deemed the solicitation of money or business "speech" within the meaning of the Constitution.  *See, e.g.*, *Ohralik*, 436 U.S. at 455 (concluding that "in-person solicitation of professional employment by a lawyer" is "speech" within the meaning of the First Amendment but that the state nonetheless may regulate it); *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

services" and to convey "information of import to significant issues of the day,"[66] the proposed transaction here does neither.  It therefore is not speech.  It is conduct.

### a.    Freedom of Speech

The First Amendment protects, among other things, freedom of "speech."  It says nothing about "conduct."  To be sure, First Amendment "rights are not confined to verbal expression,"[67] and the Supreme Court has extended constitutional protection to some forms of particularly expressive conduct—that is, to conduct that is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments."[68]  But this so-called "symbolic speech"[69] is where the First Amendment's protection of conduct ends.  The Supreme Court has "rejected the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."[70]  Indeed, "virtually *every* law restricts conduct and virtually *any* prohibited conduct can be performed for an expressive purpose—if only expressive of the fact that the actor disagrees with the prohibition."[71]

---

[66]
    *Bates*, 433 U.S. at 364.

[67]
    *Brown v. Louisiana*, 383 U.S. 131, 141-42 (1966).

[68]
    *Spence v. Washington*, 418 U.S. 405, 409 (1974).

[69]
    *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

[70]
    *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (internal quotation marks omitted).

[71]
    *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 576 (1991) (Scalia, J., concurring).

Thus, First Amendment protection has been extended "only to conduct that is inherently expressive."[72] That is, it extends only to conduct motivated by "[a]n intent to convey a particularized message"[73] such as: burning the American flag in political protest,[74] wearing black armbands to protest American involvement in the Vietnam War,[75] and conducting a sit-in to protest racial segregation.[76]

The proposed conduct here—and that the laws at issue seek to preclude—is of a different hue. It lacks the "expressive, overtly political nature" of flag burning[77] or the moral *gravitas* of a "peaceable and orderly" sit-in to protest "the unconstitutional segregation of public facilities."[78] It does not "communicat[e] . . . ideas by conduct," as often was so of draft card burning during the Vietnam War.[79] Nor is it "closely akin to 'pure speech,'" as sometimes is true of the wearing of an armband to evidence solidarity with a movement.[80] Rather, J&M seeks non-lawyer equity investors

---

[72]

     *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006); *see also Johnson*, 491 U.S. at 405-06 (noting the "expressive, overtly political nature" of flag burning).

[73]

     *Johnson*, 491 U.S. at 404 (alteration in original) (internal quotation marks omitted).

[74]

     *Texas v. Johnson*, 491 U.S. 397 (1989).

[75]

     *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).

[76]

     *Brown v. Louisiana*, 383 U.S. 131 (1966).

[77]

     *Johnson*, 491 U.S. at 406.

[78]

     *Brown*, 383 U.S. at 142.

[79]

     *O'Brien*, 391 U.S. at 376.

[80]

     *Tinker*, 393 U.S. at 505-06.

as a means to commercial end: without a "substantial infusion of new capital," J&M says it will be unable, among other things, to "expand its operations, hire additional attorneys and staff, acquire new technology, and improve its physical offices and infrastructure."[81]  What J&M wants, in other words, is to engage freely with non-lawyers in conventional commercial conduct—conduct that "manifests absolutely no element of protected expression."[82]  The New York laws that prevent J&M from accomplishing its commercial goals thus are merely "restriction[s] on a commercial practice."[83]  Such laws, directed as they are at "commerce or conduct," fall outside the purview of the First Amendment even if they impose "incidental burdens on speech."[84]  After all, "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities,"[85] and "it has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."[86]

---

[81]

TAC ¶¶ 34, 39.

[82]

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705 (1986).

[83]

*IMS Health Inc. v. Sorrell*, 630 F.3d 263, 271 (2d Cir. 2010), *aff'd*, 131 S. Ct. 2653 (2011).

[84]

*IMS Health*, 131 S. Ct. at 2664; *see also id.* ("[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct."); *Virginia v. Hicks*, 539 U.S. 113, 123 (2003) (noting that laws regulating "nonexpressive *conduct*" do not have "anything to do with the First Amendment"); *Arcara*, 478 U.S. at 707 (holding that "the First Amendment is not implicated by the enforcement of" laws "directed at unlawful conduct having nothing to do with . . . expressive activity").

[85]

*Arcara*, 478 U.S. at 706.

[86]

*Forum for Academic & Institutional Rights*, 547 U.S. at 62 (internal quotation marks omitted).  In the same vein, the fact that J&M may have spoken, in one form or another, of its proposed plans is of no moment.  *See id.* at 66 ("If combining speech and conduct were

Even if the regulated conduct were expressive, the First Amendment would not bar the New York laws here at issue.  First, the state "generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word."[87]  Second, the laws in question are not "related to the suppression of free expression" in that they are not "*directed* at the communicative nature of [the] conduct."[88]  Rather, they are concerned with its "noncommunicative impact"[89]—*i.e.*, with the conflicts of interests and other client-adverse effects that might occur were law firms permitted to accept non-lawyer equity investors.[90]  Third, the laws (1) are "within the constitutional power of the" state; (2) "further[] an important or substantial government interest;" and (3) have an "incidental restriction on alleged First Amendment freedoms" that "is no greater than is essential to the furtherance of that interest."[91]  It is well-established that "[t]he States enjoy broad power to regulate the practice of professions within their boundaries"[92] and that states have "an extremely important interest in maintaining and assuring the professional conduct of the attorneys [they]

---

enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.").

[87]

*Johnson*, 491 U.S. at 406.

[88]

*Id.* at 403, 406 (internal quotation marks omitted).  The state may not "proscribe particular conduct" precisely "because it has expressive elements."  *Id.* at 406.

[89]

*O'Brien*, 391 U.S. at 382.

[90]

*See, e.g.*, N.Y. COMP. CODES R. & REGS. tit. 22, § 1200.0 cmt. [1] (Rule 5.4) (stating that Rule 5.4 exists "to protect the lawyer's professional independence of judgment").

[91]

*O'Brien*, 391 U.S. at 377.

[92]

*In re Primus*, 436 U.S. 412, 422 (1978) (internal quotation marks omitted).

license[].''[93]   Finally, it is indisputable that New York's interest in regulating attorney conduct "would be achieved less effectively absent the regulation."[94]   Neither J&M's unsubstantiated promise that it "shall ensure that client confidences and lawyers' independence of professional judgment are at all times preserve[d]," nor its sweeping, conclusory statements about the purported benefits of non-lawyer equity investment in British and Australian law firms, among others, counsels differently.[95]

Ultimately, J&M's challenge to these New York laws on free speech grounds is without merit.   To the extent that the contested provisions of New York law incidentally affect expression—if indeed they do at all—J&M's effort to cast itself and other law firms like it as victims of a heavy-handed, outmoded regulatory regime "plainly overstates the expressive nature of their activity and the impact of the [New York laws] on it, while exaggerating the reach of [the Supreme Court's] First Amendment precedents."[96]

### b. *Freedom of Association*

These New York laws regulate non-expressive commercial conduct and do not violate J&M's freedom of speech, but that conclusion does not end the Court's analysis under the First Amendment, the protection of which extends beyond the right to speak to the "right to associate for

---

[93]

*Middlesex Cnty. Ethics Comm*, 457 U.S. at 434.

[94]

*Forum for Academic & Institutional Rights*, 547 U.S. at 67 (internal quotation marks omitted).

[95]

TAC ¶¶ 41, 49-52.

[96]

*Forum for Academic & Institutional Rights*, 547 U.S. at 70.

the purpose of engaging in those activities protected by the First Amendment."[97]   This right, also

called a "right of expressive association,"[98] protects, among other things, "the freedom of individuals

to associate for the purpose of engaging in protected speech."[99]   Courts safeguard this unenumerated

right to associate because the "right to speak is often exercised most effectively by combining one's

voice with the voices of others."[100]   Indeed, an "individual's freedom to speak, to worship, and to

petition the government for the redress of grievances could not be vigorously protected from

interference by the State unless a correlative freedom to engage in group effort toward those ends

were not also guaranteed."[101]   Thus, the Supreme Court has "long understood as implicit in the right

to engage in activities protected by the First Amendment a corresponding right to associate with others

in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."[102]

---

[97]

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).

[98]

*Boy Scouts of Am. v. Dale*, 530 U.S. 640, 644 (2000).

[99]

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 544 (1987).

[100]

*Forum for Academic & Institutional Rights*, 547 U.S. at 68.

[101]

*Roberts*, 468 U.S. at 622; *see also Forum for Academic & Institutional Rights*, 547 U.S. at 68 ("If the government were free to restrict individuals' ability to join together and speak, it could essentially silence views that the First Amendment is intended to protect.").

[102]

*Roberts*, 468 U.S. at 622.

A second and distinct line of Supreme Court decisions granting First Amendment protection to "choices to enter into and maintain certain intimate human relationships" does not apply here.  *Id.* at 617.  Certain characteristics of law firms, namely that they are "neither small nor selective," clearly place such firms and their lawyers' professional relationships with non-lawyers "outside of the category of relationships worthy of this kind of constitutional protection."  *Id.* at 620-21.

Once again, however, J&M's claim faces an insurmountable threshold issue. Just as its proposed professional partnership (here in the colloquial, not legal, sense) with non-lawyer equity investors would be non-expressive commercial conduct outside the scope of the First Amendment, so too does J&M—like other law firms—propose to engage primarily in non-expressive commercial association undeserving of constitutional protection.[103]

J&M admits that the primary purpose of its plan to accept non-lawyer equity investors is to "expand its operations, hire additional attorneys and staff, acquire new technology, and improve its physical offices and infrastructure to increase its ability to serve its existing clients and to attract and retain new clients and qualified attorneys." Its attempt to highlight the *kinds* of clients it says it has and wants to attract—those from "working-class, blue-collar and immigrant families"—is mere misdirection.[104] The demographic and socioeconomic characteristics of J&M's clientele are not constitutionally relevant to the question of whether these New York laws abridge law firms' "expressive associational" rights.[105] Ultimately, there is "only minimal constitutional protection" for the sort of "*commercial* association" in which J&M and other law firms regularly engage, and associations "whose activities are not predominantly of the type protected by the First Amendment [are] subject to rationally related state regulation."[106]

---

[103]

To whatever extent J&M occasionally engages in protected expressive activity, that activity is "incidental" to its "ordinary law practice for commercial ends," which has "never been given special First Amendment protection." *Id.* at 635, 637 (O'Connor, J., concurring).

[104]

TAC ¶ 34.

[105]

*Dale*, 530 U.S. at 648.

[106]

*Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 473 n.16 (1997) (internal quotation marks omitted); *see also Roberts*, 468 U.S. at 634 (O'Connor, J., concurring)

There is no question that the New York laws challenged here survive rational basis

review, which requires courts to uphold legislation "if any reasonably conceivable state of facts

could demonstrate that the statute is rationally related to a legitimate government purpose."[107]  For

one thing, statutes come with a "strong presumption of rationality,"[108] and J&M has not met its

burden of alleging facts that, if proved, would show "that no set of circumstances exists under which

---

("The Constitution does not guarantee a right to choose . . . those with whom one engages in simple commercial transactions, without restraint from the State.").

To be sure, some lawyering is constitutionally protected expressive activity.  As J&M points out *ad nauseam*, "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *United Transp. Union*, 401 U.S. at 585; *see also In re Primus*, 436 U.S. at 426.

And yet, there are important differences between this case and those in which the Supreme Court has deemed lawyering sufficiently expressive to warrant First Amendment protection.  Among them are the identity and motivations of the party seeking that protection.  First, the constitutionally protected parties generally are cause lawyers—not-for-profit associations litigating on behalf of their members, not for-profit firms with paying clients.  *See NAACP v. Button*, 371 U.S. 415, 429-30 (1963) ("In the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment . . . for the members of the Negro community in this country. It is thus a form of political expression.").  Second, lawyers engage in expressive association only when they "intend[] to advance beliefs and ideas."  *In re Primus*, 436 U.S. at 438 n.32 (internal quotation marks omitted).  Where a lawyer engages in "associational activity" not "for the advancement of beliefs and ideas," but for "the advancement of his own commercial interests," the First Amendment will not protect him.  *See id.*

Try as it might, J&M has not convinced this Court that it is more akin to the NAACP than to the lawyer in *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978), whose profit-seeking motives took his conduct outside the protection of the First Amendment.  J&M is a commercial law firm, and little—if any—of its business "constitutes protected expression on political, economic, cultural, [or] social affairs," *Roberts*, 468 U.S. at 626, even if it does, as J&M describes it, benefit "people of modest or average means."  TAC ¶ 29.  No, J&M's business is the same as any other commercial law firm's: to make money.  The First Amendment thus provides it no shield from reasonable regulation by the state.

[107]

*Rojas-Reyes v. INS*, 235 F.3d 115, 123 (2d Cir. 2000) (internal quotation marks omitted).

[108]

*Beatie v. City of N.Y.*, 123 F.3d 707, 712 (2d Cir. 1997).

the Act would be valid."[109]  For another, the New York laws "promote[] the independence of lawyers by preventing non-lawyers from controlling how lawyers practice law" and by, among other things, "attempt[ing] to minimize the number of situations in which lawyers will be motivated by economic incentives rather than by their client's best interests."[110]  The state's "extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses" is a more-than-adequate justification for the various restrictions on relationships between lawyers and non-lawyers and for the prohibition on non-lawyer equity ownership in law firms.[111]

Moreover, even if J&M were engaged in constitutionally protected expressive association, the New York laws it challenges here would not violate the First Amendment.  Indeed, "the freedom of expressive association, like many freedoms, is not absolute."[112]  It may be overriden "by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."[113]  As the Court has discussed, New York passed these laws to serve its "extremely important interest

---

[109]

     *United States v. Salerno*, 481 U.S. 739, 745 (1987).

[110]

     *See Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1385 (7th Cir. 1992).

[111]

     *Middlesex Cnty. Ethics Comm*, 457 U.S. at 434.

[112]

     *Dale*, 530 U.S. at 648.

[113]

     *Roberts*, 468 U.S. at 623; *see also Buckley*, 424 U.S. at 25 ("Even a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." (internal quotation marks omitted)).

in maintaining and assuring the professional conduct of the attorneys it licenses,"[114] and the laws in question "do[] not aim at the suppression of speech, do[] not distinguish between prohibited and permitted activity on the basis of viewpoint, and do[] not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria."[115]  Finally, J&M has not alleged sufficiently that the laws actually "impose[] any serious burdens" on its constitutionally protected *associational* freedoms, as distinct from, for example, its bottom line or its economic viability.[116]  In the last analysis, New York's "especially great" interest in regulating lawyer conduct—an interest that is unrelated to the suppression of expression—justifies any incidental impact that application of these laws may have on J&M's associational freedoms.[117]

Finally, J&M contends that Supreme Court precedent "make[s] clear that association for the purpose of providing access to the courts is a fundamental right which cannot be trumped by state regulation of the practice of law."  It is true that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First

---

[114]

     *Middlesex Cnty. Ethics Comm*, 457 U.S. at 434.

[115]

     *Roberts*, 468 U.S. at 623.

[116]

     *Id.* at 626; *see also Dale*, 530 U.S. at 658.

[117]

     *See Roberts*, 468 U.S. at 623-24.

     The fact that other jurisdictions allegedly have allowed non-lawyers to invest in law firms, and that the ABA allegedly has discussed allowing such arrangements, is of no moment. There is no indication whatsoever that New York could accomplish its goals—regulation of its bar, ensuring the professional conduct and independence of the lawyers it licenses, and preventing conflicts of interest—were it not permitted to prevent lawyers from accepting non-lawyer equity investment in their law practices.

Amendment."[118]  But J&M's theory that the Constitution grants *it* the right to associate with non-lawyer equity investors in particular forms of business organizations for the benefit of its clients misunderstands to whom the right of access adheres.  The Constitution "protects the right of *individuals*" and legal persons "to appeal to courts and other forums established by the government for resolution of legal disputes."[119]  It does not confer protection on lawyers with respect to the nature and forms of the associations and organizations into which they may enter for the purpose of representing their clients.  It is, in fact, those clients whose access to the legal system the Constitution protects.  And while the constitutionally protected right of access to the courts "would be a hollow promise if courts could deny associations of workers or others the means of enabling their members to meet the costs of legal representation,"[120] the Court's conclusion in this case—that the Constitution does not forbid state laws precluding lawyers from accepting non-lawyer equity investors—has no such effect.  J&M has no members. It is not an advocacy organization.  It is a law firm with paying clients.  Whether or not J&M receives a financial boost from non-lawyer equity investors will have no constitutionally problematic impact on the public's right of access to courts.  If anything, of course, laws that forbid lawyers from entering into financial arrangements with non-lawyers *protect* the public "by preventing non-lawyers from controlling how lawyers practice law" and by attempting to "minimize the number of situations in which lawyers will be motivated by

---

[118]     *United Transp. Union*, 401 U.S. at 585.

[119]     *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011) (emphasis added).

[120]     *United Transp. Union*, 401 U.S. at 585-86.

economic incentives rather than by their client's best interests."[121]   The First Amendment does not bar these laws.

2.      *Dormant Commerce Clause*

J&M argues also that the New York laws prohibiting non-lawyer equity investment in law firms violate the dormant Commerce Clause because they (1) "substantially dampen" the flow of "capital, goods, services, lawyers, and employees across state lines," thereby burdening interstate commerce in a way that is "clearly excessive" relative "to any putative local benefit [the laws] might otherwise advance," and (2) "reach across state lines" to bar non-New York law firms from accepting non-lawyer equity investors in such a way that they "constitute[] extraterritorial regulation."[122]   This argument relies on a fundamental misunderstanding of the dormant Commerce Clause.

The Constitution gives Congress "the power to regulate commerce among the States," but "many subjects of potential federal regulation"—owing to their "local character and their number and diversity"—are "open to control by the States so long as they act within the restraints imposed by the Commerce Clause itself."[123]   These restraints—which, in effect, are "an implied limitation on the power of the States to interfere with or impose burdens on interstate

---

[121]

*Lawline*, 956 F.2d at 1385.

[122]

TAC ¶¶ 85, 88-89, 92; *see also id.* ¶¶ 81-94.

[123]

*City of Philadelphia v. New Jersey*, 437 U.S. 617, 623 (1978) (internal quotation marks omitted).

commerce"[124]—constitute the dormant Commerce Clause, which is "driven by concern about economic protectionism"—that is, "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."[125]

The critical question in a dormant Commerce Clause challenge is whether the state law in question "regulates evenhandedly with only incidental effects on interstate commerce"[126] or, instead, "discriminates on its face against interstate commerce."[127]  A facially discriminatory law motivated by "simple economic protectionism" is subject to a "virtually *per se* rule of invalidity"[128] and may survive only if it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives."[129]  A state law that "regulates even-handedly to

---

[124]

   *Ark. Electric Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 389 (1983) (internal quotation marks omitted).

[125]

   *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (internal quotation marks omitted).

[126]

   *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996) (internal quotation marks omitted).

[127]

   *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007).  "In this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *Id.* (internal quotation marks omitted).

[128]

   *City of Philadelphia*, 437 U.S. at 624.

[129]

   *Davis*, 553 U.S. at 338 (internal quotation marks omitted).

effectuate a legitimate local public interest" and that has only "incidental" effects on interstate commerce, however, "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."[130]

This is not a high bar: "State laws frequently survive this . . . scrutiny."[131]  In fact, "[f]or a state statute to run afoul of the *Pike* standard, the statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce."[132]  If the party challenging the law has not alleged facts that, if proved, would show such an "unequal burden," the "reviewing court need not proceed further."[133]

J&M's dormant Commerce Clause claim relies on the woefully misguided premise that the laws at issue here are facially discriminatory.  But they are not.  They provide no special or beneficial treatment to New York lawyers or law firms.  They treat in-state and out-of-state interests identically.  They do not have a "disparate impact on any non-local commercial entity;"[134] rather, they treat all commercial entities equally, without regard to in-state or out-of-state status.  They do

---

130

      *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

      Incidental burdens on interstate commerce, after all, "may be unavoidable when a State legislates to safeguard . . . its people."  *City of Philadelphia*, 437 U.S. at 623-24.

131

      *Davis*, 553 U.S. at 339 (citing cases).

132

      *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 109 (2d Cir. 2001).

133

      *Id.*

134

      *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 50 (2d Cir. 2007) (internal quotation marks omitted).

not "regulate[] commercial activity that takes place wholly beyond the state's borders;"[135] rather, they apply only to lawyers and law firms practicing in New York. And they do not "impose[] a regulatory requirement inconsistent with those of other states;"[136] rather, as J&M acknowledges, "virtually every jurisdiction in the United States" bans non-lawyer equity ownership in law firms.[137] Assuming, *arguendo*, that these laws have any effect at all on interstate commerce, that effect is merely incidental.

As evenhanded laws that serve New York's "extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses"[138] and that have, at most, an incidental effect on interstate commerce, the laws at issue here must be upheld unless the TAC alleges facts that, if proved, would show that the burden those laws impose on interstate commerce is "clearly excessive" relative to the benefits they have for New York. But the TAC alleges no such facts. Indeed, its factual allegations are insufficient to make out a plausible claim that these laws impose any more than a *de minimis* burden on interstate commerce, if they impose any burden at all. And as the Court explained earlier, New York legislators were entitled to conclude that laws like these yield important benefits for the citizens of that state. They arguably "promote[] the independence of lawyers by preventing non-lawyers from controlling how lawyers practice law," and

---

135

       *Id.* (internal quotation marks omitted).

136

       *Id.* (internal quotation marks omitted).

137

       TAC ¶ 21; *see also id.* ¶ 43.

138

       *Middlesex Cnty. Ethics Comm.*, 457 U.S. at 434; *see also Ohralik*, 436 U.S. at 467 (noting that the State has a "strong interest in regulating members of the Bar").

by, among other things, "attempt[ing] to minimize the number of situations in which lawyers will be motivated by economic incentives rather than by their client's best interests."[139]  Thus, the TAC does not allege sufficiently that these laws violate the dormant Commerce Clause.[140]

### 3.    Fourteenth Amendment

J&M's contends finally that the New York laws banning non-lawyer equity investment in law firms violate the Fourteenth Amendment, first by "abridg[ing] a fundamental right under Substantive Due Process"[141] and, second, by denying J&M "the equal protection of the laws in violation of the Equal Protection Clause."[142]  J&M's equal protection argument appears predicated

---

[139]

       *See Lawline*, 956 F.2d at 1385.

[140]

       The Court's conclusion that the New York laws do not regulate activity that takes place "wholly beyond the state's borders" dispenses with J&M's argument that these laws "constitute[] extraterritorial regulation"—an argument that, assuming without deciding that J&M has standing to raise it, relies on a misunderstanding of the Supreme Court's narrow extraterritoriality doctrine.

       A law "may disproportionately burden interstate commerce if it has the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction."  *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 110; *see also Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) ("The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.").  These laws have no such effect.  They regulate the practice of law in New York.  They have no bearing on the practice of law in any other state.

[141]

       TAC ¶¶ 95-100.

[142]

       *Id.* ¶¶ 101-07.

on the idea that the restrictions on outside ownership that apply to lawyers do not apply to other "similarly situated" professionals, such as investment bankers, rendering those restrictions "arbitrary and capricious" and, ultimately, unconstitutional.[143]  Both of these arguments are frivolous.

> a.    *Due Process Clause*

Neither the TAC nor J&M's briefing is particularly clear about which "fundamental right" (or rights) J&M believes these New York laws "abridge."  As best the Court can tell, though, it is the right to free speech, the right of access to the courts, or both.[144]  For reasons already discussed herein, however, these laws have nothing to do with speech, and the right of access to the courts inheres in individuals and entities seeking relief or defending themselves as litigants, not in law firms like J&M in their capacities as legal representatives.[145]  But there are other problems with J&M's argument, as we will see momentarily.

The Due Process Clause of the Fourteenth Amendment, in addition to its guarantees of fair process, "provides heightened protection against government interference with certain fundamental rights and liberty interests."[146]  But this concept of substantive due process is limited,

---

[143]

  *Id.* ¶ 106.

[144]

  To whatever extent J&M argues that it has a fundamental right to practice law, the Supreme Court foreclosed that argument long ago.  *See Leis v. Flynt*, 439 U.S. 438, 444 n.5 (1979) ("[T]he suggestion that the Constitution assures the right of a lawyer to practice in the court of every State is a novel one, not supported by any authority brought to our attention.").

[145]

  *Guarnieri*, 131 S. Ct. at 2494 (noting that the First Amendment "protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes").

[146]

  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

and "the Due Process Clause specially protects" only "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'"[147]   Moreover, "if a constitutional claim is covered by a specific constitutional provision, . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."[148]   Finally, a regulation that infringes on a fundamental right will be struck down as a violation of substantive due process under the Fourteenth Amendment unless the regulation is "narrowly tailored to serve a compelling state interest,"[149] but "[l]egislative acts that do not interfere with fundamental rights . . . carry with them a strong presumption of constitutionality and must be upheld if rationally related to a legitimate state interest."[150]

The right to free speech, of course, is covered by the First Amendment.  The Court already has analyzed J&M's free speech claim in that context and will not do so again under the substantive due process framework.  As there is no legally sufficient free speech claim, there is no speech-related substantive due process claim.

---

[147]

Id. at 720-21 (quoting Moore v. City of E. Cleveland, 431 U.S. 494, 503 (1977)).

[148]

United States v. Lanier, 520 U.S. 259, 272 n.7 (1997).

For this reason, it is only unenumerated rights whose infringement comes within the ambit of substantive due process.  Such rights include, among others, the right to marry, Loving v. Virginia, 388 U.S. 1 (1967), the right to marry a person of the same sex, Obergefell v. Hodges, No. 14-556, 2015 WL 2473451 (U.S. June 26, 2015), the right to have children, Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535 (1942), the right to use contraception, Eisenstadt v. Baird, 405 U.S. 438 (1972), the right to have an abortion, Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833 (1992), and the right to refuse unwanted lifesaving medical treatment, Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261 (1990).

[149]

Reno v. Flores, 507 U.S. 292, 301-02 (1993).

[150]

Beatie, 123 F.3d at 711 (internal quotation marks omitted).

The right of access to the courts, in some contexts, is a fundamental right for substantive due process purposes.[151]  In others, however, the Supreme Court has grounded the right of access to courts in the Privileges and Immunities Clause.[152]  In still others, as here, it is "an aspect of the First Amendment right to petition the Government for redress of grievances."[153]  In all contexts, however, "the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."[154]  J&M has no legally sufficient right of access claim and therefore has not alleged a sufficient substantive due process claim of infringement of its right of access to the courts.

Finally, the Court must uphold these laws, which "do not interfere with fundamental rights," if they are "rationally related to a legitimate state interest."[155]  For reasons already discussed in its analysis of J&M's First Amendment claims, the Court concludes that they are.[156]

---

[151]

*See, e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 523 (2004); *Wolff v. McDonnell*, 418 U.S. 539, 556, 579 (1974); *Morello v. James*, 810 F.2d 344, 346-47 (2d Cir. 1987); *see also United Transp. Union*, 401 U.S. at 585 ("[C]ollective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment.").

[152]

*See, e.g.*, *Chambers v. Balt. & Ohio R.R. Co.*, 207 U.S. 142, 151 (1907); *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872).

[153]

*Bill Johnson's Rests.*, 461 U.S. at 741 (1983); *see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

[154]

*Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

[155]

*Beatie*, 123 F.3d at 711 (internal quotation marks omitted).

[156]

That other jurisdictions have chosen to do away with restrictions on non-lawyer equity ownership in law firms is irrelevant to the Court's analysis on this issue, which considers only whether there is *some* rational basis for these New York laws.  Indeed, the laws need not be the only—or even the best—means of accomplishing New York's legitimate regulatory objectives.  *See Dandridge v. Williams*, 397 U.S. 471, 487 (1970) (noting that

b.      *Equal Protection Clause*

J&M's final argument is that New York law draws an "arbitrary" distinction between lawyers and investment bankers who, despite their many alleged similarities, are "treated completely differently under the law."   According to J&M, New York prohibits lawyers from accepting non-lawyer equity investment but allows public ownership of investment banks.

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike."[157]  However, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same."[158]  Thus, where similarly situated parties are treated differently, the "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."[159]

---

courts need not decide, in conducting a rational basis inquiry, whether the legislation is "wise" or that "it best fulfills the relevant social and economic objectives that [the state] might ideally espouse"); *Beatie*, 123 F.3d at 712 ("We will not strike down a law as irrational simply . . . because the problem could have been better addressed in some other way . . . .").

[157]

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

[158]

*Plyler v. Doe*, 457 U.S. 202, 216 (1982) (alteration in original) (internal quotation marks omitted).

[159]

*City of Cleburne*, 473 U.S. at 440.

To be sure, classifications based on race, gender, national origin, and certain other traits "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." *Id.*  As a result, laws that make distinctions based on these kinds of "suspect classification[s]" are "subjected to a higher level of scrutiny"—one that is greater than rational basis review.  *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 547 (1983).  But there is no suggestion here that lawyers are a suspect class.  Indeed, they very clearly are not. Lawyers are not "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command

Whether lawyers and investment bankers are similarly situated in the first place is a "fact-intensive inquiry" that the Court need not make in any depth here, for it matters not to the outcome of this claim.[160]  Whatever similarities may exist in their day-to-day work, lawyers and investment bankers do not play the same role in the American judicial system or in the administration of justice in this country.  As the Supreme Court has recognized, "lawyers are essential to the primary governmental function of administering justice, and have historically been officers of the courts."[161]  No other profession—not even investment banking—fills such a role.  The judiciary and the public depend upon the "ethical conduct of attorneys," and these New York laws preventing non-lawyers from investing in law practices are rationally related to New York's legitimate—indeed its "extremely important"—"interest in maintaining and assuring the professional conduct of the attorneys it licenses."[162]

---

extraordinary protection from the majoritarian political process."  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).

[160]

*Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (Sotomayor, J.).

[161]

*Goldfarb*, 421 U.S. at 792 (internal quotation marks omitted).

[162]

*Middlesex Cnty. Ethics Comm*, 457 U.S. at 434.

40

## III

For the foregoing reasons, defendants' motion to dismiss the third amended complaint

[DI 127] is granted.  The Clerk shall enter judgment and close the case.

SO ORDERED.

Dated:      July 15, 2015

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)